DAVID K. BOYLAN et al. *ads.* JOHN MEEKER et al.

1. Unless a will carries upon its face clear marks of being the product of an unsound mind, neither its injustice nor its unreasonableness ought to be the foundation of a verdict against it.

2. Sanity being the normal state of the mind, every person is presumed sane until the contrary is shown; but where it is proved that insanity existed at a certain time, that state is presumed to continue until the contrary is shown.

3. The conduct and declarations of the testator, both before and after he executed the will, are competent evidence to show his want of capacity at the time the will was executed where the issue is upon the sanity of the testator; but conduct and declarations of the testator after the will is made, manifesting ignorance of the existence of the will, are not competent to show that the testator had never made the will in question.

4. Where the execution of a deed or will is proved in the mode required by law, the declarations of the grantor or testator, made before or after the execution of the instrument, are not competent to prove fraud, duress, or forgery, or to disprove the execution of the deed or will; they are rejected upon the principle that they are hearsay, and not under the sanction of an oath; but declarations made at the time the instrument is executed are admissible as a part of the *res gestœ.*

5. The testimony of subscribing witnesses to a will, that it was duly executed in their presence, cannot be overcome unless impeached, nor should it be disregarded upon proof of the simple improbability of their statements.

6. A will can only be revoked in the manner provided by statute, and cannot be changed, annulled, or in any manner affected by the verbal declarations of the testator made after its execution.

7. Where positive proof is attempted to be overcome by negative testimony, the latter must be complete, and must negative every link in the chain of the former.

8. The doctrine that the declarations of a tenant in possession adverse to his title, and relating to facts which may be proved by parol, may be given in evidence against him and those claiming under him, does not apply to declarations relative to a will made by a testator after the will is executed. The former are admitted in evidence upon the ground that they are against the interest of the party making them, and that they affect his estate; the latter do not affect the interest or estate of the testator, and are only hearsay evidence.

9. If a party cross-examine a witness to whose admission he has objected, or if he introduce evidence to rebut testimony illegally admitted, it is no waiver of the objection.

10. Upon the issue whether a will is forged, the circumstances attending its production, and also what was said by the person having the custody of the will during the time he had it in possession, and when it was produced for probate, showing a design to produce or prove it as a genuine will, are competent evidence, and are admissible not upon the ground that the custodian is a subscribing witness to the will, but from necessity, because he would know its origin and history.

11. On the charge of fraud or forgery in the execution of a sealed instrument, the declarations and bad character of a deceased subscribing witness are admissible in evidence to impugn the presumption arising from the witness' attestation and signature, but standing alone and unsupported, are not sufficient to overcome such presumption.

12. A will was offered in evidence to prove title to lands, one of the subscribing witnesses was dead, and the execution of the will was proved by the other witness: *held*, that the declarations of the deceased witness, made before and after the execution of the will, were no part of the *res gestæ*, and were not admissible: *held*, also, that the bad character of the deceased witness for truth could not be given in evidence for the purpose of invalidating the will.

13. Where two wills of the same testator are found, the will of earlier date will remain uncancelled and unrevoked if the one of later date is not duly executed or is declared invalid or void.

14. If a party to an action in ejectment claim title to the premises under a will, and for the purpose of proving *his* title offers the will in evidence, he is bound by all its provisions, and the opposite party has the same right to use the will for his own benefit as if he had offered it in evidence; and in such case, if the will shows title out of the party offering it, he cannot recover.

15. To entitle the plaintiff in ejectment to a verdict, he must show a right to the possession of the premises when the action is brought, and must recover on the strength of his own title, and not on the weakness of that of the defendant.

16. Where executors are authorized, by the will, to pay the rents of certain property over to the widow of the testator during her life, and after her death to sell the property, and pay the money over to certain legatees, it is a power given to the executors coupled with an interest, and they have the right to the possession of the property, and to rent the same during the life of the widow; it is a specific appropriation of the rents to a particular purpose, and the heir at law cannot recover the rents nor the possession of the land during the life of the widow.

17. Where it appears that injustice has been done by the course of the trial and the verdict, and that the party has been deprived of the protection of clear and important principles of law, the court will set aside the verdict, and order a new trial.

On rule to show cause.

This was an action of ejectment, commenced in this court, and tried at the Essex Circuit before a jury. A verdict was rendered for the plaintiffs, and on the return of the *postea* the defendants obtained a rule to show cause why the verdict should not be set aside, and a new trial granted.

The facts in the cause are fully stated in the opinions delivered.

Argued at June term, 1859, before the CHIEF JUSTICE and Justices WHELPLEY, VREDENBURGH, and VAN DYKE.

*J. P. Bradley* and *A. O. Zabriskie*, for the rule.

*C. Parker* and *A. Whitehead*, contra.

WHELPLEY, J. If the due and formal execution of a will can be proved by the testimony of witnesses present when it was executed, the will in question was so proved.

Four witnesses of respectability and character swear they were present, and saw it executed. Their evidence is so minute in its details as to cut off all possibility of mistake. They either saw what they testify or they are perjured. To say that they may be mistaken is a cavil, not an argument. No sane man can read their testimony and truthfully say they are honest; but they did not see a will executed, they are mistaken.

Upon the trial, the plaintiff set up against the will—

1. Incapacity. 2. Forgery of the will. 3. Fraud practiced on Meeker, by inducing him to sign a paper without knowing it was a will.

These defences do not support one another. The evidence of incapacity does not tend to show that the instrument produced was a forgery or a fraud. On the contrary, if the deceased was incapable, by old age and failure of body and mind, to make a will, what he said and

did after the time of its alleged execution were not the sayings and doings of a sound mind, and if so, they are no evidence that he did not, on the 12th of January, 1852, execute the will in question. What a man says who does not know what he is saying or doing furnishes no evidence that he has not done an act which those sayings and doings seem to manifest ignorance of. There can be no doubt that the jury, or any jury of fair men appreciating the force of testimony, capable of weighing it, and understanding the standard of testamentary capacity adopted in New Jersey, so clearly stated by Judge Washington in *Stevens* v. *Vancleve,* 4 *Wash. C. C. Rep.,* would have found that Meeker had testamentary capacity on the 12th of January, 1852. Indeed, the proposition of plaintiffs' counsel, that he had not capacity to make such a will, admits that he had capacity to make some will. I cannot understand how a testator can have capacity to make one will, and not another; it seems a legal absurdity. If he had capacity to make any will, that capacity was sufficient to enable him to make any will, no matter how unjust or unreasonable its provisions may seem to others. *Voluntas stat pro ratione.* I do not mean to be understood as saying that the contents of the will may not often be very important evidence, as the product of his mind, to show the state of that mind ; the character of the stream near its source is often the best evidence of the condition of the fountain. That the will to others not having the means of knowing what the testator knows, not occupying his stand-point, not having lived his life, not having his secret affections and hates, may seem unreasonable, injudicious, and even unjust, is no reason why it should be declared the product of a diseased mind. A testator has a right to make an unreasonable, unjust, injudicious will, and his neighbors have no right, sitting as a jury, to alter the disposition of his property, simply because they may think the testator did not do justice to his family connections.

Unless the will on its face carries clear marks of being the product of a diseased mind, its injustice, its unreasonableness, ought not to be the foundation of a verdict against it. Unless this be the rule, every trial of the issue *devisavit vel non* is in danger of becoming a mere review by a jury of the propriety of the testator's conduct in the disposition of his property, an appeal by disappointed heirs or devisees from the testator to a jury of sympathizing friends and neighbors. It is better that occasionally a will about which there may be some doubt should be proved and enforced, than to establish rules for the purpose of reaching hard cases, which in effect transfer the power of testamentary dispositions from a testator to a jury, who must make the will without the evidence which the testator had, who must gratify their partialities and affections by frustrating his, who are generous with his property, not their own.

Upon a careful review of the evidence in this case, I have no doubt of the testator's capacity to make this will, or any other that seemed to him right. There was no evidence upon which a jury should be permitted to find against testamentary capacity. Such a verdict could not be sustained except by applying the maxim *voluntas stat pro ratione* to the jury, instead of the testator. The testator transacted his own business long after the date of the will with the entire approbation of all his friends. No one appears then to have doubted his capacity, even when his conduct was disapproved of. The verdict must be supported, if at all, because the will was either forged or a fraud upon Meeker, effected by substituting one paper for another.

It is manifest, from the state of the case and the course of the argument in this court upon this rule, that the plaintiffs relied upon the declarations and conduct of Meeker, both before and after the day of execution, to show that while living he never knew of the existence of such a will, and that therefore he had never knowingly executed the paper.

Upon the issue as to his sanity when he executed the paper, his conduct and declarations, both before and after that time *tending to show his want of capacity at the time*, were competent evidence for the plaintiffs. All the authorities support that position.

But the case clearly shows that these declarations were offered, received, and pressed upon the jury as the proper foundation of a verdict against the will, on the broad ground, that even if the testator had testamentary capacity, yet that he never executed the paper as a will because these declarations showed his utter ignorance of any such paper, and were, if true, inconsistent with the idea of its execution by him.

The admissibility of this evidence on the issue of fraud and forgery has been argued upon two grounds. 1st. That they were exterior manifestations of an inward condition of the mind, that is to say, *ignorance* of the existence of the will. It is argued that they are admissible for this purpose upon the same grounds as upon the issue of sanity or capacity. That sanity and ignorance are both states of mind—that exterior manifestations must be relied upon to prove both. If this were so, there might be some force in the argument. But ignorance is not a state of the mind in the sense that sanity and insanity are. When the mind is ignorant of a fact, its state still remains sound; the power of thinking, of judging, of willing, is just as complete before communication of the fact as after—the essence of the mind remains unaffected; but where insanity exists, its mysterious texture, so to speak, is impaired or for the time paralyzed—it is no longer subject to the will—its operations cease to be voluntary, its perceptions are impaired. Insanity is a state, a condition of the mind itself. Ignorance of a particular fact consists in this, that the mind, although sound and capable of healthy action, has never acted upon that subject because it has never been brought to the notice of the perceptive faculties. The one is an incapacity to act perfectly, the other is the never

Boylan *ads.* Meeker.

having acted, although perfectly capable of so doing. Upon this theory all the presumptions of the law in relation to sanity and insanity are based.

When a state of sanity is proved to exist at a certain time, the law presumes that to continue until the contrary be shown, because that is the normal state ; every person is presumed sane until the contrary be shown. Where a state of insanity is shown to have existed at a certain time, that is presumed to continue until the contrary is shown.

If insanity and sanity were not states or conditions of the mind—the sentient faculties—these presumptions would not obtain.

But ignorance of a fact at a certain time raises no necessary presumption of ignorance of that fact at a subsequent time, nor does ignorance of a fact, at a time long subsequent to its occurrence, raise a necessary presumption that the mind never was acquainted with it. The will of an individual may conceal for ever his knowledge of a fact, but his will is powerless to conceal for any length of time his insanity. The exterior manifestations of insanity are involuntary, those of knowledge purely voluntary. The argument of plaintiffs' counsel is, if he had executed the will of January, 1852, he would have told of it—he would have manifested his knowledge by communicating it to somebody. They undertake to prove that he never did tell of it. The attempt was to overcome the evidence of eyewitnesses, who swear they saw it executed, who have not been impeached by any proof of want of character, by proving that what they swear to could not be true. This was to be done by proving affirmatively, according to their own theory, that Meeker never admitted its execution to anybody, never spoke of it. Any evidence coming short of this perfect proof of the negative that he did not do it, that he kept silence at all times and on all occasions, was incompetent to prove this ignorance, thus relied on to break the positive testi-

mony. The argument shortly stated is this. Four witnesses positively swear they saw the will executed. The plaintiffs affirm this testimony is overcome or proved false because they have proved that the testator never spoke of it, never by his words or actions manifested any knowledge of such a will. The defendants answer, you have not proved your proposition; you undertook to prove that he never spoke of the will of January, 1852; the whole burthen of this is upon you; you have undertaken to prove a strict negative, your evidence does not do it, it comes far short of it, it makes no case, and is therefore incompetent. The burthen of proof cannot be again shifted by incomplete proof on this point.

It is to be remembered that we start in this case with full proof of knowledge of the will; the testimony of the subscribing witnesses settles that; the presumption is that continues. Can that presumption be overcome by any amount of mere negative evidence? If it be satis factorily proved by the testimony of one unimpeached witness that Meeker knew of this will, spoke of it anywhere at any time, can the testimony of ten thousand witnesses testifying to every subsequent movement of his life, that he never again spoke of it or of its contents, overthrow it? Clearly not; and in this case we start with the proof that he spoke of it to four witnesses, and knew all about it. There is no necessary inconsistency between the testimony of the four and that of the ten thousand; at most they but prove an *alibi* at all other times except the time in question.

Unless proof of a negative be complete, it is no proof; unless every link is complete the conclusion does not follow. There is a great show of demonstration without any certainty. Every lawyer of extended experience in his profession can recollect cases where he himself has been almost confounded by the apparent strength of imperfect negative proof, although well knowing the truth to be otherwise. Five units make almost six, but fall

short just one unit. But it is said the declarations of Meeker go further than mere negative evidence; that they were equivalent to declarations by him that he never signed the paper of the 12th of January, 1852. Be it so. Suppose the testator did declare that he never executed any will after September, 1851, and that if any such will should be produced it would be a forgery, is such evidence competent when a will duly executed and proved by the subscribing witnesses has been offered in evidence? The ground upon which the admission of the evidence is usually put is, that the devisee claims under the devisor. The rule, that the declarations of a former owner of real or personal property, affecting or charging the property, are admissible to charge the property in the hands of the devisee, subject to some exceptions, appears to be well settled. The property is said to pass to the subsequent owner *cum onere*. The declarations of the tenant in possession adverse to his title, and relating to facts which may be proved by parol, are evidence not only against himself, but also against those claiming by subsequent conveyance from him. It is equally well settled that such declarations, made after the declarant has parted with his title, are inadmissible.

The reception of the testimony is made to depend upon two matters.

1. That the declarant had an interest.

2. That the party to be affected by them claims under him.

It is obvious that the declarations in question in nowise affected, limited, or changed the title of Meeker, the testator.

They were not in that sense, or in any sense that I can perceive, declarations against his interest; they never could have been offered in evidence against him; they were not admissions that anybody had any claim upon his estate which could in any way impair its value. The

law admits this evidence, although not under oath, because it esteems self-interest a sufficient guaranty for their truth. They are admitted not because the grantor made them before he parted with his title, and therefore had a right to impair the value of his estate, but because it is considered that their being made under the stimulus of self-interest renders it equally certain that they are true as if made under oath. No such motive operates to secure truth in the declarations of a devisor. He may, to secure his own peace and comfort during life, to relieve himself from unpleasant importunities of expectant heirs, conceal the nature of his testamentary dispositions, and make statements calculated and intended to deceive those with whom he is conversing. He has neither the sanctity of an oath or the strong bond of self-interest to secure his adherence to the truth. The experience of every one must satisfy him that an inquiry made of a testator, as to the contents of his will, rarely elicits the truth.

The evidence is clearly hearsay, and I cannot see upon what rational principle it can be made an exception to the rule excluding that species of evidence, unless it be that the devisee is not a purchaser for a valuable consideration, and has no cause of complaint against the devisor, if he loses the estate devised by his untrue declarations, carelessly or wantonly made. But it must be recollected that the controversy is not between the testator and the devisee, but between the heir and devisee, both claiming the property. The question is, what is the safe rule of evidence by which to determine the right. Neither the heir or the devisee are purchasers, both are mere beneficiaries. Ought a will, executed and proved according to law, or rather proved by positive evidence to have been so executed, to be nullified by the merest hearsay unsanctioned by oath or self-interest, by declarations which it is often the interest of the devisor to make although untrue?

To admit the evidence even in the strong form which I have stated, to wit, that the testator had made no will

since a certain time, and that any will of a subsequent date is a forgery, is in clear contravention of the statute of wills, its whole policy, scope, and object. That statute provides that a will of lands must be in writing, subscribed by the testator in the presence of two subscribing witnesses. The testator is not permitted to express his will verbally. He must do it in writing, and declare it to be his will in the presence of two creditable witnesses On proof, that these conditions have been complied with by the witnesses, or one of them, if alone at the time of proof, the law gives it effect. The law prescribes the mode in which he shall declare his will, *i. e.*, in writing, and the mode in which his declaration and signature shall be authenticated and proved. Its object is to secure certainty in the proof of the will and its terms. If the object be to get the latest manifestations of the testator's mind, why not allow a will to be made verbally, and proved by any two bystanders? If the will have but one attesting witness it can have no operation although the devisees may be able to prove by forty credible witnesses that the testator said on his dying bed, in *articulo mortis*, repeatedly, that is my will, the statute is inexorable, no amount of evidence will supply the want of that one credible witness attesting; and yet the rule contended for by the plaintiffs' counsel would permit the testimony of two credible witnesses to be overthrown by the mere verbal declarations of the testator, made in the presence of one witness, and proved by him. We have this absurdity, that a will must be executed in the presence of two credible witnesses, so as to furnish clear and safe proof as a security against fraud, but that its execution may be disproved by the testimony of one witness, who does not testify that it is a fraud or forgery, but that he heard the testator say so Two witnesses heard him say it was his will, and must hear him say so and sign it, and they must subscribe as witnesses, and one witness afterward heard him say it was not, and he is sufficient, if believed, to authorize a

verdict against the will.   May a will be destroyed by less testimony than is required to prove it ?   Is that a sound construction of the statute ?

In may be said, in reply to this view, that the testimony of one witness would not in practice be sufficient to satisfy a jury ; but I am unable to perceive how in any such case there can be said to be more than one witness, and his testimony is not given in court under the sanc-- tion of an oath, but proved by other witnesses.   If the provisions of the act were designed to prevent fraud and perjury in making a will, there is the same necessity for the observance of the provisions in disproving the making of a will.   This appears not only from the reason of the provisions, but the legislature have, in the section on the subject of revocation, specified the solemnities which must attend a revocation.   It must be done by burning, cancelling, tearing, or obliterating the will by the testa- tor, or in his presence and by his direction and consent, or by a will or codicil in writing executed with the same so- lemnities as a will.

This shows clearly the legislature's intent to protect wills, when executed, by the most stringent requirements of evidence of revocation.   No proof of declarations of revocation made by the testator, though proved by a cloud of witnesses to have been made times without number, will avail.   The statutory evidence must be had, or the intended revocation fails.   If proof by any number of witnesses that the testator said, after the execution of the will, I hereby revoke and declare it null and void, will not avail to destroy the will, why should proof by the same number that he said, I never executed any will, have that effect ?   Is not the liability to perjury the same in both cases ?   Is not the clear actual will of the testator frustrated as much by the rejection of the one evidence as the other ?   Should a difference in the phrase admit one declaration, and reject the other, when the effect of both is the same, to change what otherwise the law declares to

be the will of the testator? The effect of the statute of frauds and wills, generally, is to prevent frauds and perjuries; but by adhering to their salutary provisions they may, and doubtless sometimes do prevent fraud and perjury from being exposed; but that is no reason why the court should repeal them. Such always is the operation of arbitrary rules of evidence; but the experience of more than one hundred and fifty years has vindicated the policy of excluding parol evidence in such cases. In England, parliament has constantly been engaged in requiring, by new statutes, written evidence in lieu of parol testimony.

Sound policy requires the rejection of the evidence. The effect of its reception is to put the testator upon trial; and if the jury, by an examination of his whole life and conversation since the execution of the alleged will, find him guilty of an inofficious will, they dispose of his property by a new will, got up out of the loosest possible material and proved in the loosest possible way. Park, J., in *Provis* v. *Reed*, 5 *Bingham* 435, puts the case very pointedly: "Where the legislature have taken so much care to prevent frauds in wills, and when it is considered how easily declarations may be extorted by artful persons after the intellect of the testator has been impaired by time, it would be most mischievous, and a violation of all established principles, to allow such declarations to be received in evidence."

If the question be examined by the light of authority, it seems to be settled by the great weight of adjudication against the admissibility of the evidence. In *Provis* v. *Reed*, just cited, the whole court, consisting of Best, C. J., Park, Burrough, and Gaselee, all concurred in holding the evidence inadmissible. That case was one where the declarations expressly impeached the execution of the will. It was decided in 1829.

In *Jackson* v. *Kniffen*, 2 *Johns* 31, the Supreme Court of New York ruled that the declarations of a testator, made

a few hours before his death, that he had executed his will through duress and fear of being murdered, were inadmissible. Thompson, J., delivered the opinion of the court. Kent, C. J., and Livingston, J., concurred. The reasons are shortly and clearly stated, and are to my mind conclusive. Spencer, J., dissented, and gave as his reason, that a will takes effect only on the testator's death. During his life it is subject to his control, and until consummated by his death no one had a legal interest in it. The argument is, that for these reasons the testator's parol declarations should be permitted to destroy it. If this be so, why require a revocation to be in writing? The statute of wills takes away the control a testator would otherwise have over his will, and provides that it can only be exercised in a prescribed mode. Equally unsatisfactory is the other reason given, that they are declarations of a party in interest. This has already been shown. *Stevens* v. *Van Cleve*, 4 *Wash. C. C. Rep.* 266, is also an authority against the reception of the declarations. The opinion is that of Judge Washington. *Smith* v. *Fenner*, 1 *Gallison* 170, per Justice Story; *Moritz* v. *Brough*, 16 *S. & R.* 403; *Comstock* v. *Hadlyme*, 8 *Conn.* 254; *Gibson* v. *Gibson*, 24 *Miss.* 227; *Waterman* v. *Whitney*, 1 *Kern.* 157, review the cases upon this point, and again affirm the doctrine of *Jackson* v. *Kniffen*. These cases show that this doctrine is now the law of England, New York, Connecticut, Pennsylvania, and Missouri, and is sustained by the weight of the names of a Story, a Kent, a Washington, and Kirkpatick.

The author of Cowen and Hill's note to *Phillips' Ev.* vol. 1 of *Notes*, p. 268, asserts the admissibility of the evidence, and in his argument in support of it, he adopts the reasoning of Justices Spencer and Tompkins, in *Jackson* v. *Kniffen*, and says, "waiving the inquiry whether the declaration was admissible because made *in extremis*, the rule, that I am liable to be affected by this declaration of one who conveys to me, made before my right

vests, is at this day sustained by a force of authority not to be resisted." This statement of the rule is too broad. It begs the question in dispute. The rule is believed to be true with this qualification, that the declaration must be adverse to his title. This limitation of the rule, the annotator himself declares, on page 266, citing *Bradstreet* v. *Huntington*, decided by Judge Conkling. The fallacy of the argument appears from the necessity of suppressing a part of the rule. He further says, the objection that such evidence contravenes the statute of frauds applies equally to a deed for lands; yet it is not to be doubted that a grantor declaring before the title to the land passes by his deed that he shall convey, but it is to save his life threatened by the grantee, would be evidence to affect the latter. The answer to this argument is obvious. If the declaration accompanied the act of execution it would be admissible, as a part of the *res gestœ*, under another rule; but if the author means declarations made before the time of execution, so as not to be a part of the *res gestœ*, it is not true. The grantor could not give it in evidence in his own favor because not a part of the *res gestœ* and not in disparagement of his own right, nor could anybody claiming under him. I would not be against his interest, but in favor of it. The same reason which would exclude the declaration, if made after the title passed, would exclude it if made before the execution of the deed.

There can be no doubt but that the fact of duress and undue influence may be proved, but it by no means follows that every kind of evidence adapted to prove it is admissible. The evidence must be legal. These are not to be proved by hearsay; whether they are or not, is the whole question in dispute.

In *Reel's Exr's* v. *Reel*, 1 *Hawks.* 247, in the Supreme Court of North Carolina, and *Howell* v. *Bardin*, 3 *Dev.* 442, the question was considered, and the cases of *Provis* v. *Reed, Jackson* v. *Kniffen, Smith* v. *Fenner* were overruled, and the evidence declared admissible in the last case by

a divided court, Daniel, J., dissenting. The argument is condensed in the first case as follows : say the court, " to reject the declarations of the only person having a vested interest, and who was interested to declare the truth, whose fiat gave existence to the will, and whose fiat could destroy, and in doing the one or the other could interfere with the rights of one, involves an absurdity."

It is to be observed, in the first place, that although the testator had a vested interest, as the declarations do not affect anybody's rights, not even his own, he is not interested to declare the truth ; and in the second place, the fact that his fiat gave existence to the will, does not prove that he may destroy it by his breath. The statute requires him to make his will in writing, and declares he shall not revoke it by parol. The argument might be sound to address to the legislature to secure a repeal of the law, but cannot overthrow it. The great anxiety manifested by these judges seems to have been to adopt such a rule as would prevent forged and fraudulent wills. The legislation had precisely the same end in view, but by widely different means. The one admits the parol evidence to prevent fraud, the other excludes it. The difference is irreconcilable.

The rule is admitted by all, that the declaration of the grantor of a deed in disparagement of his title, if made before he departs with it, are admissible against his grantee, but those made afterwards are not admissible.

Why not receive the declarations made afterward by the grantor of a deed to show fraud or forgery, that the deed never had a legal existence as against the grantor ? Suppose a father puts his son in possession of property in his lifetime, and after his death the son produces a deed for the same, duly executed and purporting to be duly acknowledged, and forgery of the deed is set up by the other heirs at law, an ejectment is brought by them against the son. He proves the deed in due form of law. Would the declarations of the father, made after the date of the

deed, that the same was a forgery, or had been obtained by duress, be competent evidence for the heirs at law? All the cases say not, because they were made after the date of the deed. But do not the declarations prove there was no deed; and if there was none they were in time, for no title had passed? If the declarations are competent at all, they are so to prove there never was any deed. They overthrow the date, the presumed or proved time of execution, as well as the other part of the deed. The truth is, the law excludes the declaration of the grantor of a deed or maker of a will, whether made before or after the time of alleged execution, when that execution has been once proved in the mode required by law, when offered to show fraud, duress, or forgery, but admits the declarations made at the time as part of the *res gestæ* upon this plain principle, that they are hearsay, not under sanction of an oath, not in disparagement of the right of the declarant, and therefore not against his interest. To admit them would be a departure from principle, an abrogation in fact of the statute of wills, and in the last degree mischievous and destructive of the right of testamentary disposition.

I have not overlooked the case of *Saff* v. *Atkinson*, 2 *Eng. Eccls. Rep.* 67. I do not think the decision of that court entitled to any weight. In admitting to probate wills of personal property, it proceeds on peculiar principles. The object of the ecclesiastical court is to find some testamentary paper the last promulgation of the testator's mind. In that court, little if any form of making, attesting, or publishing a will of personality is required.

Says Lord Hardwicke, in *Ross* v. *Ewer*, 3 *Atk.* 163, there is nothing that requires so little solemnity as the making of a will of personal estate, according to the ecclesiastical laws of this realm, for there is scarcely any paper writing which they will not admit as such. The paper need not be in the form of a will; its form

does not affect its title to probate, provided it is the intention of the deceased that it should operate after his death, although the testator should not be aware that he had done a testamentary act. Deeds, bonds, drafts, letters promissory, have been held to be wills. The courts of common law in England have always adhered to the rule of *Provis* v. *Reed*, although the practice of the ecclesiastical courts has been different. They disregard the decision of those courts upon probate, because they proceed by entirely different rules. Tindal, C. J., in *Marston* v. *Fox*, 8 *Ad. & Ellis*, says, " The ecclesiastical courts are concerned in the granting probate of wills and testamentary papers relating to personalty only, in which cases no statutory enactment has excluded parol evidence of the intention of the testator as to what shall or shall not be a testamentary paper, or what shall or shall not amount to a revocation or republication of a will. On the contrary, the evidence bearing on these points is generally mixed up with declarations of the party, and frequently consists of such declarations alone."

The same evidence has been received in the probate court of this state on the same points and for the same reason.

In the case of *Den ex dem. Trumbull* v. *Gibbons* this question did not arise, and was not decided by the court. *Den* v. *Vancleve, South.* 589, is not a decision in favor of admitting the evidence to show fraud or forgery. The case was decided by Judges Rossell and Southard against the dissenting opinion of Kirkpatrick, C. J. Rossell puts the admission of Vancleve's declarations, supporting the will in question, upon the ground that they showed no change of mind ; that they proved the absence of insanity ; that the case of the plaintiff was that testator, at the execution of the will, and long before, was in a state of second childhood, totally incapable of managing his property and destitute altogether of the legal testamentary capacity, and that therefore the will was a fraud. The de-

fendants, to rebut this, proved that the testator, for many years before his death, had declared his intention of giving his land to the defendant, and that he had executed two previous wills to carry his intention into effect. Southard, J., gives it as his opinion that it is competent for a party who has exhibited a written will, and proved its formal execution, in support of the sanity of the testator, which is disputed not only at the time of the execution, but for years before, and in denial of the allegation of fraud in procuring it, to prove the designs of the testator while his intellect was unquestionable. He says that, if the jury did believe the fact of execution, these declarations were proper guides in forming their estimate of the portion of intellect which accompanied it. This case decides that previous declarations of a testator are admissible where a will formerly proved has been attacked upon the ground of incapacity or fraud; that the evidence is proper to rebut circumstantial evidence upon those points. But it does not decide that such declarations are competent when offered to overthrow the direct proof of actual execution and publication by the statutory witnesses. In the one case the evidence does not take the place of the statutory writing, signed by the testator and attested as the law requires, nor subvert it, as Justice Southard remarks, that has been already given; in the other it does.

The legality of evidence depends very frequently, if not always, on the circumstances in which it is offered, and the nature of the question to which it is to be applied.

The declarations proved were made previous to the execution of the will, as opened by the counsel of the heirs at law. They were, that the testator, at sundry times, and many years before his death, in 1809 and at other periods, declared to the witnesses that it was the intention that his son Joseph should, after his death, own and enjoy all the landed property of which he should die possessed, and that to effect this purpose he had made a will devis-

ing it to defendant; that he gave his reasons for doing it, and what those reasons were; and that these declarations were uniform, and continued as long as he was capable of speaking. The case does not support the proposition, that declarations made after the execution of the will were competent.

*Den* v. *Vancleve* was tried at the bar of this court, in November term, 1818, before Kirkpatrick, C. J., and Southard, J., and heard on the rule to show cause, at September term, 1819, before the Chief Justice and Justices Southard and Rossell. The case was argued by Wall and R. Stockton for the plaintiffs, and L. H. Stockton and Ewing for the defendant. *Stevens and Wife* v. *Vancleve* was tried in the Circuit Court of the United States, at April term, 1822, before Judge Washington. On that trial the plaintiffs' counsel disavowed any charge of fraud or improper conduct in obtaining the will, and the evidence of the previous declarations and wills was offered distinctly upon the question of competency, and over ruled by Judges Washington and Pennington, who declared that nothing could be more dangerous than the admission of the declarations of a party to a deed or will, whether prior or subsequent to its execution, either to control the construction of the instrument or to support or destroy its validity; that if offered in support of the instrument it could only have that effect upon the supposition of the uniform consistency of those declarations, not only with the instrument itself but with the secret *intentions* of the party at all times after these declarations were made. It is to be observed that the judgment is put upon the ground that the evidence can by no possibility make out lawfully what it is offered to prove, and that this vice is inherent in it from the very nature of the case.

The case of *Stevens and Wife* v. *Vancleve* was tried after the determination of *Den* v. *Vancleve*, and by the same distinguished counsel. I think the authority of that case has been shaken by the opinion of Judge Washington,

2 B*

and that we are not bound by it, and that the decision of this case, upon principle and the great weight of authority, requires the rejection of evidence of the testator's declarations, whether made before or after the execution of a will, either to support or destroy its validity, when the declarations are offered as evidence of the facts declared, and not as showing soundness or unsoundness of mind. For these reasons the verdict should be set aside, and a new trial granted.

But if the case be tried again, it is presumed the same questions will arise as arose upon the former trial, and I will proceed to consider the most material of them.

Were the declarations of Jon. Edwards Hoyt evidence?

He was one of the attesting witnesses to the will, but was dead at the time of the trial. The defendants did not rely on his evidence to sustain the will. The will was left by him at the surrogate's office for probate, was in his custody at the death of the testator, and had been so since its execution. The defendants made proof of the execution of the will by the testimony of the other subscribing witness.

Chief Justice Ewing, in the course of an elaborate judgment in *Patterson* v. *Tucker*, holds that the foundation of the rule permitting proof of the handwriting of the subscribing witnesses to stand as proof of the execution of the instrument in certain cases, is, that the attestation of the witness is a declaration by him that the instrument was duly executed in his presence, as the attestation clause usually declares. *Newbold* v. *Lamb*, 2 *South*. 450.

If that be the case, I think it is quite clear, *whenever the attestation is offered in evidence as proof of the execution of the instrument*, any evidence which would have been competent against the witness, had he been sworn, will be competent to overthrow the force of his declaration, offered in evidence, instead of his testimony. Why should his declarations not under oath have greater sanctity than his testimony? Where his attestation is relied upon as proof

of the instrument, it is to prove that the instrument was executed. The declaration of witness is offered in evidence. If sworn, the other party might cross-examine him, prove his declarations made before inconsistent with his evidence, and show his general bad character for truth. The most valuable of the three rights is lost when he is not produced as a witness. Why should the others be also? I can see no reason.

The argument of Nelson, C. J., in *Losee* v. *Losee,* 2 *Hill* 612, that proof of the handwriting of a deceased witness is presumptive evidence of the truth of everything appearing upon the face of the instrument relating to its execution, as it is presumed the witness would not have subscribed his name in attestation of that which did not take place. Hence the propriety of permitting him to be impeached in the usual mode, as if he were living and had testified at the trial to what his signature imports. This doctrine is sustained by too great a weight of authority to be overturned by the single case of *Stobart* v *Dryden,* 1 *Meeson & Welsby* 615. That case was decided upon the ground that the attestation was not a declaration, but the mere doing by the witness what is usually done in in a case of genuine signature. If that be so, why does proof of the handwriting of the deceased attesting witness prove the execution of the paper? *Wright* v. *Littler,* 3 *Burr.* 1244 ; *Provis* v. *Reed,* 5 *Bing.* 435 ; *McElwee* v. *Sutton,* 2 *Bailey* 128.

*Reformed Dutch Church* v. *Ten Eyck,* 1 *Dutcher* 45. In the last case the point was presented distinctly for the decision of this court and decided, although the case might have been disposed of upon other grounds. With the opinion of the Chief Justice in that case I entirely concur.

In this case the defendants *did not offer Hoyt's attestation as any proof of the truth of what it purported to declare,* but expressly disclaimed it, although they were compelled to prove his handwriting as a fact. If he had been living and in the court room, the defence need not have called

him as a witness. His attestation did not stand in the stead of his evidence. He could not be impeached until sworn, either by general evidence of character or by proof of disparaging declarations made by him.

But it was urged, that even if Hoyt's declarations and character were not originally admissible, they were rendered so by the subsequent introduction of his testimony given upon a former trial. To this the defendants were compelled by the admission of the declarations. They desired to exclude the declarations of Hoyt because they did not wish to be bound by what he had said. If the declarations ought not to have been received, the course of the defence did not waive the objection. If a party cross-examine a witness to whose admission he has objected, it never has been held a waiver of the objection, or if a party introduces evidence to rebut testimony unlawfully admitted, that is no answer to his objection.

These cases are analogous to the one now under consideration. But it is said further, by the plaintiffs, that the declarations of the producer of the will are competent as such. Be this so. That does not legitimatize the evidence to impeach *the character* of Hoyt. If he had been upon trial as a criminal, that would not have been competent, much less would it be competent in a civil case upon a charge of combination to commit a fraud. Evidence is admissible or not, according to the circumstances of the case. Hoyt, according to the defendant's case, was the depository of the will, from its execution to its production after Meeker's death, and made so by Meeker himself. The plaintiffs set up that he forged it himself. Upon that issue the circumstances attending its production and what the producer said were competent evidence ; and I think anything said by him after its execution, and before its production in furtherance of the design to prove or produce it as a genuine will, is also competent, and this not upon the ground that he was a witness to the will, but *ex necessitate* because he was the one who must know its origin and history. *Wright* v. *Littler*, 3 *Burr.* 1258.

The declarations of Hoyt would be admissible against him upon a trial for forgery, but it by no means follows that for that reason they would be upon this issue. In the criminal case he would be a *party*, here he was not. The reason of their admission must limit the occasion of their admission. Declarations made by him not in furtherance of any design to produce the will, and prove it, or made after its production, fall without the reason of the rule, and should not be admitted. It was insisted as another reason for a new trial, that the plaintiffs, who claimed and recovered as heirs at law of the testator, could not so recover because they proved another will of the testator, made in September, 1851, which showed that they were not at the time the action was brought entitled to the possession of the premises in dispute, which were a house and lot in Washington street, Newark. The will of September, 1851, was proved by the plaintiffs to have been duly executed by the testator, and it remained uncancelled and unrevoked at his death, if the will of January, 1852, was not a later will duly executed by the testator.

If the will of September, 1851, was proved, and in evidence in the case, and showed title to the premises out of the plaintiffs, it matters not for what purpose it was offered; they could not use it for one purpose and deny its use to the defendant for any purpose for which it might have been used by defendants, if they had offered it.

The plaintiffs, to entitle them to the verdict, must show a right to the possession of the premises at the time of action brought. Title or the right of possession in another is a complete answer to the action. They must recover on the strength of their own right, not on the weakness of that of the defendant's, who could not be called upon to part with the possession except to one having the right. Such is the settled law. *Love* v. *Simms' lessee*, 9 *Wheat.* 515; *Jackson* v. *Harrington*, 9 *Cow.* 86.

By the second clause of the will of 1851, the testator

gave to his wife Betsey, in addition to other bequests, four hundred dollars a year during her natural life.

By the twenty-second clause, he empowered and directed his executors and their survivor to sell all his real estate not by his will disposed of, but house in River street and the one in Washington street, No. 451, where he lived in Newark, New Jersey, and that it was his will that they be not sold until after the death of his wife Betsey, but that they be kept insured in the Mutual Insurance Company, the one in Washington street for $1500, and the one in River street for $1200, and the rents paid over to his wife towards the annuity she is to be paid in his will. By the same clause, he directs the executors to sell the land in suitable lots, that lying on Washington street, north of the dwelling, say one hundred feet deep, and twenty or twenty-five feet front, as they will cut up best. If there can be a street in continuation of Plane street, two hundred from Washington, of sixty feet wide, suffer it to pass; if not, lay one of that width from Spruce, as far as south of 451 Washington street, to come out with Washington street on the line of Samuel Pierson, of twenty-four feet, ur'l it intersects the one laid from Spruce, and sell the same in lots of 21 or 25 by 100. He also provides that liberal time shall be given on the sale of all his lands, and the money arising from the sales be paid over to those to whom he has ordered special legacies, and the balance to be kept on bond and good and sufficient mortgages during the lifetime of his wife, and at her death sell the two houses, the one in River street and the one in Washington street, and divide the money among, &c.

It is clear that the testator intended that his executors, during the life of his widow, should lav t e sole possession and control of the houses in River s reet and in Washington street. They are not to be sold until after the death of his wife; they are to be kept insured, and the rents to be paid over to his wife towards the an-

nuity of $400 a year. These directions are contained in a clause exclusively devoted to prescribing with great particularity what his executors are to do with his undisposed of real estate. The executors are to do this. There can be no doubt on this point. They are to keep the houses insured. They are to rent them, and to pay over the rents to the widow towards the annuity. They are made, by the clear provisions of the will, the landlords of the property. This necessarily gives them the possession and the right of possession. It is necessary, in order to carry into effect this clause of the will, that they should have a life estate in the houses in trust for the widow. No discretion is left in the executors whether to rent or not, or when to rent. They must rent the premises immediately. The intention is clear upon the face of the will, that the widow shall have the rents from the hour of his death towards her annuity, and they should be paid to her by the executor.

It is in substance a devise to the executors of the rents and profits of the property in trust for the widow, or to pay them to her. This is not a bare power to rent, but a power coupled with an interest. Whether the executor takes a bare power, or a power coupled with an interest, is a question of intention, to be gathered from all parts of the will. *Oates ex dem. Markham* v. *Cook,* 3 *Burr.* 1686. Yates, J., in that case, said the estate must be coextensive with the charges; that when annuities were charged upon the real estate the legal estate must pass. Necessary implication is equivalent to expression.

It is said, in a note to *Sugden on Powers* 194, (3*d Am., from 7th Lon. ed.*) that the character of such a power does not depend upon the quantity of interest given, for a trustee invested only with the use and profit of the land for the benefit of another has an interest connected with his power, and an authority to lease is sufficient to exempt a power from the character of a mere naked authority to a stranger.

In *Osgood* v. *Franklin*, 2 *Johns. Ch. Rep.* 20, Ch. Just. Kent says, a trustee invested only with the use and profits of the land for the benefit of another has an interest connected with the power.

The executors take such an interest in the land as is necessary to enable them to execute the power, and no more; if the fee is not necessary for that purpose, it descends to the heir. The executors cannot execute this power of renting and paying over the rents without the possession, and to that they are entitled during the lifetime of the widow. The heir at law could not recover the rents nor the possession of the land out of which they spring, not only because of the power given to rent, but because the whole item shows an intention that the executors should have possession.

Nor is this a charge of the annuity upon the land in and of the personalty. It is a specific appropriation of the rents to the payment of the annuity at all events. The personalty is primarily chargeable with the payment of a legacy, in the absence of express direction as necessary implication in the will, but the testator may otherwise order. *Hartley* v. *Hurle*, 5 *Ves.* 540; *Bootle* v. *Blundell*, 1 *Merivale* 216. Or if it appears very clearly from the whole will that such was the testator's intention, the real estate will be the primary funds. 1 *Story's Eq. Juris.* 572, 574; *Lupton* v. *Lupton*, 2 *Johns. Ch.* 614; *Livingston* v. *Newkirk*, 3 *Johns. Ch.* 319.

The case of *Brearley* v. *Brearley*, 1 *Stock. Ch. Rep.* 22, was supposed by the plaintiffs' counsel to be a parallel case ruling this. In the first place, the evident desire of the Chancellor in that case was to go to the verge of the law to prevent the vesting of any estate in the lands in the executors, which would have kept the two children out of their whole estate, except $500, until the death of their stepmother. It was emphatically a hard case. The executors were directed to sell all his real and personal estate, the real estate to be rented at their discretion. The will

further directed the proceeds of the sale and the moneys arising from any source to be invested until it was needed to carry into effect the provisions of the will; gave his wife an annuity of $400, his two children $500, to be paid out of the first moneys after paying his debts and providing for his wife's annuity.

It is manifest that the clause concerning sale and renting was merely designed as a security that the provision of the will should be complied with, that is his wife's annuity be paid. There was no appropriation of the rents of a particular property for a definite time to the payment of the annuity. It was the conversion of his whole estate, real and personal, into a fund for the security of the annuity, a charge, not an appropriation of a particular property to a particular purpose.

I am of opinion that, by the terms of the will, the executors were to have possession of the premises until the death of the widow. But what premises are to be rented for the purpose of paying the annuity? Manifestly only that part of the Washington street house and lot reserved from sale, not the land adjoining the house, which is authorized to be sold immediately.

The jury was charged that, if the premises reserved for sale until after the death of the widow were the premises in quesion, there was no devise in the will of 1851 to ba. the plaintiffs recovering. There was sufficient evidence of the widow still being alive and the identity of the premises to go to the jury. The charge was erroneous upon a material point.

The testimony of the deceased witnesses was clearly admissible; the subject matter of the suit, in the trial upon which they gave evidence, was the same, although it included other things. The point at issue was the same in both suits, will or no will.

The defendants or their privies in estate were parties, and had the right of cross-examination. 1 *Greenl. Ev.* 163, 164, and cases there cited.

Without noticing some of the minor objections to the verdict, enough has been said to show that injustice has been done by the course of the trial. The defendants have been deprived of the protection of sound, clear, and important principles of law.

Upon the issue of fraud and forgery, Meeker's declarations were not competent evidence, although upon the issue of sanity or insanity, all that he said tending to show unsoundness of mind was for that purpose competent. The court expressly told the jury that the declarations of Meeker were incompetent upon the question of the actual execution of the will; that they were of great weight as tending to show that he had no knowledge or no recollection of the January will. This was erroneous. The charge clearly reveals the difficulty—if all believed by the jury, they did not show either want of knowledge or recollection of the will. These declarations prove that he spoke on many different occasions, to different witnesses, without mentioning his will of January. They did not tend to show want of knowledge or recollection of it. It is presumed that evidence of the same kind might have been heaped up *ad nauseam*, but the increase of its quantity would not have added to its strength. The evidence of forty witnesses proving that he spoke without mentioning the will, would not come any nearer proving the proposition than that of one. A million of zeros added togehter are but zero, yet witnesses should not be convicted of perjury by showing that their testimony is in a high degree improbable.

Hume did not disprove the miracles of the New Testament by showing that the positive testimony in their favor was in the highest degree improbable. The testimony of four concurring witnesses unimpeached, of good character, having no interest in the case, ought not to be disregarded upon proof of the simple improbability of their story.

The declarations of Hoyt, not a part of the *res gestæ* of

the will, not in furtherance of his alleged design to produce it as a genuine will, or give it credit as such, or made after the production of the will, were not competent when they were offered, and their admission was injurious to the defendants.

The evidence of the bad character of Hoyt was improperly received.

The plaintiffs were not entitled to the possession of the house and lot in Washington street. The will of 1851, as to that, showed title out of them.

VAN DYKE, J. This is an action of ejectment brought by some of the heirs at law of Jonathan M. Meeker, deceased, against persons claiming the premises in dispute, by virtue of a will of said deceased, dated January 12th, 1852; and although the evidence taken is very voluminous, the great question in the case is, did the deceased execute the will in question, knowing at the time what he was doing. If he did, it must end this controversy. The defendants affirm that he did, and the plaintiffs deny it.

The matter in controversy, as presented here, involves grave questions of law as well as of fact. These in order, or so many of them as I deem important to a decision of this case, I will proceed to examine.

The first exception taken at the trial was to the verbal declarations of the deceased, offered not to show an insane or unsound mind on his part, but showing a sound one, and made at various times through a course of years, and to divers persons, to prove that it had long been his intention to make a different will, in some respects, from the one in question, and consequently that he could never have executed this one. There were other of his declarations offered going to different points, but all offered to show that it was very unlikely and improbable that he ever signed this will. The declarations were often isolated, far apart, and formed no part of what could be termed the *res gestæ*. It was very proper for the plaintiffs

to show, if they could, that it was unlikely and improbable that the deceased should have signed such a will, but could they do it by such declarations? Can a will, duly and solemnly made and abundantly proved, be overthrown by proof of such declarations? Can every party who, in good faith or in bad faith, sees fit to make the charge of fraud or forgery against a will, surrounded it may be with all the form and substance and sanctity known to the law, be permitted to assail it, and destroy it by calling witnesses, either few or many, to show that, according to the declaration of the testator, it had been his intention to make a very different disposition of his property, and to leave a legacy to some one which is not found in the will? What will could be safe under such a rule?

For if the evidence can be received at all, it is because it is of a character and kind which may be allowed to prevail over a will, no matter how well it is proved. If a jury may hear it they may believe it, and act upon it, and give it preference over everything else; and all a party has to do who dislikes a will, and which may in fact be unpopular because it disappoints a whole community, is to raise the charge of fraud or forgery against it, call the dissatisfied community as witnesses to prove the promises made them by the testator in his lifetime, and which were quite different from the provisions of the will, accumulate such declarations of a talkative testator until the jury shall think they ought to prevail over the witnesses who saw the will executed, and the best prepared and best executed will in the world is a perfect nullity. One thing more may perhaps be necessary, and that is to ask the court to declare and determine that it is the exclusive province of the jury to pass upon the facts in the case, and they having done so, the court cannot interfere with their verdict. Nor does the rule derive any aid from the large number of witnesses that have testified on that subject in the present case, for if a jury can lawfully be governed by the testimony of a hundred witnesses, they may also be by

that of fifty, by that of ten, or five, or one.  There is no fact that can be established by a hundred witnesses that cannot be lawfully established by one witness, unless it may be some special exception requiring more.

It is easy to see with what danger this rule is accompanied.  A man makes his will according to all the forms of law; both the subscribing witnesses have died, and no direct proof can be brought to bear on the fact of the execution.  The testator, being unable to write, has made his cross.  Some heir at law raises the charge of fraud or forgery against the will.  No one knows anything about the affair, and to prove the signatures of the subscribing witnesses is all that remains to be done.  This is accomplished quite satisfactorily, but the jury hesitates in face of so grave a charge, and then the opponent of the will finds one, two, three, or a dozen persons, who testify that they heard the testator say, at different times, that he did not like the principal legatee, or that he intended to give some portion of his estate to some one else ; and as no such legacy or devise appears in the will, and as such evidence is perfectly lawful and seems overwhelming, and as the jury are told by the judge that they are at liberty to believe it and act upon it, they hesitate no longer.  The weight of the testimony seems to them to be against the will, and they determine to annul it.  The court, on review, holds the evidence to have been competent, and as the jury have passed upon it, their verdict does not seem to be so much against the weight of evidence as to justify an interference. Here the will is destroyed simply by the admission of declarations of the testator, which may have all been correctly detailed, and yet the will be perfectly good and have been duly executed by the testator, and the same result *might* be effected in any and every case by the same means, even when all the witnesses were living and testified to the due execution of the will.  There seems in fact to be no end to the mischief that might be done by the establishment of such a rule.

And besides, what is the effect of the rule contended for but to permit a testator to make or unmake a will by his mere verbal declarations, or what is worse, is it not to permit a devisee or heir at law to make or unmake a will by giving in evidence such real or pretended declarations ? It is very certain that no will can be made here of any validity unless it is in writing and subscribed to by witnesses, nor can a will once made be revoked or annulled except by the same formality or by its cancellation or destruction. Here we have two wills of the testator, both of them are duly proved, but both of them cannot be good wills, and both cannot stand. The one last executed must prevail unless it can be overthrown.

To overthrow it, the party offers a variety of declarations of the testator, the objects of which are to sustain the first will and destroy the last. Suppose the effort to be successful, and suppose the last will to be a good and genuine one notwithstanding, has it not been defeated and annulled by the mere verbal declarations of the testator ? It is no answer to say that here was other evidence which bore against the latter will, for all the other evidence in the world can never make these declarations competent if they were not so without it. If they are evidence at all, they are capable of producing the same result without the aid of any other evidence whatever. If they are not competent when standing alone, if offered in sufficient numbers to sustain the first will and destroy the last, they cannot be competent to be thrown in as mere makeweight along with the other evidence to accomplish the same result.

Few things are more easy than to make a false or forged bond against a deceased person, and raise it against his estate, but if a subscribing witness were to swear that he actually saw the deceased obligor sign, seal, and deliver the bond, and that he subscribed the same as a witness at the time, how many declarations of the deceased obligor, made in his lifetime, that he owed nobody anything, that

he had never given a bond in his life, and that there was no debt or claim whatever that could be presented against his estate after his decease? How many such, I ask, or similar declarations could be received in evidence to overcome the bond thus proved, even though it should then be held and prosecuted by one of his children? Not any, beyond all doubt. And why not, says the party resisting the suit on the bond; for, says he, we not only charge that this bond is forged, but we charge also that the subscribing witness is one of the conspirators in the fraud, and therefore we claim, under the peculiar circumstances of the case, to lay before the jury such declarations of the deceased obligor himself, being the ancestor of the plaintiff, as must show conclusively that he never could have executed such a bond. The answer of the law would cer. tainly be that no such declarations could be received, simply because they were incompetent and unlawful, and there was nothing in the nature of the case to justify the admission of unlawful evidence.

Now what is the difference in principle between a will and a bond, and where the charge is, in both cases, fraud, forgery, and conspiracy, and where both are proved in the first instance by the subscribing witnesses?

I can see none whatever, unless it be the one suggested on the argument, that in the case of a will the declarations are those of an ancestor in possession, and that his declarations and admissions may be received against either himself or any one claiming under him. This rule does not apply, I think, to such declarations as have been offered in this case; but I will examine this point in another connection.

I think therefore upon principle, upon reason, upon safety and expediency, and on the express demands of the statute, that the declarations excepted to in the case should have been refused at that trial.

I think, too, that the current of decisions, almost unbroken in this country and in England, has settled the

law that such declarations are inadmissible. In *Falkland* v. *Bertie and others*, in 2 *Vern.* 333, it was held that parol declarations of the testator could not be received to affect his written will, and Chief Justice Holt there declared that he was clearly of opinion that all the parol proof, as to what the testator either declared or intended, was to be disallowed, and the case must stand confined to the will, and is to be considered as it stands on the will alone, and must have been so even before the making of the statute of frauds and perjuries.

And in the case of *Strode* v. *Russel*, 2 *Vern.* 622, Mr. Justice Tracy says he was " clearly of opinion that no parol proof ought to have been received, nor is any regard to be had as to expressions before or after making the will, which possibly might have been used by the testator on purpose to control or disguise what he was doing, or to keep the family quiet, or for other secret motives and inducements, but the will that must pass the land must be in writing, and must be determined only by what is contained in the written will."

The case of *Provis and Rowe* v. *Reed*, in 15 *Com. Law Rep.* 490, is very decided, and more strong and direct to the same effect. It was an offer to prove, by the declarations of the testator, that a will purporting to have been duly executed by him had not in fact been so executed. The evidence was rejected at the trial, and such decision was sustained in the court above, and on the ground, almost exclusively, that it would be a violation of the statute, and on account of the extreme danger of adopting such a rule.

But the most recent and best considered case in the English common law courts, which I have been able to see, is in 35 *English Com. Law Rep.* 303, in which all the judges of England sat except Lord Denman, and their decision was unanimous. The Chief Justice Tindal states the question before them as follows: " The broad ques tion, therefore, which has been argued between the par

ties, has been whether evidence of the testator's intention that his will should not be revoked, is admissible to rebut the presumption of law that such revocation should take place." Again he states it, "The question now before us relates to the revocation or nonrevocation of a will devising real property, and whether the parol declarations of the testator could be received in evidence to affect that question." The court decides that they cannot; and the reason given by the court clearly is, because the statute of frauds has anxiously and carefully excluded all evidence of that nature with respect both to the original making and to the revoking of wills of land. This reasoning seems to me to be very conclusive; for when a statute absolutely requires that all wills of real estate shall be in writing, signed and sealed by the parties, and executed in the presence of subscribing witnesses, and when revocations must take place in the same way, it is not possible that the mere verbal declarations of a man can be permitted either to make or destroy a will, and if they cannot, when offered in sufficient force, extend to the *making* or *destruction* of a will, they should not be received at all.

In this country we find, in the case of *Jackson ex dem. Coe.* v. *Kniffen*, 2 *Johns.* 31, the question is presented in a perhaps still stronger light. It was the offer of the declarations of the testator, declaring in the presence of divers persons and for many reasons, that a will which he had executed had been obtained from him under duress and from fear of being murdered, which declarations he repeated within an hour of his death, and called on those present to witness what he said, and that he desired to make an equal distribution of his estate among his children, and that he had requested the person having his will in his custody to return it for the purpose of cancelling it. The court rejected this evidence, and gave for it very satisfactory reasons.

In the case of *Dan and wife* v. *Brown and others*, 4 *Cow.*

483, the offer was to prove that the testator, a few days before his death, had declared that his will was in his desk at Brunswick, locked up with other papers which he specified, and where the key was. These declarations were rejected by the court as incompetent.

In the case of *Jackson* v. *Betts*, in 6 *Cow.* 377, the question again came up on the same will last mentioned, and the same and other declarations of the testator were offered in evidence and rejected by the court below, and the ruling was affirmed in the court above. This case was removed to the Court of Errors and reversed, but the point in question did not arise for discussion or decision.

In the case of *Smith* v. *Fenner*, in 1 *Gallison's Reports of the Circuit Court of the United States*, the same question came up, and Justice Story held that declarations of the testator made at the time of executing the will, or so near to it as to form a part of the *res gestæ*, might be admitted, but no others.

He says " the evidence is inadmissible. The mere declarations of the testator as to his intentions to do or not to do any particular act, or to make any alterations in his will, is not of itself evidence to revoke or destroy it;" and even admitting the existence of all the fraud charged in the case, he says, still it must be proved not by mere declarations, but by acts done or attempted to be done, and suppressed by fraud, violence, circumvention, or threats.

In the case of *Comstock* v. *Hadlyme Society*, in 8 *Conn. Rep.* 254, the same question came up, and the court held that the declarations of a testator *about* the time of executing the will could only be given in evidence to show the state of his mind, but not as to the facts stated. The previous decisions are all reviewed and approved, and the court says if his declarations were not a part of the *res gestæ*, I know not on what principle they can be introduced as evidence of facts.

The same question was raised in the state of Pennsyl-

vania, in 16 *Serg. & Rawle* 403. The offer was to prove
by the declarations of the testator that his will had been
executed under duress. The evidence was admitted in the
court below, but the judgment was reversed by the
Supreme Court for that reason.

The question has been before the Circuit Court of the
United States, held in this state, in 4 *Wash.* 262, the court
holding all such declarations to be improper, Judge Wash-
ington declaring that nothing could be more dangerous
than such declarations, either to control the construction of
the instrument or to support or destroy its validity.

This question was presented in the Supreme Court of
Missouri, in 24 *Mo. Rep.* 227, and also again in the same
volume, page 236. In the first case, it was offered to be
proved that the testator declared " that he had never made
the will ; that if he had signed it, they had got him drunk,
and made him do it, for he had no recollection of it." In
the second case, it was offered to be proved that the testator
declared, on various occasions before the date of the will,
and afterwards up to the time of his death, that the legatees
mentioned in the will " should never have any of his pro-
perty," and also on several occasions after the making, that
" he had no will." The court held in both these cases that
the evidence was unlawful.

In *Robinson* v. *Hutchinson and wife,* in 26 *Verm. Rep.*
38, the offer was made to prove, by the declarations of the
testatrix, that the will was procured by undue influence
over her, amounting to a species of coercion or duress, but
the court held the evidence to be incompetent to prove any
such facts.

Again, in the Court of Appeals in the state of New York,
in the case of *Waterman* v. *Whitney,* in 1 *Kernan* 157,
the court held, after reviewing all the cases, that the declar-
ations of a testator could be given in evidence if a part of
the *res gestæ* or to show unsoundness of mind, but were
not competent evidence to impeach the validity of the will
on the ground of fraud, duress, imposition, or other like
cause.

In 20 *Penn. Rep.*, Judge Black says, that when a will is made by a man of sound mind and memory, it cannot be defeated by proof that his intentions were different at a previous time.

The law, therefore, seems to be well settled against the admission of the declarations of the testator in this case, except such as formed a part of the *res gestæ* and such as went to show mental incapacity or imbecility, and I have been able to find but two adjudged cases that seem to conflict with this doctrine. In the case of *Reel* v. *Reel*, in 1 *Hawks' North Carolina Rep.* 248, the reasoning of the court is against it, although the case itself and the decision upon it are not inconsistent with it. The case of *Howell* v. *Barden*, 3 *Dev.* 442, was also cited, on the argument, as being of an adverse character, but I have not been able to see it.

The case of *Nelson* v. *Oldfield*, 2 *Vern.* 76, so often referred to to sustain the kind of evidence now under consideration, and so often condemned, is no authority at all. The validity of the will was not before the court, and the Court of Chancery had no authority over the question if it had been. The will in that case had been duly proved before the competent and proper tribunal. It was a settled matter, so far as the Court of Chancery was concerned, and the Chancellor was bound to treat it as such; but on an application to him to enforce one of its provisions, he saw fit to consider the depositions that had been taken in the case, and which went to show, in his opinion, that the will had been wrongly admitted to probate, and he thereupon refused to enforce the provision.

An effort was made to draw a distinction between a will which had in fact been signed by a testator through fraud or duress, and one which it is charged he never executed at all, but I cannot perceive the distinction. I cannot see why the declarations of a testator are less legal when they apply to a will which he has executed through fraud or duress, and which he is supposed to have some knowledge of, than when they are offered to apply to one

that he never signed, and to which he cannot be supposed to have referred.

It was also urged, on the argument, that the declarations in question should have been received because they were the declarations of a common ancestor in possession, under and through whom both the parties in this suit claim title. This idea is suggested in the opinions of some of the dissenting judges in some of the cases above cited, but the rule referred to applies quite as much to a purchaser as to an heir at law or a devisee.

The reason why the declarations of a former owner in possession can be given in evidence against those who hold under or through him, is because they are admissions made against his own interest, such as the admissions of defects in his own title, and such admissions as might be given in evidence against himself. Such admissions, thus made, pass with the land as a kind of encumbrance upon it, and may be given in evidence against a subsequent owner, but you can give in evidence no declarations or admissions of a former owner against a subsequent one, except such as might have been received against the former owner himself; but as a testator, when speaking of the contents of his will, is making no declarations against his own interest or title, or one that could be offered in evidence against himself, so no such declaration can be received against the title of one claiming under or through him.

Suppose an action of ejectment had been brought against J. M. Meeker, in his lifetime, to recover possession of his real estate, how many of all his declarations that have been offered in evidence in *this* suit could have been lawfully received in *that* to affect his title? Not one of them. They cannot, therefore, be offered to affect the title of any one claiming under him.

Jonathan Edwards Hoyt was one of the subscribing witnesses to the will of January 12th, 1852. He was deceased at the time of the trial, and the will was proved

by the surviving witness, and with such proof offered in evidence.

The plaintiffs demanded of the defendants that, before the will could be read in evidence, the deposition of the said J. E. Hoyt touching the execution of the said will, taken on another occasion and reduced to writing, should first be offered in evidence. The defendants refused to do so, and the court, on application for that purpose, refused so to direct.

The plaintiffs thereupon afterwards offered to give in evidence various declarations of the said Hoyt, made at various times and places and to various persons, both before and after the execution of the said will, but not confined to such as were part of the *res gestæ* of the execution or probate thereof. And they also offered to prove the bad character of said Hoyt for truth and veracity : to all of which evidence the defendants objected, but the objections were overruled by the court, and the evidence admitted ; and this is urged as another reason for setting aside the verdict.

I find it impossible to perceive the ground on which the admission of this evidence can be justified. The declarations offered were not confined even to such as related to the execution of the will, but *any* declarations and all declarations which he had ever made, either to the testator or about the testator, or about his will, or about his property or on any other matter which seemed to have even the most remote reference to the testator or to his affairs were received in evidence, and eighteen different witnesses were examined to testify to something that he had said at some time or another.

Now if Hoyt had been living at the time, and the defendants had offered him as a witness to prove the execution of the will, and had availed themselves of his evidence, the adverse party might, of course, have contradicted him by showing, if they could, that he had at other times given a different version of the same transaction

But the defendants did not do this; they neither availed nor attempted to avail themselves of any advantage from the testimony of Hoyt. In fact they declined to do so. The execution of the will in due form was fully and completely proved by the other subscribing witness, and the only use made of the signature of Hoyt to the will was to show, as was done by the other witness, that the requirements of the statute had been complied with at the time; that the testator had in fact signed the will in the presence of two subscribing witnesses. No other use was made, or offered to be made, of the signature of Hoyt. It was not necessary, nor was it used to prove the attestation clause, for this was sufficiently proved by another.

On what principle it is then, after death has deprived the party of the presence and testimony of a subscribing witness, and after the grave has closed over him, and he can no longer defend or protect his character or conduct, or inform others how to do so, and when he can neither contradict others nor explain his own conduct or conversation, and when his signature to the instrument is only used to prove the fact that it is there, and not in anywise to prove the genuineness of the will—on what principle it is that a witness so circumstanced can have every remark that he ever made, which can by possibility be construed into a reference to the subject offered in evidence, when he himself has given no evidence to contradict, and have his character for truth subjected to a *post mortem* examination, when he has said nothing which the jury can be called on to disbelieve, is more than I can comprehend.

There is a semblance of reason for the admission of this kind of evidence where there is but a single subscribing witness to the instrument who has deceased, and when the proof of his signature is indispensable, and being proved, it is supposed to prove the attestation clause, if there be one, and to amount to *prima facie* evidence of the execution of the paper. In such cases the signature

is made use of not merely to show the fact that it is subscribed to the paper, but it is made use of to prove the actual execution of the instrument. Here there seems to be something to combat, and the courts, in a case or two in former times, have allowed the evidence, but they have never carried it any further. The case before us, however, does not belong to that class, and is not affected by the reason and necessity supposed to exist in such cases; but in no case can the boundless range of declarations allowed in this trial be sustained. If the witness had been living and had been examined, all of his declarations that could be offered in evidence would merely be such as would contradict something that he had said on the witness stand, and no more. Now all that this deceased witness can by posssibility be supposed to say through his signature on the will, is that he saw the testator execute it; and all the declarations in any such case that could be allowed, would be such as bore on that point, and such as contradicted what the signature is supposed to speak, and not every declaration that he had ever made relating to either Meeker or Boylan, or any one else.

The cases that bear on the subject are not very numerous.

A few are to be found in the English books, which at one time feebly sustained the idea that the dying declaration of a subscribing witness, adverse to the due execution of the instrument which he had subscribed, might be given in evidence; but this doctrine has long been abandoned there, and in 1836, in the case of *Stobart* v. *Dryden,* 1 *Meeson & Welsby,* the Court of Exchequer, after a careful examination of all the cases, all the judges who heard the case concurring, held that all declarations of a deceased subscribing witness were inadmissible. The offer of the defendant in that case was to give declarations of the deceased subscribing witness of facts tending to prove that the deed was a forgery. Lord Abinger re-

jected them, and on a rule to show cause being granted, and elaborately argued, Parke, B., who delivered the opinion of the court, remarks, "We who heard the argument are all of opinion that the evidence was properly rejected;" and the question may be considered as having been there put at rest.

I have been able to find but a single American case which sustains the doctrine of giving in evidence the declarations of *deceased* subscribing witnesses. In the case of *McElwee* v. *Sutton*, 2 *Bail Rep.* 128, the South Carolina Court of Appeals seemed to take this position.

The structure of this court I am not familiar with. Its reasoning in the case is quite unsatisfactory to me, and I prefer greatly to adopt the principles and reasoning of the case in *Meeson & Welsby* 614.

On the point of receiving evidence to impeach the character of a *deceased* subscribing witness, I find no authority in any English decision, and but one American decision, where the character of a *deceased* subscribing witness has been assailed. This is the case of *Losee* v. *Losee*, in 2 *Hill* 609. This case fully sustains the principle contended for in the present case, and the Chief Justice, in delivering the opinion of the court, cites as his authority six English decisions; but what seems a little remarkable is, that not one of these decisions supports the doctrine, nor is the subject of directly impeaching the character of a deceased subscribing witness referred to in either of them. The question in three of these cases was simply as to the admission of dying declarations. In the other three the execution of written instruments had been assailed for forgery and fraud, and the character of the deceased subscribing witnesses thereby impeached by implication : the parties sustaining the instruments were permitted to show the good characters of the witnesses by way of rebutting such implication.

In 10 *Serg. & Rawle* 155, the court permitted a party to impeach the books of account of his adversary, by show-

ing that the person who kept them, who was one of the defendants, who was living but absent, was of bad character for *honesty*. In 2 *Yerger* 23, and 1 *Harrington* 109, the characters of subscribing witnesses were allowed to be impeached in some way, but how they were impeached, or whether the witnesses were living or dead, I have not been able to learn from such parts of the cases as I have been able to see.

In the case before us the character for *truth* and *veracity* of the deceased witness has been assailed, but it seems difficult to perceive on what principle the character for *truth* and *veracity* of a person can be impeached who has not been sworn and who has not uttered a word. If he can be impeached at all merely as a subscribing witness, it cannot be for anything that he has *said*, but for something that he has done. If there is anything that can be laid to his charge, it is the concocting of a forged or fraudulent will, and signing his name to it as a witness. If the plaintiffs can be permitted to show, by an attack upon his character, that he is base and bad enough to do this, it should be by assailing his character for *honesty*, and not for truth, technically speaking.

It is said, however, that the offering in evidence of the deposition of Hoyt cures this error, if it be one. I do not think so. Where the evidence is unlawful when offered, and the opposite party objects to it and resists its introduction, but has it forced upon him nevertheless, and suffers all the evil effects of it before the jury, he cannot be considered as consenting to it or committing himself to it by afterwards attempting to combat it by evidence, which he would not otherwise have introduced. When a witness is placed upon the stand who is clearly incompetent, and objection is properly taken and overruled, the party objecting cannot be considered as legalizing the testimony thus offered by a cross-examination of the witness. The defendants in this case decline to use the deposition of Hoyt, although urged to do so by the plain-

tiffs, choosing, I suppose, to forego the advantage of his testimony rather than embarrass the case with questions likely to grow out of it. This they had a right to do, and when they did offer it, it was not so much to prove the execution of the will, as to neutralize, so far as it would so, the unlawful evidence to which they had been subjected. This they had a right to do, also, without thereby legalizing the evidence to which they had objected.

I think, therefore, that the introduction of all these wide sweeping declarations of Hoyt, as well as the evidence touching his character, under all the circumstances of this case, were clearly wrong ; and as they may have had a controlling evidence over this verdict, it should be set aside for that reason.

It is also objected to this verdict, that it is against the weight of evidence in the case. If it be against the clear weight of the evidence it should be set aside. The general rules of law in relation to new trials are too well understood to need discussion here. The facts of the case and the law of the land make up the evidence on which the jury is required to find their verdict ; and if it be clearly contrary to these, the court is quite as much bound to set it aside as the jury were to find a true one. The rights and province of the jury, when in the exercise of their functions, should not be encroached upon, but the power and duty of the court to correct their errors, if they make any, must also be pursued and enforced when necessary.

The evidence in a case is not to be measured so much by the number of the witnesses or the length of their testimony, as by the materiality and importance of what is said, and the means which the witness has of information. The jury in the present case have found against the will of January 12th, 1852, set up by the defendants, and the question is whether they were justified in so doing by the evidence. If the declarations of Hoyt and the testator were stricken out, it would take from the opposition to the will much of its force ; but in the view I shall now

take of the case, I shall consider all the evidence as having been properly received, and shall confine my examination to its force and effect. Classifying, then, the different portions of the evidence in their proper places, without regard to the time or order in which they were introduced, we find the execution of this will to be proved, according to all the forms of law, by five different witnesses, all of whom say they saw the testator sign it, all of whom say they heard him first read it, all of whom say he was of sound and disposing mind and memory at the time, and all of them describe the transactions with so many circumstantials and concurrent details as to preclude all possibility of their being mistaken, whatever else they may have been. Seldom, if ever, was a will in terms so well proved, and unless this evidence, so positive, so clear, so certain, so concurrent, and with such sure and certain means of knowledge of what was said on the part of the witnesses can be shown to be false, the will must prevail and be sustained, notwithstanding all the improbabilities, incongruities, eccentricities, hardships, prejudice, or passion by which it is supposed to be surrounded.

The plaintiffs undertake to falsify and overthrow this evidence, not by any direct testimony bearing immediately on the execution of the will, not by showing that the testator was not present at the time and place mentioned, not by showing that the witnesses, or some of them, were elsewhere at the time, not by any contradiction of what the witnesses have said touching the execution of the will, not by any direct or indirect impeachment of the credit of the witnesses, except one of them, but by the exhibition of a variety of circumstances, of sayings and doings on the part of the testator and others, which seem to render it very unlikely and improbable that he should have executed such a will as the one in question. It may be possible that this testimony in support of the will can be overcome by circumstantial evidence, but such circum-

stances should be very strong and conclusive, and such as are wholly inconsistent with the existence of this paper as a legal will. If the circumstances, including the declarations of every kind as given by the witnesses, only raise a strong suspicion against this will, or render the making of it very improbable, but are such as may exist nevertheless consistently with the will, and especially if the circumstances themselves are explained away, neutralized or overcome, it certainly cannot be legally contended that such circumstances, as a rule of law, should be permitted to destroy the direct, positive, and certain evidence of five witnesses, all of whom declare they saw the will executed, and against four of whom, and their evidence, not the slightest evil imputation has been brought or attempted. Let us examine these circumstances.

The general objections to the will are two-fold. It is insisted—first, that the supposed will was never in fact signed by the deceased; and secondly, if it were, he could not have known what he was doing at the time.

The first point raised against the will is, that it is different from all the other wills that he ever made. This is true in point of fact, but it cannot of itself be considered even unusual, for it is equally true that all the wills he ever made were different from each other; and I have always supposed that the object of a person in making a second or subsequent will, was to make it different from what had preceded it. But it is said that the will in dispute is not only different from his other wills, but is different from the declared intentions of his life, chiefly because, by such wills and by such repeated declarations, he had always, ever since the date of the will before us, avowed his intention to make a devise or bequest for the erection of the Meeker Seminary at New Providence, which is not found in this will. It appears that, as early as 1846, and perhaps earlier, some six years before his death, and from that time down to September, 1851, he made several wills, in which such provision, in different

forms, was inserted. It appears, also, from several letters. and the testimony of twenty-two witnesses, that he had at various times declared that he either had or would make such provision. Admitting all this evidence to be competent, and the witnesses all truthful, we may reasonably infer that such had been his intention ; but with a mind so eccentric and vibratory as the deceased is shown to have been, it furnishes but slight evidence that he might not change his views on that subject, while, on the other hand, there is much evidence to confirm this will, and to corroborate the witnesses who testify to its execution. It is proved, by six different witnesses, that the deceased declared, during the last few months of his life, that he had entirely abandoned the project of the Meeker Institute, and that he had not or would not leave anything for that purpose. The will of 1852 was in accordance with these declarations. Nine different persons, exclusive of those present at the execution of the will, heard him declare that he would or had left Boylan something by his will. These declarations are in accordance with the will of 1852, but with no other that we have seen. Six witnesses testify that they heard the testator say that he had made or would make provision in his will to contest the park controversy in the highest courts of the state. This provision, such as it is, is found in the will in controversy, but in no other.

Two witnesses testify that they heard him say that he had left $1000 to the Methodist Church at New Providence. This provision is found in the will of 1852, but not in that of 1851.

One witness heard him say that he had left to Boylan the property in Newark which the city was contending for, and that he had made him his executor, and another states that he said he had made provision in his will for a monument. These things are found in the will of 1852, but in no other. All these things certainly go against the will of 1851, and to sustain the one of 1852.

It is true that the declarations of the testator on this as on almost every other subject, were very contradictory, and consequently unreliable, for while he was insisting to one set of persons that he had abandoned the seminary project, he was informing others that he still adhered to it; but it is impossible to avoid the conclusion that his latter declarations in favor of the seminary were mostly made, either to New Providence people, or in connection with his fierce controversy with the people of Newark, and made to enlist aid or sympathy in his behalf, under the idea that Newark, in the course she was pursuing, was destroying a great public charity.

I cannot see therefore, taking into consideration all of what purports to be the testator's wills, and all the declarations that he ever made concerning them, or his property or affairs, as furnished by the evidence, that they operate more against the will of 1852 than in its favor. I can find nothing in them essentially inconsistent with the lawful existence of this will, and I certainly think they should not be permitted to overthrow the clear and positive evidence of the persons who saw the will signed.

Considerable evidence was offered to show that the relations between the testator and Mr. Boylan were such as to render it impossible that he should have preferred him to all others in his will, and thirteen persons have testified that he had at different times spoken of Boylan in very disparaging terms. It seems to be conceded that, at some early stage of the difficulty between the testator and the city of Newark, Boylan stood so high in his favor as to have received from him the conveyance of a lot of part of the disputed premises, in consideration of his carrying on the litigation, or as a compensation therefor. The testator, having learned that Boylan had sold the lot and joined with the city, for a time denounced him with much severity, but having learned his mistake, he became reconciled to him, and twenty-seven witnesses testified that he spoke of him in very friendly, and most of them

say in very exalted terms, recommending him to others and promising to make a man of him. Besides these declarations in his favor, he seems to have been on intimate terms with him, was frequently at his office and at his house, he had him at Trenton, he wrote a codicil to his will, and was made the executor thereof a year or two before his death, and was sufficiently intimate in his family to be invited to his funeral when he died.

The evidence on this branch of the case, taken altogether, so far from impeaching the will, seems to me to confirm and strengthen it; at all events I cannot find in it anything taken altogether materially to shake the force of the evidence which is offered to prove its execution.

Again, it is said that the testator had not sufficient confidence in Hoyt to make him the custodian of his will, or to execute it in his presence, and three witnesses have testified to remarks made by him prejudicial to Hoyt. I do not see anything very remarkable in the fact that he should execute his will at the house of Hoyt. His wills had all been written by different persons, and signed at different places, and before different witnesses, and although he spoke unfavorably of him at times, as he did of persons generally, he seems to have treated him civilly: he had some business transactions with him; he invited him to his house; he occasionally called at Hoyt's, and several times remained there over night and part of the day. I see nothing in this aspect of the case to shake the evidence in support of the will.

It is also insisted that Hoyt, one of the witnesses to the will, is so impeached as to be unworthy of credit, and it is sought, by some process not very clearly defined, to extend the corruption to his whole family. I do not find in the testimony of Hoyt any internal evidence of either corruption or falsehood, and although eighteen persons have testified to certain of his declarations, made at different times, and efforts have been made to contradict and show him untruthful, yet I cannot see that they have

been successful except in a single aspect. His character for veracity and truth has been boldly impeached, and while I hold this competent, as now viewing the case, but very uncertain and unreliable evidence on which to act in important cases, for there are doubtless many men who in their business affairs, either from disregard of, or from inability to perform them, become so unfaithful to their promises and engagements as to acquire among their acquaintances the reputation of great liars, but who if put under oath, and on the witness stand, with the state-prison doors open to them on the one side, and the gates of perdition on the other, and with the court and counsel, and jury and country intensely watching for the first stammering speech and the first crimson flush which a guilty falsehood would instantly force to the surface, could not be driven from the truth, still it is evidence which the jury may consider of and carefully weigh and duly estimate ; and if Mr. Hoyt had been the only person who testified to the execution of the will, I should not feel at liberty to disturb the verdict on the ground of its being contrary to the evidence. But this is not the case, nor was his evidence relied on at all to prove the execution. If his evidence were stricken from the case, the will is still proved in the most conclusive manner by evidence which is in no way impeached.

It is suggested, however, that the testator may have signed this paper, and in the presence of the witnesses as described, and yet that it is a fraud and a false will, for that, by some trick of legerdemain, he was made to sign a paper which he did not intend to sign, and that both he and the female witnesses were alike deceived. But this cannot be so if the witnesses tell the truth. They tell us expressly that they not only saw the testator sign the paper, but that they heard him first read it. The same principal features that we now find in this will bearing his name were read over by him with approval before he signed it. The paper, as he then read it, contained a

better provision for his widow than did the will of 1851. So does the paper before us. The paper he then read excluded the Meeker Seminary from its provisions. So does the one before us. The paper he then read made the considerable devise to Boylan. So does the one before us. These things were not only read over, but were commented on at the time freely, and his determination expressed to execute it in that form. So there seems no possibility that he could have been deceived, or that he signed a paper that he did not intend to sign. Nor can I see any mode by which to avoid this concurrent, and in its terms overwhelming testimony to the execution of this will, except on the assumption of the most wicked, wilful, and corrupt forgery, and the most wicked wilful, and corrupt perjury on the part of all the witnesses. Such a position, so filled with horror, so shocking to our moral sense, and so variant from our experience, I cannot adopt, and am not at liberty to adopt, without some evidence to prove it.

What consideration *could* have induced them all to embark voluntarily into so stupendous a crime? None has been hinted at but the hope of gain, and no mode suggested for its accomplishment except by some kind of division of the devise with Boylan. For the property thus divided the deceased had asked $8000 in 1850. At the time this will was made its value was rendered somewhat doubtful by the claim made upon it by the city of Newark. So that the prospect of advantage to be received by Hoyt, as the consideration for forging the will, and sustaining it by the blackest and foulest perjury of himself and family could not have seemed very extraordinary. And it seems difficult to suppose it could have been done without previous conspiracy between the parties. Indeed it is distinctly so charged, and yet I am unable to find any evidence whatever to prove it. Boylan was not examined; Hoyt denies it, and there is no evidence to show that, at the date of the will, the parties had ever been seen to-

gether. A single witness only, if he is right in time, conveys the idea learned from Boylan, that they had seen each other before.

It is also contended that the signatures to the will are not genuine, and fourteen witnesses have expressed their belief that they are not, while ten have expressed the opinion that they are. If this were the only evidence in the case, it might be contended, with propriety perhaps, that the preponderance of evidence is against the will; but while we are often forced to depend on this kind of evidence, we all know how unreliable it is, and how little real dependence can be placed in the mere opinions of witnesses, either skilled or unskilled in such matters, where they seem to be nearly equal in adverse views, and when no one can either know or speak with certainty. Nor can I find much light thrown on this part of the case by a very careful inspection of the signatures and comparing them, as we are invited to do by the counsel on both sides, with signatures admitted to be genuine. My belief is that human skill cannot solve the question in this way. Most if not all that can be said with certainty, is that the signatures on the will greatly resemble some of those admitted to be genuine, but that they may be forged nevertheless. The right legal conclusion from the matter is, however, that the testimony of one unimpeached and uncontradicted witness, swearing positively, directly, and unequivocally that he saw the party sign the paper, and added his own name at the time as a witness, is entitled to more weight than the doubting, uncertain guesses of a hundred witnesses who are equally divided, or nearly so, in opinion among themselves.

Other objections are made to the face and appearance of the will, such as the fastenings, the margin, the color of the ink, the strange handwriting in which it is, its erasures, alterations, &c. The will is drawn with a good degree of skill, and by a person who understood the use of language, except the attestation clause. Its commend-

able brevity, as compared with his other wills, arises much more from the abridgment in words than in items or ideas. The handwriting of it is bold, strong, and natural, so far as I can perceive. It is neither proved nor charged to be in the handwriting of any one suspected of being in the conspiracy, while all the evidence we have on the subject is that it was prepared in the city of New York or Newark. If in the former place, it is quite probable that the writer has never heard of it since. Its erased and slovenly appearance is, to my mind, stronger evidence of genuineness than of falsity. A person writing his own name, or signing a genuine and honest paper, may be willing to leave it in a very imperfect condition, but person forging the signature of another to a false paper, would be very unlikely to do this when copying from a genuine one, especially when he could renew the instrument, and repeat the experiment until it was satisfactory. So here, if this whole thing is a forgery and fraud, and the witnesses all in the conspiracy, as they must be if the charge is true, and it was discovered that these glaring blunders had been committed, it would seem to me much more likely that the whole paper would have been rewritten and made perfect, rather than that it should have been left to the legal scrutiny, to which it was certainly exposed, with all this supposed guilty evidence on its face. These alterations derive their significancy from the testimony of Chancellor Williamson ; but if we take his impression of the time when the conversation occurred to which he refers, it will appear to have been " in the fall," and before the will in question was made, not after—and if so, cannot amount to much.

And again the question is presented, and evidence has been taken on both sides of it, though it has scarcely been insisted on, that even if it be true that the deceased did sign and seal the will in the manner and at the time mentioned by the witnesses, yet that he was not at the time of a mind sufficiently sound, and had not sufficient

testamentary capacity to enable him to make a legal will. If this position had been insisted on it could not have been sustained.

The general impression of the deceased is, that he was a man of more than ordinary mind, although always subject to strange freaks and eccentricities of temper and behavior. On a single subject he was greatly excited ; and about the first of March, 1852, at or before the adjournment of the legislature, his mind on that particular subject seemed somewhat disturbed and almost unsound, but at all other times and on all other subjects he seems to have been about as rational during the last year of his life as at any other time. The will, which the plaintiffs offer in evidence as a good will, was made less than four months previous to the date of the one in question, and there is no evidence to show any special change in him between the two periods. The five persons who witnessed the execution of the will, say his mind was then sound, and of the five witnesses of the of the plaintiffs who saw him on the 12th of January, 1852, no one speaks of him as being incompetent to make a lawful will. And of the one hundred and fifty-four witnesses that have been examined in the case, not one has gone sufficiently far, if all had gone the same length, to justify the rejection of the will on the ground of mental incapacity at the time of its execution.

And finally, on a careful examination and re-examination of the whole case, although it is conceded that there are various circumstances to awaken suspicion that all may not be right, yet, looking at the evidence through the medium by which the law requires me to test it, I am forced to say that these circumstances are not, in my opinion, inconsistent with the lawful execution of this will, and that they should not and cannot be allowed to overthrow the clear, positive, certain, concurrent, and unshaken testimony of those who say they saw it signed. I do not question the right of a jury to pass upon contro-

2 E*

verted facts; but this right is clearly subject to certain well established rules of law.   All our rights of life, liberty, and property may be passed upon by juries and upon human testimony, but of what value are all these rights if passion, prejudice, caprice, ignorance, misapprehension, or a wilful disregard of evidence are to pass unchallenged through the jury-box, with no power in the courts to correct them ?   There is no practitioner who does not know that a large part of the value of the trial by jury is in the fact that their verdict is subject to review and correction.   A juror is not at liberty to reject clear, certain, corroborated, uncontradicted, and unimpeached evidence, simply because he *wont* believe it, or because it is his right to reject it ; nor is he at liberty to believe what is not proved, merely because he thinks it may be so, or because his superior discernment has led him to the discover of imaginary truths, which the evidence has wholly failed to develop ; and it is because I think, in the present case, that the jury have ignored facts fully and clearly proved, and have substituted in their place supposed facts which have not been proved, and have necessarily adopted erroneous principles by which to reach their conclusion, that I am in favor of setting aside the verdict, as contrary to the clear weight of the evidence.   There are a few legal points raised in the case which I have not deemed it necessary to discuss, but I concur entirely in the opinion, as expressed by Judge Whelpley, on these points.

VREDENBURGH, J.   This was ejectment for a lot in Newark.   The plaintiffs claimed as heirs of Jonathan M. Meeker, deceased, the defendants under a devise from him.   The testator died at the age of seventy-six, on the 22d May, 1852.   The plaintiffs having proved their descent, the defendants proved the formal execution of a will, dated the 12th of January, 1852, devising the lot in question to Boylan, and read the same in evidence.   The

plaintiffs, in reply, proved and read in evidence a will of the same testator, dated the 25th of September, 1851, making a very different disposition of the property from that of 1852, not for the purpose of thereby showing title in themselves under it, but for the purpose, in connection with the declarations of the testator and some other facts, of showing that testator could never have intended to change the will of 1851 and substitute in its place such a will as that of 1852, and that consequently the will of 1852 was a forgery or a fraud. The defendants then, in reply, produced five witnesses, who all testified that they saw the testator execute the will of 1852, and also some other facts to show that the will of 1852 was genuine, and in all respects *bona fide*. The jury found against the will of 1852. The defendants now seek to set aside this verdict, among other grounds, because it is, as they allege, against the clear weight of evidence.

This presents for consideration the following questions.

*First.* Does the clear weight of the evidence show that, on the 12th of January, 1852, the testator did execute the paper of that date now before the court as his will.

*Second.* If he did, was it so done under any want of testamentary capacity, or under any hallucination, undue influence, imposition, substitution, forgery, or fraud.

*First.* Does the clear weight of the evidence show that, on the 12th of January, 1852, the testator did execute the paper now before the court as his will?

The will of 1851 had been admitted to probate by the Orphans Court, and the great point made by the plaintiffs, on the evidence before the jury and on the argument here, was that the will of 1851 was the true will; that the testator never made any one after that, and, consequently, that the will of 1852 was either a forgery or a fraud.

The paper now here propounded as the will of 1852 is dated on the 12th January, 1852, and is written, chancery-wise, on three separate half sheets of ordinary foolscap

paper, with margins at the top and at the left hand sides, fastened through the top margin by a tape, signed by the name of the testator at the end thereof, and also on the side margin of each half sheet, and attested by the names of J. Edwards Hoyt and Anna Hoyt.

J. Edwards Hoyt, Maria L. Hoyt, his widow, Anna Hoyt, Mary E. Hoyt, and Elizabeth Hoyt, his daughters, all testify that, on the evening of the 12th of January, 1852, after tea, after their extension table had been shut up round again, between seven and ten o'clock, on that round extension table, by their lamp, in their dining room, in their house, in the township of Union, in this state, they heard the testator read and comment on this paper as his will, and that its contents were not different from those of the paper now before the court; that they then and there saw the testater sign it, at the end thereof, and also on the side margins, and then and there, with his finger on the seal, heard him declare it to be his will, and request some of them to witness it, and that they then and there saw J. Edwards Hoyt and Anna Hoyt, in pursuance thereof as such witnesses, sign their names thereto.

If this be so, there is an end of this part of the case. If not so, all these witnesses must be either perjured or mistaken, or, in the language of the counsel, deceiving or deceived.

We are inquiring as to the clear weight of the evidence upon the question, whether on the evening of the 12th of January, 1852, the testator executed the paper of that date as his will.

In pursuing this inquiry, we should place in the scales of our judgment—first, the evidence of these witnesses who swear directly to the fact, and secondly, all the different items of evidence which go to corroborate them, and then place in the opposite scale all the evidence which goes to show that the testator made no such will as that of 1852, and holding them up, see whether the scales greatly preponderate in favor of the will.

*First*, then, let us put in the scales the evidence of these five witnesses who swear directly to the fact. But how shall we estimate its weight? We cannot mark it as so many ounces, pounds or tons, and yet we know that it may have all degrees of weight from the lightest feather to the most absolute moral certainty. All we can do is to note all the facts and circumstances carefully, and estimate its absolute and relative weight by the lights of conscience and experience. This weight varies with the greater or less liability of the witnesses, in the first place, to mistake, and in the second place to perjury. Thus if one undertake to identify a stranger whom he has seen only once, and that by a doubtful light, the liability to error is very great, and it takes but little to balance it, but it becomes less if he saw him by daylight, still less if it should have been a friend, still less if a brother, still less if they conversed about family matters, still less if they transacted serious family business, still less if there were two witnesses to all these facts ; and the liability to mistake decreases with every additional witness and fact, until the hypothesis of mistake is excluded from the case. So as regards perjury. If one man of bad repute testifies to an improbable fact, slight circumstances in the opposite scale might balance it ; but the probability of perjury becomes less if the fact testified to be in itself probable, still less where it is accompanied by numerous and minute details corresponding with outside facts, still less where it is supported by an intelligent and unimpeached witness, and the probability, nay the possibility of perjury becomes less by a very rapidly increasing ratio with every additional witness, until their number, their details, and their consistency may be such as to exclude from the case the question of perjury as well as of mistake.

These five witnesses, upon the salient facts which they detail, could not have been both perjured and mistaken. If mistaken, they could not have been perjured, and if perjured, they could not have been mistaken. It would

have saved us considerable investigation into this mass of evidence if the plaintiffs had informed us which hypothesis they claimed to be the true one. But they had a right to say that it was not for them to propose a theory. But although none was proposed, yet it was in fact discussed upon the theory of perjury by Hoyt and mistake by the ladies. The argument would at times look to perjury by all, but recoiled before the distinct enunciation of that hypothesis. I shall endeavor, accordingly in the first place, to mark, as it were, its weight upon this direct evidence under the allegation of mistake.

When J. Edwards Hoyt, Maria Hoyt, Anna Hoyt, Mary Hoyt, and Elizabeth Hoyt say that, on the evening of the 12th of January, 1852, they heard the testator read, and saw him sign this paper as his will, could they be mistaken? If mistaken at all, it must have been either, first, that on the evening of the 12th of January, 1852, the testator did not read, comment on, and sign any will at all, or the will he did read, comment on, and sign was not the will now before the court.

*First.* Can these five witnesses be mistaken when they say that, on the evening of the 12th of January, 1852, they heard the testator read and comment on, and saw him sign a will of some kind or other? As regards J. Edwards Hoyt, it is conceded t hat he cannot be; that, as to him, it is perjury or truth.

As regards the ladies, can they be?

*First.* Was the testator at their house at all on the evening of the 12th of January?

Could they have been deceived in the identity of his person? No one can read the evidence of these four ladies without perceiving that they were well educated and remarkably intelligent. They lived in the country some distance back from the road, with a grove of forest trees around the house. They all state that the testator, for several years, had been a frequent visitor at their house, often taking his meals there, and sometimes staying all

night; that upon such occasions they entered into familiar conversation with him; that he was fond of telling anecdotes and talking about his own affairs; that he was a very peculiar man and had peculiar notions; that he had been there about a fortnight before, and so anxious to see their father, who was not at home, that he staid until the next afternoon, when he left word for Mr. Hoyt to come to his house at New Providence, about seven miles off, as he wished to see him on important business; that their father not going, the testator came again to their house about dusk on the 12th of January, 1852, the evening in question, which was a very severe, cold, snowing, blowing, moonlight winter evening; that the testator came with a set of new horse blankets, a pair of black ponies, sleigh and bells, the sleigh being remarkably old fashioned, long, low, and yellow; that upon looking at it, they, as well as the servants, were incontinently seized with an impulse to try the old curiosity; but he not encouraging it, they all went into the dinner parlor, when after taking tea, they, the father, mother, and these three daughters, *spent the entire evening listening to the testator reading and commenting on this paper as his will*, and occasionally they themselves taking part in the commentaries; that he staid all night, took breakfast there the next morning, and that then he and their father left their house together in the sleigh aforesaid, as they understood, for Newark.

But more than this, O'Shanessy, one of the plaintiffs' witnesses, says, that he was a waiter in the Hoyt family in the winter of 1851–2, and that in the early part of the evening in question he heard bells, and went out and found the testator in the woods around the house with a sleigh and pair of black ponies, and went in and said it was old Meeker, and then the ladies came out and said there is old Meeker, and took him in; he made tea for him and lit him to bed; the family sat in the winter parlor; Hoyt and the testator left the next morning together in the sleigh aforesaid.

Mrs. O'Shanessy, another of the plaintiffs' witnesses, says, that she also was at the same time a servant in the Hoyt family; that in the fall of 1851, the testator and his wife was at Hoyt's on a visit; that again afterwards in the winter, on the same evening spoken of by her husband, the last witness, he came again, with the horses, sleigh and bells; my husband made tea for him; the young ladies used to say he was fidgety, and used to fun him, and say we must not mind what an old gentleman should say; the next morning he came into the kitchen to put on his overshoes, and went away; I remember of hearing no other sleigh or carriage coming in that evening.

Mr. Valentine, another of plaintiffs' witnesses, residing at New Providence, says, that he had an arbitration on the 12th of January, 1852, and that late in the afternoon, it being very cold winter weather, the testator came along with a pair of black ponies and an old fashioned sleigh, and wanted him to go along with him to Newark, and stay all night and sell the horses to the Plank Road Company, but he declined; that afterwards, in February, he was riding with the testator past Hoyt's, when he told the witness that, on the night of the 12th of January preceding, he did not go to Newark, but staid at Hoyt's all night; that the testator then said that he wished to drive into Hoyt's, and did so, and asked to see Hoyt, and was told that he was not at home; the testator then asked about a pair of large oxen, and was told that Hoyt had sold them; the testator replied that Hoyt ought to have kept them till Washington's birthday; this conversation was on the stoop between the testator and the ladies; the ladies seemed familiar, and invited him to come in, which he declined.

Mr. Bonnell, another of the plaintiffs' witnesses, says, that on the afternoon of the 12th of January, 1852, the sun about half an hour high, the testator drove to where he was in New Providence with the black ponies, and in

the said sleigh, and wished him to go along with him to Mr. Miller's, near Newark, to stay all night; he said he wanted to sell his horses; the witness declined, but adds that he afterwards heard from the testator, or somebody else, that he staid at Hoyt's, and not at Miller's, all night. Now can these ladies be mistaken when they say they well knew the testator? Can they be mistaken in the identity of his person? They spent that entire evening, from tea time until bed time, with him alone, reading and commenting on the contents of this paper. All agree that he staid there all night, and that no other one but the family did. Was this on the evening of the 12th of January, 1852? This question is not important, except so far as that it should be after the 25th of September, 1851, the date of the next preceding will. All agree, not only the witnesses of the defendants but also the witnesses of the plaintiffs, that it was in sleighing time, in a very cold evening in the winter of 1851-2. It must have been, therefore, after the date of the September will. But is there any reason to believe that the ladies are mistaken as to the true time? The paper is dated on the 12th, and they all testify that it was executed at its date, and there is no evidence that it was executed at any other time. The testator died on the 22d of May, 1852, and a controversy, unexampled for its bitterness, and for the ability and zeal with which it has been prosecuted, immediately arose, involving this family, father, mother, and three daughters, in the crimes of perjury and forgery respecting this will; consequently their strictest attention must have been early called to the time and circumstances relating to its execution, and which must have been retained in their memory by repeated and severe examinations and cross-examinations since. Anna Hoyt says, I have been examined two or three times since, and fixed the date in my mind. Elizabeth says, the testator executed the will a few months before his death, in January, a few days after new years; he came in a sleigh and two horses

—it was very cold, and I think storming or blowing; the testator had been there the Saturday before new years; she remembered it from his bringing a bag of new years cake, and staid till Sunday to see her father, and left word for him to come to New Providence. Mrs. Hoyt says, the testator staid twice at our house the winter before his death; he executed a will there the January before his death; it was snowing slightly, quite cold and sleighing; he had been there between Christmas and new years, on Saturday, and staid till Sunday to see Mr. Hoyt, who was not at home; he gave me a paper of new years cakes.

Mary Hoyt says, the testator executed the will at our house the fore part of January, the same year as his death; he came about sunset in a sleigh with two black horses; he had been there about a fortnight before, on Saturday, and staid till Sunday afternoon; he brought some new years cake, and said he was taking them to his wife. Mr. Bonnell and Mr. Valentine, both witnesses for the plaintiffs, testify that he left New Providence, with that identical team, late in the afternoon of the 12th of January, 1852, saying that he was going to stay all night at Miller's, near Newark; but there is no evidence that he staid at Miller's, or anywhere else that night except at Hoyt's, and Mr. Valentine himself states expressly, that afterwards, in February, when riding by Hoyt's, the testator told him that, on the evening of the 12th of January, 1852, he did not stay at Miller's, but did stay at Hoyt's all that night. Mr. and Mrs. O'Shanessy, two of the plaintiffs' witnesses, also testify to his coming to Hoyt's, in the evening in the winter of 1851–2, on precisely such a night, at the same time of day, with the same team, in sleighing time, and not a particle of proof that on that cold winter night he staid anywhere else. Can there be any doubt that the time spoken of was the 12th of January, 1852? This question was not disputed by the plaintiffs on the argument. On the contrary, it was insisted that the will was cunningly dated on the 12th of

January, 1852, because the testator did stay they all night. But I have notwithstanding reviewed the evidence, on account of its great importance in the cause.

The testator, therefore, spent the evening of the 12th January, 1852, at Hoyt's, and staid there all night.

Did the testator on that evening read, comment on, and execute a paper of some kind or other as his will? Could all these four ladies be mistaken upon that point?

*We have, then, on this winter evening of the 12th of January, the testator at the house of Hoyt.* Outside, the black ponies are put away for the night, the long yellow sleigh put under cover, the new blankets economically not put on the horses, the weather is very cold, the snow is blowing, and the wind howling through the forest trees. Inside, in the dining-room, warmed by a furnace, the tea things are cleared away, the extension table shut up round, the lighted lamp thereon, and around sit father, mother, and these three daughters, among them one person only not of the family, this eccentric testator, as curious an antique as his sleigh. No distraction from without—all concentrated within.

All these four ladies unite in testifying that the testator had come there about a fortnight before, when Mr. Hoyt was from home, and was so anxious to see him that he staid over until the afternoon of the next day, and left word for him to come to New Providence, as he wanted to see him on important business. When he came on the 12th of January, Mrs. Hoyt, Elizabeth, and Mary unite in saying that he inquired for Mr. Hoyt as soon as he came. The plaintiffs' witness, O'Shanessy, says, when the testator was out among the trees, as soon as I came to him he asked if Hoyt was at home. They would therefore think that he came on important business, and be not inattentive observers of what was going on. Elizabeth Hoyt says, that on the evening of the 12th of January, after tea, and when father, mother, the three girls, and the testator were all, as we have described, in the

dining-room, the testator said he wished to see her father alone, and they went into the little, or winter parlor, were gone ten or fifteen minutes, and then returned into the dining-room. Mrs. Hoyt says, soon after Mr. Hoyt had tea, Meeker said he wanted to speak to him, and they went into another room—were absent five or fifteen minutes, and returned. Mary Hoyt says, after father had been home a little time Mr. Meeker and he went into another room, the small parlor—were gone a few moments, and returned. Anna was not asked the question. Could this fail, under the circumstances, of arousing their attention?

Elizabeth says, when father and Mr. Meeker returned into the dining-room, after their short absence, the testator had a paper in his hand, and said it was a will, and that he wished to have it executed, and had come down for that purpose, and asked me to get pen, ink, and paper, which I did. Mrs. Hoyt says, when they returned, the testator said he had his will, and he wished to execute it there. Mary Hoyt says, when they returned, the testator had a paper in his hand, which he said was his will, and he wished to execute it. Now if the fact was so, it would certainly get so in all their heads at the same time. But if not so, how could they all labor under the same delusion at the same time? If it was mishearing or misremembering, there would be variety in their mistakes. But with their faculties aroused and their attention excited, would all these three ladies be very likely to hear such a thing amiss, and get it wrong afterward from failure of memory, and that, too, all in the same way? *But they heard it rightly or wrongly.* If they *thought* the testator said this, would it not call their attention so vividly as possible to what took place afterwards? *What could better call up all their faculties of hearing, seeing, and attention than the announcement of the testator, upon his return, that the paper he held in his hand was his will, and that he wanted to execute it then and there?* The evidence shows he was eccentric. They saw he was old—they had heard he was rich—they

knew he was childless. He had talked to them a great deal about his riches and his relations. He had talked about giving a legacy to one of them and to the father. ,Whether they heard, then, this first announcement rightly or wrongly, would they not be attentive observers of what followed? Elizabeth Hoyt says, after the testator had said he wanted to execute the paper as a will, and she had got the pen and ink for him, he then sat down by the lamp, commenced reading the paper which he said was a will; he read it aloud, and as he read the different provisions of the will, he commented upon them; the first I remember was for Mrs. Meeker. Mrs. Hoyt says, that after the testator had said he wished to execute the paper as his will, he read it over aloud, and it was remarked upon. Mary Hoyt says, when the testator said he wished to execute the paper as his will, he sat down by the table, keeping the paper in his hand, and read it, and as he read along, he remarked upon the several provisions of the will; it was executed after it was all read over; mother was there most of the time—father, two sisters, and myself all the time. Anna says, that the conversation at the execution of the will, relating to the will and the bequests in it, occupied from one to three hours, Elizabeth, that it occupied two hours or more, Mrs. Hoyt, that there were a good many remarks made by the testator about the will. All four of these ladies also testify that they were present when the paper now before the court was taken from its envelope, after the death of the testator, on the 2d of June, by their father, and that they then and there heard it read, and that its contents were the same as those of the paper read by the testator at their house, on the 12th January, as his will. Upon turning to this paper, we find that it is in the usual shape and form of a will, beginning with the usual solemn adjurations: "In the name of God, amen. I, Jonathan M. Meeker, of the township of New Providence, county of Essex, and state of New Jersey, being in good health and of sound mind, do make my

last will and testament as follows :" and which is followed by no less than twenty-one different testamentary provisions, and some of them of a very striking character. Not only so, but these ladies give us almost the entire contents of the will the testator read. They speak of no less than seventeen out of the twenty-one testamentary dispositions of the papér now before the court, and of all the most important ones. But, more than this, they detail to us a large amount of commentaries made, either by the testator or themselves, on the different bequests and devises as he read along. *These ladies may all be perjured, but how can we conceive them to be mistaken or deceived in the great fact, vital to this cause, that the testator did upon that occasion read, comment on, and recognise some paper as his will.*

But this is not all. Anna says, I don't know who wrote the body of the will; the testator brought it with him prepared; he said it had been prepared in New York. Elizabeth says, the will was all written except the last clause; the testator said it was written in °Newark or New York, I can't remember which. Elizabeth says, father wrote the last clause in the will at the request of the testator. Mrs. Hoyt says, there was some addition made to the will; the attestation clause was written by Mr. Hoyt, at the request of the testator; I do not know the handwriting of the body of the will, or who wrote it. Mary says, my impression is father wrote something on the paper, I don't know what; I think the testator told him what to write; and being shown the will, she says, the latter clause in the will is in my father's handwriting; I saw him write it. It is not disputed but that the testatum clause in the will in question is in the handwriting of Hoyt. Can these witnesses be so far mistaken as not to have heard the testator read, or see their father write an attestation clause by the request of the testator to any paper purporting to be the tesator's will at all? But this is not all. After they had spent this long winter evening listening to the old gentleman reading and commenting

on the different provisions of the will, and he and they joining in the commentaries on almost every clause, and after their father, at his request, had written the attestation clause, they came to the finale, the solemn execution of the instrument.

Elizabeth says, after father had written the attestation clause, the testator asked me to cut a seal, which I did, and put it on the will; I recognise the seal on the will before the court as the seal I cut. Mrs. Hoyt says, the seal was prepared by Elizabeth. Mary Hoyt says, I think Elizabeth prepared the seal at the testator's request.

Next came the question of witnesses. They all agree that the testator wanted some of the family to witness it. Elizabeth says, the testator asked me to sign the will as a witness, and said he had a fancy for my name, because it was that of his wife; I refused; father then proposed to go for a neighbor, Mr. Brown; the testator objected, and seemed hurt because we did not wish to witness it; mother objected to our witnessing the will, and said we did not know any of his relations, and told him he had better take the will among his relations, and execute it there; he said he would rather do it here, because it would be entirely private.

Mary says, the testator asked Elizabeth to witness the will, and she declined; then he asked Anna; before that father had proposed to get Mr. Brown; the testator replied he preferred not to have anybody out of the family, as he wished it to be entirely private. All four of the ladies unite in saying that at first they all objected to witnessing the will. The testator first asked Elizabeth; she absolutely declined.

Elizabeth further says, that her mother said she did not wish her family to witness it; father said he had better take it to Mr. Meeker's, at Elizabethtown, or elsewhere, and leave him a donation. Mrs. Hoyt says, I objected to my daughters witnessing the will; he said that the only reason he wished to execute it at our house was, that he

did not wish any one to know anything about it. · Mary says, the testator asked Elizabeth to witness it, and she declined—then he asked Anna; father proposed to get another person, Mr. Brown, and started to go for him, r at the testator objected, and it was storming. Anna says, the tesator requested me to witness it; father then got his hat, and started to go for another person. According to them, then, owing to the severity of the weather and the solicitations of the testator, Hoyt and Anna finally consented to witness it. Elizabeth says, the testator asked for pen and ink, and she brought the ink and a box of metallic pens; he said he could not write with those pens, he had tried them, and could not use them, and asked me for a quill; I got a quill, but we had no pen-knife; I tried to find a knife, but could not; I know no quill was used, because no knife could be found; he then selected a gold pen, and tried it several times on other paper, and remarked that he could write better than any of us, and then signed the will. Mrs. Hoyt says, she doesn't remember anything about the pen, but thinks he said he could write better than any of them. Mary says, I think the testator said he liked quills best, and quill pens were brought, but he used a metallic pen; he tried several before he found one to suit him, and said he was a good writer, and could beat any of us. Elizabeth says, after I cut the seal, and put it on, the testator signed his name at the bottom, and put his finger on the seal, and said it was his last will and testament, and asked me to sign it as a witness, which I refused; father and Anna witnessed the will, and then the testator signed it on the margin. Mrs. Hoyt says, the testator signed the will, and Mr. Hoyt and Anna witnessed it at his request. Mary says, the paper was signed after it was read over; the testator signed it, and put his finger on the seal, and said it was his hand and seal and his will, and father and Anna witnessed it. Elizabeth says, that after father and Anna had signed as witnesses, the testator wrote his name on

the margins, and said he had done so on previous wills. Mrs. Hoyt says, the testator signed his name several times at the foot and on the margins; I think he said he had done so before, or something of that kind. Mary says, the testator signed the paper at the bottom and on the sides of the paper; he signed it at the bottom before it was witnessed, and on the sides after it was witnessed. Anna says, after the will had been executed, the testator took up the will, and put it in his pocket-book. Mary says, after the will was executed, I think the testator put it in his pocket-book. Elizabeth says, the will, I think, was executed between nine and ten o'clock; after it was executed, I think the testator put it in his pocket, and then we females retired at the usual hour, about ten o'clock.

Now we can conceive this to be all perjury, but can we conceive all these ladies to be mistaken or to have been deceived in either of these three propositions: 1st, that the principal actor in this scene was this testator in *propria personæ;* 2d, that he did then and there read, comment upon, and sign some solemn instrument; and 3d, that such instrument was his will. First, could any one, sitting in the glare of that lamp, with all this family sitting round from tea time until bedtime, have personated the testator in reading, commenting on, and executing this will? Governor Vroom says he was very garrulous. Judge Whelpley, that he was a character, a bore, naturally so. Could any one during this whole winter evening have so personated the testator? The evidence is that there was nobody else there but Hoyt. Could he do it? To suppose so, the testator must have been insensible, and Hoyt have carried on the scene for all parties, and so as to deceive all parties. With respect to the execution of some solemn instrument, and that instrument being a will, in the nature of things, what possible mistake or deception could happen? What possible fraud, imposition, substitution, deception, or forgery by Hoyt was possible, so as to deceive these

ladies? They speak of what the testator himself read, said, and did; what they heard the testator say with their own ears, and saw him do with their own eyes, and what they themselves said, saw and did. Could the instrument be anything else than a will? Could it have been a bond, a note, a bill of sale, or any other known instrument than a will? If the testator read and commented on no will that evening, then this whole scene is a romance from the beginning to the end. The testator himself held the paper in his hand, and called it his will. He read it as his will, and the contents, when read, were those of his will. He spent the whole evening commenting on the different gifts by the will. It was executed with the forms and circumstances of a will. It was signed at the bottom and on the margins, and finally put in the testator's own pocket-book as his will. The contention is that all this is a forgery and fraud got up by Hoyt. Can any suggest in what shape or form such fraud, or delusion, or deception, or forgery, could have come? But Hoyt himself was examined and cross-examined with great minuteness and at great length. It is conceded that his statement must be perjury or truth, that *he* cannot in this matter be deceived or mistaken. Now the testimony of these ladies agrees precisely in all its details with his. This would be the case if all spoke the truth; it probably might be the case if all spoke perjury, but it could not be the case if Hoyt was perjured and the ladies mistaken. It supposes that Hoyt invented this long and intricate fiction, and that these ladies, by some kind of delusion, should make themselves believe that each item of it was true, as matters which they had heard with their own ears, seen with their own eyes, and done with their own hands. The whole description of this evening scene is truth in all, or fiction in all. It cannot be fiction in Hoyt, and mistake in the ladies.

But the improbability that these ladies can be mistaken in the fact, that the testator did, on the evening of the

12th of January, 1852, read, comment on, and sign some document, and that document a will, does not stop even here. As was to be expected under the circumstances, these ladies had open ears, sharp eyes, and close attention to what was being enacted by the testator on that evening in relation to the will. In addition to all this, these ladies give us, each in her own language, almost the entire contents of this will, and the comments of the testator and themselves upon it, and upon each part. Elizabeth says, that when the testator sat down by the lamp, and began to read, the first provision she remembers was for Mrs. Meeker; some of the company remarked that they thought he had given her very little, considering his large estate; the testator replied that she did not require a great deal of money; that she had given him a great deal of trouble, and would not sign any papers without a consideration, and that it was enough. Mrs. Hoyt says, I told him he had not done very well by his wife, and that, as he had no children, he ought to give her more; he replied he had provided well for her—all she would ever want; that he had been obliged to give her a great deal to get her to sign papers. Mary says, when the testator read the provisions for his wife, some one remarked that he ought to have given her more; he said it was enough, she had given him trouble about signing papers, and she had considerable property of her own, and she did not need any more. Could all these ladies have got such a fact in their heads at the same time by any accident, loss of memory, fraud, imposition, or substitution by Hoyt, and if not, to what kind of instrument could it refer but to a will?

Elizabeth says, there was a provision for Jonathan M. Meeker, of Elizabeth; father asked the testator why he did not give him more; he said, because he did not like his wife, she had given him hard words. Mrs. Hoyt says, the testator spoke of Jonathan M. Meeker at the depot; that he liked him, but did not like his wife; that he

meant to do something handsome for him, because of the kindness he had received from his father. Mary says, he spoke of Mr. Meeker, of Elizabeth; that he liked him very much, but did not like his wife. Could they all agree in this mistake, too, and if not, upon what instrument but a will could it be a commentary?

The will of 1852 gives a legacy to Mrs. Tally of $1000. In commenting on this legacy, Elizabeth says, that the testator said that Mrs. Tally was a favorite niece of Mrs. Meeker's and would get most of her property. Mrs. Hoyt says, he spoke of Mrs. Tally, said that he liked her very much; that she was a favorite niece of his wife, and that she would probably make her her principal heir. Mary says, he spoke of Mrs. Tally, his wife's niece, and said he thought a good deal of her, and had given her something in the will. Here, again, they must all have got under the same delusion on the same thing at the same time, or the testator did read and comment on some paper, and such paper must have been a will.

There was a provision in the will to Jonathan M. Muir, one of the plaintiffs, of a house and lot in Newark, $1000 in money, and declaring all obligations of his void. Elizabeth says, that in the will read there was a provision for a Mr. Muir. Mrs. Hoyt says, the testator, in the will, made provision for Mr. Muir, and gave up obligations against him. Mary says, I think there was a Mr. Munn or Muir, one certainly who had an interest under the will; he said that he had done a great deal for him before, which is the same language the tesator used to Governor Vroom, and had done something in the will for him, but not much. There is a legacy in the will of $500 to Gen. Pennington, provided he brought no account against his estate for services. Gen. Pennington was then one of the testator's legal counsel, prosecuting his suit against the city in relation to the park. Mrs. Hoyt says, when commenting on this provision, the testator said that Gen. Pennington had done some business for him, and that he

thought he might as well give him something, if he did not bring in any charges; that he was always afraid of lawyers' charges. Does not this sound very much like the testator? Elizabeth says, I remember a provision in the will for Gen. Pennington. How could they have conceived this fancy, if the fact were not so? There is a devise and a trust in this will for a colored girl, named Violet. In commenting on this provision, Mrs. Hoyt says, he made, in the will, provision for Violet, a colored girl; he said she had been brought up, or lived in the house. Elizabeth says, there was a provision for a colored girl, named Violet. In this will, it is provided as follows: "In the case my niece, Phœbe Roberts, recovers her reason, so that it is safe for her to leave the insane asylum, I give her $2000, and order my executors to place it in the hands of James F. Meeker, of Elizabeth, as her trustee." In speaking of this provision, Elizabeth says, there was, in the will read by the testator, provision for a woman deranged. Mrs. Hoyt says, the testator spoke of a provision for a niece, that he said was deranged. Mary says, there was provision for a niece of his, who, he said, was deranged, and who was, or had been in the asylum. How could Hoyt deceive them about this, or how could they all get into such a delusion as this at the same time; and if not, could it have been any other instrument than a will? The will says, I give to John A. Johnson, my worthy agent, $500. Mrs. Hoyt says, I recollect the name of Mr. Johnson in the will, and he spoke of him as his agent. There are gifts in the will to Mr. Townley and to Mr. Halsted. Mrs. Hoyt says, the testator mentioned Mr. Townley, and I think a provision was made for him. Elizabeth says, I remember a provision in the will for Mr. Halsted. There is nothing left, either in the will of 1851 or 1852, to the testator's only living brother, Isaac. Mrs. Hoyt says, something was said about not giving anything to his brother; the testator said he was rich, and had but one child, and did not want it. Mary says, he spoke of his brother, who he said had enough, and he

would not give him anything. The first item in the will of 1852 is, I order my executors to erect a suitable monument to my memory. Mrs. Hoyt says, something was said about a monument—I don't know what. What other instrument than a will speak about a monument? Would a bond, or a note, or a bill of sale? There is a legacy in the will of 1852 to the M. E. Church of New Providence of $1000, when they erect a new church which shall cost $3000, provided it is built in three years after his decease. Mrs. Hoyt says, I think he made provision for a church at New Providence, provided it was built in a certain time. Could this be anything but a will? In the will of 1852, Mr. Boylan and his widow are the executors. Elizabeth says, Mrs. Meeker was one of the executors. What other instrument but a will has executors?

The will of 1852 contains this further provision (18th), I give and bequeath to my worthy friend, David K. Boylan my house and lot in Newark, bounded by Washington and Spruce streets, and also the plot of land by Broad and Lagrange streets, which land is the same the city of Newark has resolved to appropriate as a public park; and it is my wish the said Boylan shall resist, as far as he may deem advisable, every effort which the city of Newark shall make to obtain it for that purpose, and shall defend this property against the city of Newark taking it to be used as a public park in the highest courts of New Jersey.

This devise of property, to the value of $15,000 or $20,000, about one-fifth of the estate, is the item, no doubt, which has caused this protracted litigation. In relation to it, Elizabeth says, in the will the testator read, there was a provision for Mr. Boylan, which gave him property in the city of Newark, *part* of which the city intended to take for a park, and he directed that he should defend it to the last; that her father remarked. that he thought he had given Boylan a great deal; that

the testator replied, that that was his business, and no one else's; that he knew what he wished to do with his own property, without any one telling him; that he thought a great deal of Mr. Boylan; that he was a very promising young man, and he meant to give him a handsome donation in his will. Mrs. Hoyt says, that when the testator read this provision, Mr. Hoyt remarked, that he thought he had been very liberal to Boylan; the testator replied, that that was his own business; that he had received a good deal of kindness from Mr. Boylan and his family, and had staid there a good deal, and he wanted that he should defend the park property, and keep the council from taking it, and that all Boylan wanted was property to make a man of him. Mary says, that in the will the testator read there was a provision for Mr. Boylan; when the testator read it, some one remarked, why do you give him so much; he replied, that he was a very nice young man; that he did not come there to be dictated to, and that he knew better what to do with his property than anybody else. Now, as regards the reading of this clause by the testator, and his and their commentaries on it, what possible deception, imposition, substitution, hallucination, forgery, or fraud, by Hoyt, on his wife and daughters was possible? Or how could they have all been so mistaken, and so agreed? Or how could such a conversation and scene relate to any other instrument than a will? By the wills of 1846 and 1848, the testator had nominally, and by the will of 1851, he had really given $10,000 in money, and a lot of land in New Providence, which he valued at about $5000, to build and carry on an institution, to be called the Meeker Seminary, to educate the poor children of other people. By the will of 1852, he provides, nineteenthly, which comes immediately after that to Boylan, as follows: It has always been my intention, and I have made several wills to that effect, to establish in New Providence an institution of learning, to be called the Meeker Seminary; but on consulting

with good and judicious friends, and on further reflection, I have decided to divide the remainder of my estate, which will amount to a very large sum, among my nephews and nieces. Now, although we should not suppose that the plaintiffs would object to this change of the will of 1851 in their favor, yet, singularly enough, while the devise to Boylan has furnished the feelings for this litigation, this bequest to themselves has furnished the chief matter for the argument. But we are not upon that branch of the case now. In relation to this provision, Elizabeth says, that the testator remarked that if the people of New Providence knew that he had not provided for a school there, they would treat him in a very contemptuous manner; that he had often spoken of such a provision, and they expected it. Mrs. Hoyt says, that the testator, while they were commenting on this will, said that he had thought of giving money to a seminary, but had relinquished the idea; that the people of New Providence were not worthy of it; *that he did not wish them to know anything about it, or they would be angry and treat him ill—that they would ride him on a rail.* Mary says, that the testator commented on the paper; he read and spoke of a seminary, and I think he said that he had intended something of the sort, but had given up the idea; that the people of New Providence would be much disappointed about it—that they expected it. Now, if the testator did not, on the evening of the 12th of January, 1852, read and comment on some document, and that document his will, these witnesses all must be mistaken, not only about the general purport and contents of the paper, but they must each one have been mistaken and deceived about each particular item and commentary. Their testimony could have nothing, not a single item in its scope, or in its purport, correct about it; because if they give us the general nature of a single item, or its commentaries, the testator must have read and commented on some document, and that document his will, because each item and

each commentary could find a place in, and belong to no other document than a will, and this whole evening scene must, by some supernatural agency, have corresponded, in all its details, with a paper they never saw until after the testator's death, and still more mysteriously have corresponded, in all its details, with this romance invented by their father. I do not see how, upon the questions, whether the testator did or did not, on the evening of the 12th of January, 1852, read, comment on, and sign some document, and that document a will, these ladies can be mistaken or deceived, unless in this case the moral laws of Providence were specially suspended. Upon these questions, the very nature of the evidence excludes from the case the hypothesis of mistake.

The next question is, conceding that the testator, on the evening of the 12th of January, 1852, did, at Hoyt's, make a will of some kind or other, can these ladies be mistaken when they say that the paper now before the court is the will he so executed. Did he sign the paper he intended to sign? The only way that any imposition could have been practised on the ladies in this particular is, that when the testator asked Hoyt to write the testatum clause, he, in some way, made way with the will the testator had read, and substituted the will now before the court in its place. But this supposes that Hoyt, without knowing the testator was coming there about a will at all, must have had a will prepared before that, so like the one the testator had been reading all the evening, all finished, too, except the testatum clause, so that, when requested to write the testatum clause, he had only to write it to the one he had prepared, and he must have done this so as not to be seen by his wife and daughters or the testator, and that the testator should not have discovered it either at signing it at the bottom or on the sides, nor when he took it home, and with the knowledge too, by Hoyt, that the testator would himself take the paper after it was executed, and, to cap the climax of absurdity, must also have sub-

stituted a will having precisely the same contents as the
one he suppressed. Such a supposition was too impro-
bable even to have been suggested upon the argument.
If the testator signed the will he intended to sign, can
there be any mistake that the will he so then signed is
the identical will now before the court? The family all
say that it is. Anna, being shown, and having examined
the paper, says, that is the paper; the signatures of myself
and J. Edwards Hoyt are the signatures of myself and
my father, made at the execution of the will; Mr.
Meeker said that was his will, and he wished us to wit-
ness it, and we did so; Meeker signed the paper in our
presence, and we in his, and at his request; I don't know
the precise number of leaves it had, three or four. Not
a single cross-interrogatory was proposed to her touching
her means of identifying the paper. As she had been
examined more than once before, we must conclude that
the plaintiffs were satisfied with her means of knowledge.
The paper being shown to Elizabeth, she says, the paper
shown is the will that was executed; I cut the seal, and
put it on, and recognise the seal on the paper shown me
as the one I cut and put on it. And again upon this
point not a word of cross-examination. Mrs. Hoyt says,
the will being shown her, it appears to be the same that
was read at our house on the night of the execution; I
think it is the paper executed then; I recognise the sig-
natures; I have not a doubt it is the same. And again
on this point no cross-examination. Mary says, the will
was signed on the table in the dining-room; I saw my
father and sister sign it; the paper shown, I should say,
is the paper executed that night. Again no cross-exami-
nation. We must conclude that the plaintiffs were satis-
fied that upon this point they could not be mistaken. But
these witnesses further identify the paper. The one read
was all in a strange handwriting, except the attestation
clause, which they saw their father write. Again they all
say that when the will was fully executed on the evening

on the 12th of January, 1852, it was taken by the testator. On the 2d of June, 1852, it was found in the possession of Hoyt. Hoyt says, two or three weeks after it was executed, it was brought back to him by the testator, with a request that he would keep it, and that he did then, at the testator's request, put it in the envelope marked ex., seal it up, and write on it: "Jona. M. Meeker's will, not to be opened until ten days after my decease; J. Edwards Hoyt," put it in his desk, and kept it there among his valuable papers until ten days after the decease. Upon this point Mrs. Hoyt says, the testator was at our house twice after the execution, once two, three, or four weeks after the execution, alone. He hitched his horse, came in, and stayed a short time. I saw the envelope sealed and endorsed in Mr. Hoyt's handwriting "not to be opened until ten days after my decease," in my husband's drawer in his private desk kept locked; Elizabeth was folding and filing some papers there, and held this up; I think Mr. Hoyt took the will with him to the testator's funeral; I heard the envelope spoken of, and that it contained the will; Mr. Hoyt talked of presenting it that day; I said, referring to the directions on the envelope, he had better be governed by Mr. Meeker's wishes; on the day the will was taken to the surrogate's office (ten days after the death of testator) it was sealed up in the envelope; I then saw it opened, and the will taken from it, and read in my presence; it appeared to be the same that was read on the 12th of January—I have not a doubt of it. Anna says, two or three weeks after the will was executed, Mr. Meeker came, in the early part of the day, and left the will in my father's possession, as I understood; I understood, from my father, that Mr. Meeker had then left the will; a short time after this visit, I think on the same day, I saw an envelope among my father's papers; I understood the will was there from the endorsement, "Jona. M. Meeker's will, to be opened in ten days after my decease," or something to that effect;

the endorsement was in my father's handwriting ; it was opened at the proper time ; I was present at the opening of the will, and heard it read ; my father got it from his papers in his drawers, and opened it and read it in presence of myself and other members of the family ; when the envelope was removed I recognised the will.    Elizabeth says, I saw the will in the envelope, marked *Exhibit* three or four weeks after its execution, in my father's drawer, which he often asked me to arrange ; on it was endorsed, in my father's handwriting, " Jona M. Meeker's will, not to be opened until ten days after my decease ;" my father then told me the envelope contained the will; this envelope is the same that contained the will; father and mother went to the funeral; father had this will in his pocket just before he started, and said he thought he would give it to Mrs. Meeker; mother told him he had better not, as Mr. Meeker did not wish it opened so soon —he must have taken it with him, as they were in the carriage; when we were about to take it to the surrogate's office (ten days after the death), I saw the envelope opened in my father's room, and it was then read in my presence and in the presence of other members of the family ; *it was the same as that which was executed.* Mary says, very soon after the exection of the will, I saw an envelope in my father's drawer, on which was written, in my father's handwriting " Jona. M. Meeker's will, not to be opened in ten days after my death ;" eight or ten days after the testator's death, he had the will in an envelope, and took it out ; some one asked him to read it, and it was read ; I should say it was the same that was executed ; the paper Ex. looks like the envelope ; its endorsements are my father's.

Those ladies could not be mistaken that they did see this envelope, so endorsed, a short time after the execution, in Mr. Hoyt's desk, and at the funeral, and when it was broken open to be taken to the surrogate's office, for they agree in all these particulars with each other and

with Hoyt's testimony, which could not be by accident. So that if these ladies are to be believed, within two or four weeks after the 12th of January, they saw the envelope now before the court sealed up in their father's desk. They saw it again on the day of the funeral. They saw it again on the day the will was taken to the surrogate's office. The envelope was then broken open, and the will now before the court found in it, and read in the presence of the same persons who, on the 12th of January, only four months before, had spent the whole of a long winter evening listening to this eccentric testator reading this will, and commenting on its various and striking contents, and seeing and helping him execute the same, and they all testify it is the same. Elizabeth says, the seal on the will opened on the 2d of June, is the same seal she cut and put on the will executed on the 12th of January. Anna, that her name to it as a witness is the same she signed to that on the 12th of January. All, that the testatum clause on the will so opened is the same they saw their father write on the 12th of January; and all, that they heard, on the 2d of June, the will taken from the envelope read, and that its contents were the same as that executed on the 12th of January. If the contents of the will read and executed by the testator on the 12th of January, were the same as those of the will taken from the envelope, and read by Hoyt on the 2d of June, what possible fraud, imposition, substitution, or deception of any kind by Hoyt, either upon the testator or upon those ladies, in the nature of things, is possible? After the execution, as they all say, and as was natural, the testator took his will away with him. If he did not give it to somebody else to keep, he must either have preserved it or destroyed it. If preserved, it would have been found among his papers, and so have shown the forgery of the one now before the court. The presumption would be that he did not destroy it. He made it to keep, and not to destroy. We cannot imagine that, after all this trouble

to make it, he should turn round immediately and tear it up. But we must go still further; we must imagine that Hoyt forge another just like it, when he new the original was in the possession of the testator. So that we must go still further, and suppose that after the testator destroyed the original, he told Hoyt of it, for Hoyt would not certainly forged the will before the court as long as he thought a true one, another just like it, was in existence. If the testator destroyed the will he made on the 12th of January, it could only have been made by him for the purpose of deluding Boylan into doing his law business under the expectation of this devise, which he took the first opportunity that Boylan should hear of through the lady (Mrs. Trimble) he found in his office the next day, and then cheat him by destroying it. But in this case Hoyt was the last man he would have told of its destruction. That would have defeated his whole object. But the supposition must go still further. After being informed of its destruction, Hoyt must have gone and informed Boylan, and they two have agreed to forge a copy of the will destroyed, and done it by the 1st of February, 1852, so cunningly that his wife and daughters were deceived in the paper, in the handwriting and contents of the will, in the signature of the testator, in the testatum clause, so cunningly that Elizabeth did not know the seal she cut and put on the paper, or Anna know her own handwriting. We must suppose that, after all this trouble of making this will for no other purpose but to defraud Boylan, he should have turned round and torn it up, and immediately have given information of it to those whom its making was intended to defraud : such a supposition was too improbable for its suggestion to have been ventured on in the argument.

If the testator did not destroy the will he did make, he must have given it to somebody to keep, and this must have been either Hoyt or somebody else. If somebody else, the presumption is that it would have been forth-

coming. If not forthcoming, the presumption is that he really did give it to Hoyt. All the circumstances prove it. Why not give it to Hoyt to keep?- If he thought well enough of Hoyt to execute it there, and have him for a witness, is it anything strange he should give it to him to keep? It was just what he had done before. He left the will of 1836 done up in an envelope, endorsed something like this, with Mr. Whitehead, and the will of 1848, done up in the same manner, with Mr. Johnson to keep, wills, too, carefully divided into half sheets, with side margins, and all carefully signed on each margin by him. If these ladies are to be believed at all, too, it is evident that he did not wish the people of New Providence and the favored legatees under the will of 1851 to know of the will of 1852, for they all say that his object in executing it at their house, seven miles off, was to keep it a secret from them : so that naturally he would not want it about the house, and would be apt to leave it at Hoyt's, for the same reason that he executed it there. If he left it with Hoyt, must not the will before us be the one the testator made on the 12th of January? The contents are identified by all these ladies as the same, not only as to the whole, but as to each half sheet. There could have been, therefore, neither substitution nor change, unless we suppose that Hoyt, while he had in his possession the will really executed, destroyed the original, and forged a copy.

The plaintiffs' evidence does not attack this branch of the case. It does not attack the question, that if the testator, on the 12th January, 1852, made any will at all, that the one now before the court is the same. But their attempt is to show that he never made any will at all after the will of 1851, or, at any rate, no such will as this : so that the proof of the defendants on this point stands supported not only by all the proof, but by all the presumptions raised by law in favor of *omnia rite acta*. One more remark, and I leave this part of the case. If we assume that the testator did, on the 12th of January, 1852, make

or thought he made any will at all, then all the plaintiffs' evidence upon the point, whether this is the same will or not, turns against themselves    The plaintiffs have proved, by many witnesses, that after the 12th of January, 1852, the testator told the people of New Providence, and to some of the favored legatees under the will of 1851, that he had made his will in September, 1851, and that he had not made, and never intended to make another. Now if he, really did make a new will on the 12th of January, 1852, why did he conceal it from the people of New Providence and the legatees under the will of 1851? Must it not have been because he thought the will of 1852 would be distasteful to them? And precisely such is the will of 1852.

We conclude, therefore, that upon the dominant fact in this case, that the testator, on the evening of the 12th of January, 1852, did execute a will, and *the* will now before the court, these ladies cannot be mistaken. The plaintiffs are consequently forced, whether they will or no, to face the hypothesis of perjury by all. It is perfectly apparent, that if Hoyt be perjured, so also must be his wife and daughters. They are all in the same boat, and must sink or swim together.

What, then, is the weight of this direct evidence, as regards the question of *perjury* by all? These five witnesses swear directly to the fact, that they did see the testator, on the 12th of January, 1852, sign this will. No witness or other evidence directly contradicts them. But it is said the circumstances are such as to make it a doubtful question whether they are or are not perjured. We have already seen with what minute detail they give us the circumstances of the execution. They are too long to repeat. Mr. Hoyt also gives the same detail with more minuteness, and with the addition, that while he and the testator were out in the private parlor, the testator produced this will and read it to him, and he said he wished to execute it, and that the testator took it away with him

the next morning, and in from one to two weeks, brought it back, and prevailed on him to keep it, and that he did then, at the request of the testator, seal it up in the envelope produced here, and endorse on it "Jona. M. Meeker's will, not to be opened until ten days after my decease," and sign his own name to it; and that he kept the will, so sealed up, among his papers until it was opened and read on the day it was taken to the surrogate's office If these five witnesses are all perjured, then that winter evening there in the country was spent in the ordinary way; no will was produced, or read, or commented on by him or them. Then it is not true that the testator produced a paper, which he said was his will, and that he wished to execute it then and there. Then it is not true that with the paper in his hand, by the lamp, by the round table, in the presence of them all, he read it paragraph by paragraph, and commented on its different provisions for two or three hours. Then it is not true that the testator came there with the will written, except the testatum clause, and said he had got it prepared in Newark or New York, nor that he asked Hoyt to write the testatum clause, who did so write it. Nor is it true that he pressed some of the family to witness it, which some refused, and all objected to. Then it is not true that he asked Elizabeth to get pen and ink, which she did, nor to cut a seal, which he put on the will. Then it is not true that he wished Elizabeth to witness the will, saying he had a fancy for her name, as it was that of his wife, nor that anything was said about pens, or quills, or penknife, or that he tried the pens, or wrote with the gold pen on other paper to try it, saying he could beat any of them. Then it is not true that, on that round table, on that cold winter evening, in the presence of these five witnesses, father, mother, and three daughters, after reading and commenting on it from tea time until bed time, he did, with that gold pen, sign the will, and with his finger on the seal, say it was his will, and request them

to witness it. Then it is not true that Hoyt started for Brown for a witness, and was prevented by the testator's objections and the state of the weather from going. Then it is not true that Ann signed the will as a witness, or that Hoyt did either, or that any of them saw or heard any such thing. Then it is not true that after he had signed it at the bottom, he signed it also on the margins, saying he had done so on his former wills to make it more secure, and after that put it in his pocket-book. Then it is not true that Mrs. Hoyt told him he had better take the will among his neighbors, and execute it there. Then it is not true that the testator said he did not wish to have anybody not of the family to witness it, as he wished it to be entirely private. Then it is not true that the will he then read had any arrangement for a monument, or that he read any will having a provision for Mrs. Meeker, upon which some one remarked that she thought he had given her very little, considering his large estate and that he had no children, and that he replied that she did not require a great deal, and that she had given him a good deal of trouble about signing papers, and that she had considerable property of her own. Then it is not true that he read any will having a provision for Mr. Boylan, giving him property in Newark, part of which the city were intending to take for a park, and directing that he should defend it against the city in the highest courts in the state, nor that Hoyt thereupon remarked that he thought he had given Boylan a great deal, to which the testator replied, that that was his business; that he thought a great deal of Boylan, that he was a very promising young man, and he meant to give him a handsome donation in his will; that he had received a good deal of kindness from Mr. Boylan and his family, and staid there a good deal, and he wanted him to defend the park property, and keep the council from taking it to the last, and that all Boylan wanted was property to make a man of him. Then it is not true that, while he was read-

ing his will, the testator said, that if the people of New Prov .dence knew that he had not provided for a school there they would treat him in a very contemptuous manner; that he had often spoken of such a provision, and they expected it; that he had thought of giving money to the seminary, but had relinquished the idea; that the people of New Providence were not worthy of it; that he did not wish them to know anything about it; that they would be angry, and ride him on a rail. Then it is not true that he read a will containing a provision for Mr. Meeker of Elizabeth, and that upon Hoyt asking him why he did not give him more, replying that he liked him, but did not like his wife, but that he had received kindness from his father. Then it is not true that he read a will giving a legacy to Mrs. Tally, and while reading it remarked, that she was a favorite niece of his wife, and he had left her something. Then it is not true that he read a will making a provision for Mr. Muir, and giving up obligations against him, remarking that he had done a great deal for him before, and had done something for him in the will, but not much. Then he did not read a will providing for Violet, remarking that she had been brought up in his house; nor that he read a will giving a legacy to Mr. Pennington, or made the idiosyncric remark respecting it; nor did he read a will containing a provision for a niece who he said was deranged,, and had been or was in the asylum. Then it is not true that he read a will containing a provision for a church at New Providence, provided it was built in a certain time, nor one giving a legacy to Mr. Halsted. Then it is not true that, while reading his will, he gave as a reason for not leaving a legacy to his only living brother Isaac that he was rich, had but one child, and did not want it, nor read a will containing a provision for Mr. Townley, or one for Mr. Johnson, and spoke of him as his agent. Then it is not true that the testator, a short time after he executed the will, brought it back to Hoyt, who put it in the en-

velope and endorsed it and kept it sealed until after the testator's death, nor that the ladies saw this envelope, so endorsed, in Hoyt's desk, a short time after its execution.

If these five witnesses are perjured, if the testator read, commented on, and signed no will at all on the 12th of January, 1852, all, all this, and much more, is pure romance. This long winter evening was spent in no such business. There was no such excitement around that lamp. When the testator and Hoyt returned after that short absence in the winter parlor, the imaginations of these ladies were not struck by this eccentric, rich, childless old man declaring that the paper he held in his hand was his will, and that he wished to execute it then and there. Their curiosity was not suspended, as after each paragraph was read and commented on, they almost held their breath expecting what would come next. No will was produced or requested to be witnessed; no protest by the mother against her family witnessing it; no catching by her, with the quick sense of maternal anxiety, of a glimpse of that cloud of infamy which, by that act and this verdict, has cast its shadows on her daughters' fame. It was all, from the beginning to the end, in the aggregate and in the details, perjury, perjury all. They could have agreed upon these minute details, and made them correspond so wonderfully as they do with almost innumerable outside facts, only in two ways—1st, by their truth. 2d, by a most carefully prepared and well learned fiction. If these facts did not happen on the evening of the 12th of January, they must have been invented afterwards by conspirators, among whom must have been Boylan, Mr. Hoyt, Mrs. Hoyt, Anna, Mary, and Elizabeth Hoyt. How must they have been got up? Who wrote this drama? Who assigned its parts? When and were did Hoyt, his wife and daughters, commit their parts to memory? When and where did they act it over in private before they played it in public before the Orphans Court? It had to be conned well beforehand. It was not

like an ordinary drama, where they can have a prompter behind the curtain, and an audience who will not question its truth. It must have been all preconcerted. It could not first have developed itself during the examination by any kind of continuous extempore perjury. Anna must have agreed beforehand to swear she saw the will executed, and signed her name as a witness; Elizabeth, that she cut the seal and put it on the will; Mary, that the testator came into the room with the will in his hand; Mrs. Hoyt, that she protested against her daughters signing it, and so all through. Some time after the evening of the 12th of January, and before the 2d of June, when the seal of the envelope was broken, Hoyt and Boylan must have forged this will, and ascertained that the wife and daughters would swear it through, and all must have agreed upon and committed to memory the details of the plot. When between these two periods must it have been? The plaintiffs have proved, by Mr. Day, that on the last of January, or the first of February, Hoyt was at his house, and said that he had been writing a will for an old gentleman without children, and he thought when he was dead there would be trouble about it, because he had left his brother nothing; but he wrote it so strong all the devils in hell could not break it; that he offered to give him $1000. but he would not have it. The plaintiffs infer that the old gentleman referred to was the testator, and the will the one now before the court. I have no doubt they are correct in both inferences. But there is another inference that necessarily follows, and that is, that the will now before the court must have been in existence the 1st of February, when the testator was still living and in full health. This will must have been forged then, and this plot invented and agreed upon after the 12th of January, and before the 1st of February. How was it got up? Boylan must have been one of the conspirators, for nothing is given by the will to the Hoyts. They could get nothing by the forgery and perjury except

2 II*

by contract with Boylan. Hoyt and Boylan, then, between the 12th of January and the 1st of February must have forged this will, and Hoyt agreed to swear to it himself, and to procure his wife and daughters to do the same. Hoyt must, then, have taken this forged will to his wife and daughters, and calling them together in family council, have said to them, here is a will of old Mr. Meeker, which Boylan and I have forged, by which he gives Boylan $20,000. Boylan has agreed to give me half. You must all swear that on the evening of the 12th of January, when Meeker stayed here all night, you saw him sign and execute it. You, Anna, write your name to it as a witness. You, Elizabeth, must swear you cut the seal and put it on. All of you, that you saw me write the testatum clause, and that you saw Mr. Meeker sign it, both at the bottom and on the sides. All of you must learn the contents of this will by heart, and swear that you heard him read and comment on its contents. Here is a writing, Boylan, that I have prepared of what you must swear the testator said on that evening; learn its contents by heart, so that you can testify to them.

Is it likely that all these six persons would have embarked into and persevered in this conspiracy to the present time? Would they have done so if they could? Could they have done so if they would? Would Boylan have engaged in it? The whole suspicion is founded on the belief of his complicity. Without that there could be no possible motive on the part of the Hoyts to commit this crime. The only suggestion is that Boylan agreed to divide its fruits with their father. The motive should be proved. There is nothing suggested against Boylan's character. He appears, by the evidence, to belong to an honorable profession. Should we lightly presume that he would risk his position in society, his professional existence and his personal liberty, and hold them all at the mercy of so many conspirators? Are we, upon slight grounds, to presume that he would forge a will and suborn the witnesses? What evidence is there of complicity on

Boylan *ads.* Meeker.

the part of Boylan? There is no direct evidence, no paper, no writing, no witness who pretends to have heard the whisperings of their secret conclave. And in the first place, what kind of a conspiracy is this that Hoyt and Boylan are accused of concerting? According to the plaintiff's theory, Hoyt drew and forged this will, and was to sustain it by false swearing himself, and suborning his wife and three daughters to add their perjury to his, and yet neither Hoyt nor any of his family get a single dollar by the will. All he or they can by possibility get is by the charity of Boylan. And what kind of provision is made for Boylan? Why, the main gift to Boylan is the park property, which both Boylan and Hoyt must have known did not, at the date of the will, belong to the testator at all. The title to that had been vested in the city ten days before, on the 2d of January, by the action of the council. All that, at the date of the will, belonged to the testator was the damages, which are not given to the conspirators by the will. The only thing given by the will to the conspirators is the house and lot in Washington street. It is certainly to be supposed that when so much trouble is gone to to get up a forged will, the conspirators would hardly give themselves property which they knew did not belong to the testator. Again, if Boylan is implicated in this conspiracy he could have had nothing to do with the original draft of this will. The mistakes in the name of Gen. Pennington and of Cottage street forbid that conclusion. The first evidence of complicity on the part of Boylan is that of Carr, who says he was taken deaf in 1846; that he thinks, in the early part of March, 1852, he went into Boylan's back office, when Boylan was away, and that he then saw there, on Boylan's desk, a paper in Boylan's handwriting, endorsed copy of Jona. M. Meeker's will, and in the inside began as a will; that then Hoyt and Boylan came in, and as they passed from the front to the back office, Hoyt asked Boylan if everything was ready. Now, in the first place, Carr's own character

is very equally balanced by the evidence in that respect; in the second place, he was deaf; and in the third place, it is perfectly manifest, from the evidence of James H. Boylan and the circumstances, that Carr is mistaken about the time, and that this must have taken place after the will was lodged for probate, and Mr. Boylan had got a copy of it from the office. Then, if what Hoyt said related to the will, which might just as well have related to anything else, how natural was it for him to ask if everything was ready? But suppose Carr be right in his time, how he heard the remark of Hoyt when he was deaf, is somewhat singular; and if he did, as Carr found this copy of the will in Boylan's back office, and Hoyt's remark was made as he and Boylan were coming in from outdoors, how the remark applied to .the copy does not appear. As Hoyt and Boylan passed from the front to the back office, Hoyt asked Boylan if everthing was ready. If we suppose this was after the will was lodged for probate, and they were preparing for the contest in the Orphans Court, this might very naturally relate to the will. But if it was the first of February, and related to a forgery, what could be its meaning? Everything ready for what? It could not have related to the execution of the forgery. That was already complete, for here was the copy laying on Mr. Boylan's law table, finished, folded, and endorsed, to be inspected by any chance meddler who might happen to step in. What had Boylan to get ready? If Boylan had asked Hoyt the question, it could have had a meaning, for he had his wife and daughters to get ready to swear to it. But there is no reason, as Hoyt and Boylan came in accidentally from outdoors, and the remark was made as they were passing from the front to the back office, and the copy had been laying in the back office we know not how long, that the remark applied at all to the copy. On the contrary, as it is proved by —— —— that Meeker at times requested Hoyt to meet him at Boylan's office on matters relating to the

contest about the park, and they were then preparing to appeal and influence the legislature, and to fight and litigate the city in all imaginable ways, would not the remark, if it was heard at all, and was in February, relate much more naturally to the park controversy than to a forged will? But again, all the inferences founded on this supposed remark of Hoyt are based upon the assumption that this was a copy of the will now before the court. But how does that appear? Carr did not read any part of its contents. We know not how many wills Mr. Boylan may have written for the testator. He certainly did write a codicil for him in 1850; may he not have written others, like Mr. Whitehead, and kept the rough draft? At any rate, how does it appear that it was a copy of the will in controversy? But suppose it was, it proves that the original must have come into existence before that, and that the original was genuine rather than a forgery If genuine, it was natural to take a copy to guard against loss or destruction; but what forger ever thought of taking a copy of his own forged instrument to guard against its loss or destruction? It is as easy for him to make a new original as to make a copy. But is not the whole supposition in its nature preposterous? Here Hoyt and Boylan forge this will, and date it the 12th of January. Hoyt seduces the family—his wife and three young daughters—to support it by perjury in the courts. Boylan gravely takes a copy, endorsing it as a copy of Jona. M. Meeker's will, and leaves it on his desk in his office for the inspection of every one, and all this complication of forgery and perjury gone into, all its minute details agreed upon by Boylan, J. Edwards Hoyt, Maria Hoyt, Anna Hoyt, Elizabeth Hoyt, and Mary Hoyt, while the testator was yet alive and in tolerable health, who was likely to live, as far as they could tell, for these ten years, yet who, from his notorious facility of making wills, was most likely, at any moment, to make a new will of latter date, and thus, by a single stroke of his pen, dash the whole fabric into

atoms.    Verily, it was well worth while for the forger, on the first of February, 1852, gravely to take a copy of the will he himself had forged.    It is asked, if a copy, how could he get it.    It might be asked, in reply, if a forgery, why did he want it.    He could only want a copy because he supposed the original was genuine.    But I see no ' the slightest difficulty in answering the question.    Although the testator, in some companies, professed to keep the thing a secret from Boylan, yet he spoke without reserve respecting this devise to Boylan to those whom he thought were intimate with him.    I see no difficulty in believing that the original was written in Boylan's office under the directions of the testator, and that Mr. Boylan has unwisely permitted himself to be overawed from avowing it.    The testator did certainly, in 1850, get Mr. Boylan to draw a will for him, and execute it in his office, making Boylan his executor, and what else we know not, and both Mr. Boylan and the testator may have thought it best that, for the large legacy to him in the present will, it should be executed somewhere else than in his office, and thus Boylan would naturally have the rough draft.    Or I see nothing unlikely that the testator himself, before he gave the will back to Hoyt, should have permitted Boylan to take a copy, or that the one who did draw it or Hoyt should have so far betrayed their trust as to have permitted the same thing.    Taking Carr's testimony to be correct, I think it goes much further to prove that the original, of which Boylan held the copy, was genuine rather than forgery.

The next evidence of complicity is, that Hoyt was once or twice in Boylan's office during the winter before the testator's death.    But this evidence is, that the testator requested him to come there to assist him about the park litigation.    If he did not ask Hoyt to assist him in this business, Hoyt must have been the only man the testator met with that he did not.    I see nothing in this more than we should naturally expect.

The next evidence of complicity is, that Hoyt and Boylan went to the testator's on the evening he died, and arrived there just after he breathed his last. Hoyt took this will with him, wishing, he says, to leave it with the testator, being uneasy that, if he kept it until after the testator's death, it might involve his family in some unpleasantness. The plaintiffs have proved that, while at the testator's that evening, Hoyt mislaid his hat, which occasioned some search after it. The plaintiffs infer, from these facts, that the errand of Hoyt and Boylan there that evening was for Hoyt and Boylan furtively to hide this forged will among the testator's private papers, so that, being found there by the friends after his death, it would appear as if the testator had always kept it in his possession. I do not see that the evidence furnishes the slightest ground for such an inference. Boylan was at that time his confidential friend and legal adviser. He was then his chief agent in carrying on the park litigation, which then interested the testator's feelings more than everything else put together. Mr. Boylan knew that he had drawn in his own office the testator's codicil in 1850, by which he was appointed the testator's executor, and which he had every reason to believe was still his last will, unless the testator had told him of the will of 1852, and had therefore every reason to believe on this very evening that he was the testator's executor. He heard that evening that the testator was seriously sick. Was he not bound by every tie of gratitude and propriety to call and see him? As regards Hoyt's going, he had the custody of this will. He says he protested against keeping it, and was only induced to do so at the solicitation of the testator. The plaintiffs themselves have proved that Hoyt said, so early as the first of February, that he expected when the testator died there would be trouble about it, because it gave nothing to his brother. Is it anything more than natural that Hoyt, under these circumstances, fearing that his wife and daughters might be annoyed, and

that suspicion might attach unjustly to them, should desire to hand the will back to the testator, and he again take charge of it? But it is said that Hoyt lost his hat on that occasion, and that this shows he was seeking an opportunity of placing this forged will among the dead man's papers. But the evidence shows that when Hoyt and Boylan started to go to Meeker's they understood that he was alive yet, and Providence alone knew when he might die. They did not know he was dead until after they got there. He died while they were on the road. They must have gone there to leave with a living man his own forged will. Was that a very likely errand? But it is said he lost his hat; and this proves he did it to give him an opportunity of leaving this false will surreptitiously among the dead man's papers. But I cannot see how losing his hat would facilitate that object. It appears me to have directly the opposite effect. It would call the attention of everybody to himself and to what he was doing. The only way it could assist him would be for him to go to Mrs. Meeker or Mrs. Tally, and say, I have lost my hat, I wish you would give me the keys to Mr. Meeker's private drawers; I wish to go there to see if my hat has not got among his private papers; and if they had let him have the keys, while looking for his hat among those papers, he might have dropped among them this forged will.

The next evidence of this complicity of Boylan is, that both he and Hoyt were at the testator's funeral. But I cannot see how, considering the relations that undoubtedly existed between both Hoyt and Boylan and the testator, it can be any evidence of this conspiracy that they both paid that respect to his memory, each one with his own lawful wife upon his arm.

The next evidence of complicity is that Hoyt, about the time of Meeker's death, asked Mr. Tuttle if he thought Boylan's note would be good for a few hundred dollars. Mr. Tuttle understood him as referring to Boy-

lan's general character and standing. Now I can easily understand, if the truth be as Hoyt states it, that he had but a partial acquaintance with Boylan, that he would have a natural curiosity to know something of the general character and situation of the object of the testator's bounty. But this must have been a considerable time after the will had been forged, and the details of the plot agreed upon by all the conspirators and prepared for action. Here, then, was Hoyt, who had been hired by Boylan to utter this forgery, and suborn his wife and daughters to support it by perjury, asking his neighbors about Boylan's general character and standing, one conspirator to commit forgery and perjury, asking if the one who had hired him to do it was a man of good character. As to the inquiry about the note, it was not made with a view to get at his pecuniary responsibility, for Mr. Tuttle says, I chose to consider the inquiry as relating to his pecuniary character, but I think he referred to his general character and standing. But even if it related to his pecuniary standing, if this will was a forgery, would Hoyt, if he was to be paid by Boylan's note for plunging himself, his wife and daughters, into this vortex of crime, wait until after the will had been forged, and his wife and daughters committed to the plot, before he inquired if Boylan's note was good for a few hundred dollars? Would not all these matters have been arranged beforehand? The whole thing looks to me much more like curiosity than crime. But there is still another difficulty. How could Hoyt and Boylan conspire in this way? The legacy is to Boylan, not to Hoyt. If Hoyt was to involve himself, his wife and daughters, in forgery and perjury to support this devise to Boylan, as he had the lion's share of the crime, would he not demand the lion's share of the spoil? But how was this to be arranged? Boylan, before the forgery was committed, and before Hoyt, his wife and daughters, agreed to swear to it, must either pay cash, or give security to pay after the receipt of the fruits of the crime. If

cash, how could Boylan advance it? Whence could he get the means, or if he could, how much would he be willing to advance upon a forged will of a living testator, with no certainty when he would die, and with a good deal of certainty, that if he did not die very soon, he would make a new will of posterior date, and with all the uncertainties attending upon such an attempt? If Hoyt was to depend upon securities, what securities could Boylan give him that would be worth the paper they were written on? After Hoyt has suborned his family, and carried through this scheme of crime, his reward and the liberty and character of himself, his wife and daughters, would be entirely at the mercy of the arch fiend whose purposes he had served. But let us look at Mr. Tuttle's evidence a little more closely, and give it its true significance. Mr. Tuttle says this conversation with Hoyt was shortly before he heard of the filing of the caveat. It must consequently have been about the time of the testator's death, which was the 22d May, 1852.

The plaintiffs have proved, by Mr. Day and others, that this will was in existence as early as the first of February preceding. Mr. Tuttle says, Hoyt asked him if he thought Boylan's note for a few hundred dollars would be good, and if he was worthy to be trusted; so that we find, four months after Hoyt had forged this will, and arranged with his wife and daughters to support it by their perjury, no agreement yet between Hoyt and Boylan as to his (Hoyt's) compensation. A very disinterested and confiding perjurer and forger must Hoyt have been. So late as about the 22d of May, we find him not yet having received from Boylan any compensation or security for forging this will and suborning his family, but deliberating about getting Boylan's note for a few hundred dollars. Does this look as if Hoyt and Boylan were original conspirators, in which Hoyt was to commit all the crime, and Boylan reap all the profit? It looks to me much more as if the will were genuine, and that Hoyt thought

Boylan ought, and perhaps would in his surprise and grati-
tude, give him his note for a few hundred dollars for
what he really had, or pretended he had done. There is
here no evidence of complicity on the part of Boylan, and
consequently no evidence of any motive on the part of
Hoyt and of these ladies to commit this high crime. It is
but reasoning in a circle to say, there is complicity be-
cause there is forgery, and forgery because there is com-
plicity. Until this complicity appears by some kind of evi-
dence, these ladies have a right to say there is no motive
for us to commit this crime. In estimating, therefore, the
weight of this evidence, we should mark, in the first
place upon it, that no motive to commit forgery or per-
jury on the part of Hoyt, his wife and daughters, satisfac-
torily appears. Is it a likely thing that Hoyt would have
engaged in such a plot, and involved in it his wife and
daughters?

It is true that the plaintiffs have proved that his gene-
ral character for truth and veracity is bad. But they have
taken care to limit it to that. No one speaks of character
for truth under oath or of his general character. There is
a wide distinction, which, in such a case as this, ought
not to be overlooked. Many men get into loose habits of
talking, and of even falsifying, in ordinary conversation,
and about business matters, about bargains, paying debts,
and all imaginable things, who would not even color a
thing intentionally under oath, and still more who would
be entirely incapable of inventing a falsehood, and testi-
fying to it in a court of justice. But the unutterable
wickedness supposed, as regards Hoyt in the present case,
goes far beyond this. Men the most abandoned, the deep-
est steeped in crime, do not go ordinarily to their own
families for accomplices. They seek strangers to their
name and blood. The proof of character in this case
hardly shows a miscreant of so deep a dye. But the
plaintiffs themselves have given serious evidence corrob-
orating Hoyt's statement. They have proved, by Mr.

Day, that, on the last of January or first of February, 1852, Hoyt was at his house, and said, on that occasion, that he had been writing a will for an old gentleman without children, and he thought when he was dead there would be trouble about it, because he had left his brother nothing; but he had wrote it so strong all the devils in hell could not break it; that the testator offered to give him one or two thousand dollars, but he would not have it. The plaintiffs' object in offering this evidence was to show that Hoyt falsified when he said he did not know in whose handwriting the body of the will of 1852 was, whereas Mr. Day understood him to say that he wrote it himself. Now, taking this precisely as Mr. Day understood it, it is not literally untrue, as Hoyt, his wife and daughters relate it, and as appears by the exhibit of the will itself. He did write the testatum clause, and as his object in his communication to Mr. Day was not to specify who wrote the will, either its body or its parts, but to communicate the main fact of his participation in the execution of such a will, it is easy to see how he might use that expression without intending to say specifically that he wrote the body of the will, especially as the evidence shows he was a very talkative man, and given to exaggeration in ordinary conversation. But the point of the discussion between Mr. Day and Mr. Hoyt was not in whose handwriting the body of this will was, but that some old gentleman made such a will at all, in the execution of which Hoyt participated, and therefore it was a thing very likely to happen that Mr. Day, having his attention called to the conversation some months afterwards, should believe Hoyt used the term wrote, when he used some other expression having reference to its execution. But the expression Hoyt used, even as detailed by Mr. Day, shows that he did not refer to the handwriting of the body of the will. He said he wrote it so strong that all the devils in hell could not break it. This breaking of the will refers not to the way in which the body of the will is writ-

ten, but to the mode in which it is executed.   A will is not broken, in ordinary language, from the mode in which it is written, but from the manner in which it is executed.     If the essential formalities of its execution are wanting— if no witnesses, no signing, no declaration, or if these are informal, the will is said to be broken.   Therefore it is apparent from the conversation itself that Hoyt had reference to its execution, and not who wrote the body of the will.

But as the plaintiffs insist that this conversation of Hoyt is legal evidence, we must give its true significance, and it appears to me that it contains several remarkable confirmations of the truth of the statement of the Hoyt family. In the first place, he did not mention the name of the testator.   All the Hoyt family agree that the testator desired them not to make it public that he had made a will then; so much so that it was sealed up in an envelope, endorsed not to be open until ten days after his decease. We thus find, as early as the first of February, while the testator was alive and in full health, in a conversation apparently perfectly accidental, Hoyt acting upon the assumption of the truth of the evidence detailed in court a long time afterward.   If Hoyt saw this will executed by the testator under a pledge of secrecy on the 12th of January, from his talkative nature, he would be very apt on the 1st of February to tell it to a neighbor, concealing however the name of the testator; but if he had committed a forgery, it was the last thing he would naturally have talked about.   But again, Chancellor Williamson says, that some time before the date of this will he was counsel for Mr. Hoyt in an important lawsuit; that in riding out one day, Hoyt informed him that there was an old gentleman who was rich, and wished to leave him a large part of his property, and asked, if he should write the will, how he should perfect it.   The Chancellor advised him that it would be very indiscreet, and that he had better get some indifferent person to do it, who would see

2 I*

that it was correct. Elizabeth Hoyt says, that when the will was about to be executed, her father said to the testator that he had better take it elsewhere to be executed, and leave him a donation. Hoyt either made the remark or he did not. If he did, it shows that this evening scene of the 12th of January was a reality, and that the advice of Chancellor Williamson, which was the best possible, had had its legitimate and natural effect upon the mind of his client, and that although he desired the donation, he agreeably to the advice of his counsel, deemed it very indiscreet to have it executed at his house, but wished it done elsewhere.

But the plaintiffs' case supposes this whole evening scene a fiction. Is it possible to conceive that Elizabeth put this language in her father's mouth three years after his death to meet this evidence of the Chancellor? The case shows that she had been examined in this cause twice before. It is not suggested that there is any discrepancy in her testimony. By what divination could she, in 1852, put this language in her father's mouth to meet the evidence of Chancellor Williamson in 1858. But as we have seen, the plaintiffs themselves have proved, by Mr. Day, that so early as the first of February, 1852, Hoyt told him that the testator offered to give him $1000 or $2000, but he would not have it. Mary Hoyt says, the testator spoke well of my father; he said he wished he was his nephew, and if he was he would know what to do with a great part of his property. Elizabeth Hoyt says, the testator wished her father was his nephew, and if he had been he would know what to do with a considerable portion of his property. Now the conversation with Chancellor Williamson related to a genuine, not a forged will. He said to the Chancellor, in effect, Meeker wishes to leave me a large portion of his property. The Chancellor replied, it will be very indiscreet to have it perfected at your house; get some indifferent person to do it. A will is produced purporting to be executed at the house of

Hoyt, without any legacy to Hoyt. He talks as if desirous of having one. He tells the testator, give me a donation, and execute it somewhere else. A few days afterwards Hoyt tells Mr. Day, Meeker offered to give me $1000 or $2000, but I would not have it. Now this all looks natural, and what we would expect to happen if the scene of the 12th of January was a real one, but extremely unlikely to happen if it was a fiction. It is evident, from the terms used by Hoyt to Chancellor Williamson, that he was contemplating a real will, not a forgery. It is evident, from the remarks made by him, as detailed both by his daughter Elizabeth and Mr. Day, that the advice the Chancellor gave him was operating on his mind, and it is only in this way we can understand the remark, "go somewhere else to execute the will, and give me a donation," and he offered to give me $1000 or $2000, but I would not take it. Would Hoyt's wife and daughters enter into an agreement to commit such a complicated plot as this to memory, and act it before the courts and repeat the performances until the present time? Their characters are entirely unimpeached. Are we to infer, in the absence of all proof, their utter depravity because the one is his widow and the others descended from his loins? There is no such rule in nature or in law. Neither the one nor the other raises against them any such ancestral presumption. These ladies have a right to rest their character not upon the merits or demerits of their progenitors, but upon their own. The evidence, besides, negatives such a presumption. No one can read their evidence without being struck with its air of truth.

I have thus endeavored to mark upon this direct evidence its weight *per se.* We should now place in the same scale the other items of evidence corroborative of it. And, in the first place, let us see what was the condition of the testator's mind on the evening of the 12th of January, 1852. Was it in a condition in which he would be likely to make a new will, and a new will of the kind now in

controversy ?  In the first place, it is a matter to excite surprise if he should, on the 12th of January, 1852, change his will by making a new one ?  He was eminently a man of many wills.  We have before us a fragment of a will in 1834, a will in 1846, another in 1848, and another in 1851.  We hear the evidence speaking of another will in 1820, of two others in 1846, of another in 1849, and of a codicil in 1850, and how many more we know not. Is it to be wondered at if he made another in 1852 ?  Is it to be wondered at if he made it in the material form in which we find the one of 1852 ?  All the others are just like it, written on separate half sheets of ordinary foolscap paper, with side margins, and signed by the testator at the bottom and on the margin of each half sheet.  Is it to be wondered at that it was left with Hoyt in an envelope endorsed ?  So was the will of 1834 with Mr. Whitehead, and the will of 1848 with Mr. Johnson, and all of them found in envelopes endorsed.  As to the endorsement upon this envelope and its signatures it is very naturally explained by Hoyt, and just what I should expect from the idiosyncracies of the testator.

In the next place, was the testator's frame of mind such, on the evening of the 12th of January, as that we would naturally expect him to make such a will as that now in controversy ?  The will of 1851 gives nothing to his only living brother Isaac, but devotes about what would be his share towards establishing the Meeker Seminary.  The great change made in the will of 1851 by the will of 1852, and which has made all this litigation, is transferring this devise in value from the seminary to Boylan, for the purpose in part, and with the expressed wish, that he should contest to the last extremity the city's taking the park property.  The property given to Boylan by the will of 1852 was the property itself the city were seeking to seize, and the lot in Broad street, Newark, for which this ejectment was brought.  Now what, on the evening of the 12th of January, were the

testator's feelings with regard to the city seizing his property for the park? Were they very highly excited? Did he consider the price they offered in exchange merely nominal? Did he think, by making a great show of litigation, he would make them give more? Did he consider its seizure an outrage upon his private rights—so much so that he would contest it during his life, and make provision for contesting it after his death by a will, the offspring of his passion and reflecting its colors?

Mr. Hoyt, on cross-examination, says, that about the year 1849, when the testator was on very friendly terms with Mr. Whitehead, he wrote a will for him, in which he gave Mr. Whitehead an undivided half of what he called the park property, and a house somewhere about town, which will, it is the impression of Hoyt, the testator signed. In this Hoyt is very strongly supported by Dr. Lord, Mr. Myer, and Mr. Smith. All these three witnesses say, that in 1850 the testator executed, in Boylan's office, a codicil to which they were witnesses, and in which he constituted Mr. Boylan his executor. Dr. Lord says, "that upon that occasion the testator said he had been substituting another name for that of Mr. Whitehead—I think he said Mr. Boylan; that life was uncertain, and his object in the codicil was to substitute Mr. Boylan for Mr. Whitehead as executor ; that Mr. Whitehead had been prominent in getting the land taken for a park."

This evidence about the codicil could not be true, unless Hoyt's evidence in this regard was also true, because Mr. Whitehead was not the executor in the will of 1848, and the codicil must necessarily have been to a will subsequent to the will of 1848 and prior to the date of the codicil. Between those periods we have evidence of no other will but that spoken of by Hoyt, and this will and its codicil have both disappeared. Hoyt is undoubtedly correct as to Mr. Whitehead being executor in the will of 1849, for in it he is supported by Dr. Lord, Mr. Myer,

and Mr. Smith. Is he not probably correct in his state-
ment of the devises in that will to Mr. Whitehead? Hoyt
gives us the reasoning of the testator afterwards upon the
subject of the substitution of Boylan. According to Hoyt,
the testator said "that his brother Isaac had done one
mean act—he had applied to him to help support a pau-
per sister, and he had refused, and threw the whole ex-
pense on him and his brother Caleb; and, besides, Isaac
was rich and had but one child, and did not want any-
thing, and that he intended that Isaac's share of the es-
tate should go out of the family; that he could afford
and intended to give Mr. Whitehead a good slice out of
his estate, had it not been for the matter of the park."
Now Hoyt, so far as Isaac's share is concerned, is sup-
ported by the wills of 1846, of 1848, and of 1851 as well
as of 1852, for in all these wills he does give Isaac's share
out of the family; and when we consider the extrava-
gance of the testator, both as regards his likes and dis-
likes, and the very high esteem he justly held Mr. White-
head in prior to the park affair, thinking him to be worthy,
as he undoubtedly was, of being President of the United
States, is it not also highly probable that Hoyt is also cor-
rect as to the devises in the will of 1849, and that in that
will the testator did, besides making him executor, give
to Mr. Whitehead the one half of this park property and
a house in town, probably the very property devised in
the will of 1852, to Boylan? This becomes still more
probable by the undoubted fact, proved by the wills them-
selves, that he did, by two different wills, one in 1834 and
one in 1846, give to Mr. Whitehead, or his family, fifteen
hundred dollars, so that we have absolute proof by his
wills, so early as 1846, that he intended to leave Isaac's
share out of the family; and we have strong premonitory
symptoms, and if Hoyt is to be believed about anything,
absolute proof that, so early as 1849, he did actually de-
vise this very property not only out of his family, but to
his then favorite counsel. At any rate, the proof is con-

clusive that, in 1849, there was made a will of which Mr.
Whitehead was executor.   Now it so happened that, in
February, 1850, the legislature passed an act authorizing
the city of Newark to seize private property for public
parks.   For some reason or other, the testator immediately
thought that Mr. Whitehead had been instrumental in
getting the act through with a view of seizing upon the pro-
perty he devised to Boylan for a park, and characteristically
his whole feelings with regard to Mr. Whitehead instantly
changed.    The first fruits of this change we see in the
codicil of 1850, which he made, as he declared to the wit-
nesses, for the purpose of substituting Mr. Boylan's name
in place of Mr. Whitehead in the will (it must have been
of 1849) and of making Boylan, instead of Mr. Whitehead,
his executor, because Mr. Whitehead had been prominent
in getting the land taken for a park.   We have undoubted
proof, then, that so early as 1850, the testator did substitute,
by codicil, Mr. Boylan for Mr. Whitehead as executor in
the will to which this was a codicil, which must have been
made after the will of 1848, and before the codicil.    Was
not Mr. Whitehead devisee or legatee as well as executor?
He was in the wills of 1834 and 1846, why not in that of
1849?    Hoyt swears he was.    If, by the codicil, he struck
out the name of Mr. Whitehead as executor, did he have it
in as legatee or devisee?    If he substituted Boylan as ex-
ecutor, did he not also as devisee?   Or as he said when he
executed the codicil, that it was a codicil to his will, he had
been substituting another name (*viz.* Boylan) for that of
Mr. Whitehead, which means literally, wherever in the will
the name of Mr. Whitehead occurs, whether as executor or
devisee.    Thus we have undoubted proof that so early
(1850) the testator, on account of this park matter, did
substitute Mr. Boylan for Mr. Whitehead as his executor,
and a very strong reason to believe that he did also, at
the same time, by the same codicil, transfer by devise the
one half of this park property and this identical house and

lot in Newark from his previous favorite counsel, Mr. Whitehead, to his new favorite counsel, Mr. Boylan.

John A. Johnson says, that he saw, since Mr. Meeker's death, an uncancelled will, others than the wills of 1851 and 1852; Mrs. Meeker showed it to me at her house since his death, I think the next week, and before they took the inventory; it was dated, I think, in 1820. This will has since disappeared, and so also have the codicil of 1850, and the will to which it was a codicil. This is unfortunate and a little singular, as that will and codicil might throw important light on the cause.

We thus find, by undoubted evidence, that so early as 1850, before the city had take a single step towards seizing his property, upon the bare suspicion that Mr. Whitehead had been instrumental in passing a mere abstract law under which it might be seized, the testator was so indignant, his mind so influenced, that he actually makes a codicil striking out his long tried and faithful friend and counselor, Mr. Whitehead, and substituting Mr. Boylan in his place. What, then, should we not expect him to do as the city marched on with relentless step, unmindful of his continual and earnest protestations, to its final seizure on the 2d of January, 1852. The first action of the city under this law was on the 6th of June, 1851, when they resolved to take action in relation to the park. But the testator was making his preparations for battle before the city moved at all. So early as the 24th of April, 1851, he gives, as he calls it, Boylan a lot, part of this very land the city proposed to seize. The advantage to the testator of this gift to Boylan is eminently manifest, and demonstrates at the same time very satisfactorily both his practical sagacity and his testamentary capacity. In consideration of the gift, Boylan was to do all his small law business for life for nothing. The testator had two advantages for this—1st, he might law his neighbors *ad libitum* without charge; and 2d, he claimed to own Mr. Boylan by virtue of the gift. But after the gift Mr. Boylan found

the lot too small for practical use, so he was obliged to buy of the testator two feet additional, for which the testator made him pay one hundred dollars per foot, which was probably the full value of the whole lot. The testator got this additional advantage from the sale of these two feet—he could law as much as he was a mind to for nothing. Mrs. Hoyt says, he remarked, when he read the legacy to Gen. Pennington in the will of 1852, he was always afraid of lawyers' charges. In the second place, by selling to Boylan some of it at one hundred dollars per foot, he intended to establish that as the standard of value for the whole in all his controversies with the city. But this is not all, this deed of gift is accompanied by a written article, bearing even date, by which Boylan is bound to build immediately on this lot, in anticipation of action by the city. So anxious is the old gentleman that this shall be done that he loans him the money, to be secured by mortgage on the lot. This anxiety is further manifested by a letter from the testator to Boylan the very day after the deed of gift, April 25th, 1851, in which, among other things, he says, " If you can get Scribner or Thomp-' son to examine the clay of Mrs. Cory, and perhaps they will make the best for us. Thompson did live with Dunn the surveyor. See some of the Irish, and see if they cannot furnish good field stone for the cellar, until the top of the ground is best at Lewis' farm, or Samuel Baldwin, or Mrs. Baldwin has stone. See John Murray the mason, and Brown the mason, and Edmund Hedden mason, and George Concklin particular. He lives in Cottage near Mulberry street. I prefer him to any man I know of. Don't fail of making every exertion to drive on the work. See Kelly, and Halsey Meeker and his son, and tell them to look out for stone, and perhaps they can get some of their mountain friends to come down next week and help scrape out the cellar. There is Kelly's brother, and Sturges most likely can be got by him. Go ahead. You may expect me with my ponies on Tuesday next."

Boylan did go ahead, and was thus forced to become the catspaw of the testator in fighting the city on his own account. This whole arrangement fully justifies the opinions of the testator, so often declared in the evidence, that he thought Mr. Boylan a very nice young man, unless, as. we may suppose, Mr. Boylan was led along by the *ignis fatuus* of the executorship, and perhaps some other provisions like the devises spoken of by Hoyt in the codicil of 1850. But that the testator expected this additional advantage is manifest from the unmeasured. terms in which he afterwards denounced Mr. Boylan while he suspected that he would rather compromise with than fight the city. But things were getting continually more serious about the taking of the park. On the 6th of June, 1851, the city resolved to take action about the park. On the 25th of June, a public meeting of citizens to resist the action of the city was got up, at the instigation of the testator, at which Captain Nichols presided, and Mr. Boylan did the speaking. Meetings in relation thereto was held by the city council on the 23d and 28th of July; also on the 2d of August; also on the 6th of September, when commissioners of assessment were appointed; also on the 4th and 29th of October; also on the 7th of. November, when the commissioners reported; also, as appears by the evidence, repeatedly in November and December, and again on the 2d of January, 1852, when the city took final action condemning the testator's property for a public park, and allowing him what he professed to consider only a nominal value. Through all these proceedings the testator opposed them with the most active and deadly hostility. He attended the meetings by himself, by his counsel, by his friends, by others jointly interested in opposing the park. He electioneered with the members of the council, prepared briefs for those of them that were friendly to speak from in their meetings. He got up meetings of the citizens. He remonstrated to the council, to the people of Newark, and

to the world at large, to interfere to prevent this great outrage upon his private rights. In his remonstrance he calls the law unjust, unreasonable, unrighteous, and despotic. He goes to Morristown to get a pamphlet printed to set forth his grievances at large before the council. But all is of no avail. On the 2d of January the city consummate the outrage. Ten days afterwards, on the 12th of January, he comes to Hoyt's with a will prepared, giving this park and a house and lot to his favorite counsel to enable him to resist this outrage after his death, and in the highest courts of the state.

Is it anything more than we should expect? If he, under the excitement and indignation he was then laboring under, had given the whole of his property to litigation, instead of what, as his wills from 1846 show, he had intended to leave out of the family, would we have been surprised? The testator's feelings are further illustrated by the plaintiffs' own evidence. Thus, Mr. Cory says, during the last six months he was enraged at Mr. Pollard (an alderman) in relation to the park; he wanted me to come down and lick him, and said if I could not do it, he, old as he was, could; he said he had lost a hundred pounds of flesh contesting the park, which the witness thinks was true. Bonnell says, he was always excited about the park, and said they were going to take it away from him. Samuel Wilcox says, he was in great excitement about the city taking the park; he said that it ruined him; he was so excited he shed tears; he said he would resist it as long as he could by law; he told Mr. Low that the common council were common scoundrels, and wanted us all to turn in and help him lick them; he told Alderman Pollard that they should not have the land at all—he would law them. The same fact is further illustrated by the witnesses of the defendant. Thus Mr. Harriott says, that the testator told him in November or December, 1851, before the final action of council, that he would make provision in his will for Boylan to con

test the park in the highest courts of the state ; he told Mr. Law, prior to the 6th of September, 1851, that the city wished to purchase the park, and on the witness advising him to let them have it, he said he never would let them have it in his lifetime, and he would leave money with his executors to prosecute and resist the claim of the city. And we are to convict all the five Hoyts of forgery and perjury for testifying that, ten days after all this outrage was perpetrated, he actually did do the precise thing he told Mr. Law and Mr. Harriott beforehand he should do. Mr. Heaton testifies, that in November or December, 1851, at a meeting of the council, testator told him that they were trying to take his land away from him for less than it was worth ; that he would follow it up while he lived, and would leave means to contend for it, or look after it, after he was gone. Mr. Doremus testifies, that in the latter part of summer, or fore part of fall of 1851, the testator told him he was going to fight the city as long as he lived about the park, and after that would leave it for, as his impression is, his executors to fight. But the testator's utter detestation and hatred of this act of the city, and his determination to resist by law, living or dead, this seizure of his property, is, perhaps, best illustrated by the plaintiffs' own written evidence. Thus in his letter to the Rev. Mr. Crane, under date of the 18th of February, 1852, he says, " I have in my old days, which I was allotting to comfort, more difficulty than I think any man ought to have. The whole of Newark endeavoring to rob me of my land, and that by a most unconstitutional, most despotic, and partial law, the power to take a man's land and give him any price that they may see fit, and then have right to tax two-thirds of that sum to the owner of the land around for the idle and vicious to walk in, our loyal legislature never ought, and I think never will, allow such a most despotic, unequal, and partial law, but will expunge and erase it from their book of laws." So in his letter to Mr. Clark, a member of the

legislature, under date of March 8th, 1852, he says, " you remember that on the car I spoke to your honor about a most outrageous law, passed on the 14th of February, 1850, the most partial, despotic, unequal, and unconstitutional that was ever allowed on the records of our state, and you said you would lend your assistance to getting it repealed and put out of the statute book. I have more cause of complaint than our forefathers had of Great Britain. They never took from the citizens their right of soil, and converted it to others. This law you will perceive authorizes the city to take my land from me and convert it to the city proper, and turns round and makes me pay myself for so doing, two-thirds in the first place, and then my quantum of the remainder, and the property to pass to the city they say for a park, but when they obtain possession for whatever purpose they see fit to put it to. Should any such power be allowed a city ? I think you will say no. Our present legislature appear to be too just to allow any such law to stand on our statute book, but will vote to repeal the same, and have black lines drawn around the same, as being unconstitutional, unequal, unjust and despotic."

So in his letter to Governor Vroom, under date of the 19th February, 1852, he says, " I employed Mr. Muir, my nephew, to call on your honor to assist in getting a most partial and despotic law repealed, passed February 14th, 1850. I think our legislature too republican to suffer such a despotic act to remain on the journal, but will order it immediately expunged and the black line into all such partial, unequal and unconstitutional laws." The testator is evidently proposing to himself the model of the great expunger. The hour of victory in the senate chamber is floating before his eyes. What can be so significant of the hope of final triumph from undying battle as the obvious reference of the expression in these letters, that the " legislature should draw black lines around the act, and expunge and erase it from their book of laws." He did keep

2 K*

his promise to fight it during his life in all imaginable ways before the city authorities, before the people, before the courts, and before the legislature. Did he not keep his promise, that he would make provision for fighting it after he was gone? Does not this evidence conclusively show that, on the evening of the 2d of January, when the city consummated this outrage, he was in a frame of mind, of all others the most favorable, to go to New York or elsewhere, and have a will drawn with just such a provision in it, and by the 12th be ready to execute it? Would not our wonder be, not that he had, but that he had not done it? And if he did, who of all the world would most likely be his devisee or trustee for that purpose? Would it not be his personal friend and favorite legal counsellor? On the evening of the 12th of January, 1852, was not the testator's mind in the most favorable mood not only to make provision for litigating this park business, but also to appoint Boylan his trustee for that purpose? The evidence shows that on that evening the testator and Boylan were on the most friendly terms. All the Hoyt family testify that, during that evening the testator not only made this devise, but expressed himself in the most friendly terms toward Mr. Boylan. Elizabeth says, the testator said he thought a great deal of Mr. Boylan; that he was a very promising young man, and he meant to give him a handsome donation in his will. Mrs. Hoyt says, that he said that he had received a good deal of kindness from Mr. Boylan and his family, and had staid there a good deal, and he wanted he should defend the park property, and keep the council from taking it; that all Boylan wanted was property to make a man of him. Mary says, that when some one asked why do you give Boylan so much, he said he was a very fine young man; that he did not come to be dictated to, and knew better what to do with his property than any one else. In this, are they not supported by the most satisfactory evidence?

Mrs. Hoyt says, that the next morning after breakfast, the testator and her husband left their house with the black ponies and the old sleigh together, as she understood, for Newark. In this she is supported by her family, and the plaintiffs' witnesses, the O'Shannessy's. This being a severe winter day, it is not probable that they got away from Hoyt's much before ten o'clock. He starts from Hoyt's, and as fast as his black ponies can take him, he drives to Mr. Boylan's office. Mrs. Trimble says, that on that morning, between ten and twelve, as she was sitting in Boylan's office, the testator, the black ponies, and the yellow sleigh loomed upon her vision; the testator came into the office; Mr. Boylan was engaged in writing on her business when he came in. As Mrs. Trimble lived in town, and he out, he wished his business attended to first; he said he had some business with Boylan about the south park, and he wished his business attended to, for he wanted to return that day; she gave way to him; he staid in the office an hour, and then accepted Boylan's invitation to dinner; he said he wanted to feed the horses, and Boylan said they would be fed near his house; Boylan asked her to go with them, and the testator also said I had better go; she did not, but went out and dined elsewhere, and returned at two o'clock, and found Meeker and Boylan there; Boylan went out, as she thinks, to the bank; while he was gone, the testator said he was an old man, and had been making a will and given Boylan the property the city wished to rob him of; that he wished him to know all about his property, as he was an executor, and would have to settle it up.

In this Mrs. Trimble is corroborated by Amos Wilcox. He says, " that on the morning of the 13th of January, 1852, before twelve o'clock, I met the testator in the street in a sleigh, and got in with him; as I got in Boylan was in the street; Meeker said to Boylan he was going to the stable; Boylan said he would come there and see him; the stable was in the rear of Boylan's house; I had a little

financial business with Meeker, which I transacted at Boylan's house; some papers were signed there, I think a check and note; I left Meeker there; Boylan asked him to stay to dinner, which he did; I declined." Now Mrs. Trimble and Mr. Wilcox, as well as the Hoyts, speak of the very time of the date of this will. It was executed on the evening of the 12th. The first thing the testator does the next morning was to drive straight to Boylan's office on business about this very park, postpones other customers for his business, spends the day with him, morning and afternoon, attending to this very park business at his office and house, feeds his horses at his stable, does business at his house as well as in the office, not only accepts Boylan's invitation to dinner, but also invites Mrs. Trimble there on his own hook, dines at Boylan's with his wife and family, and professes so much friendship for Boylan as to tell Mrs. Trimble he had made him his executor, and given him a large portion of his estate. The condition of the testator's feelings towards Boylan at any other time than at the execution of the will are not material. It is only then that the state of his feelings are material. And then, on the evening of the 12th of January, unless Mrs. Trimble and Mr. Wilcox are perjured, as well as the Hoyts, Boylan must have been his favorite legal counsellor in relation to this very park controversy, and on the most friendly and intimate personal relations, and proves most conclusively that one of the reasons detailed by the Hoyts, as given by the testator for this legacy to Boylan, *viz.* that he received a good deal of kindness from Boylan and his family, and staid there a good deal, and that he wanted he should defend the park property, was literally true. The testator must not only have been on these terms with Boylan on the 12th of January, when the will was executed, but he must have been on the same terms with him on the 2d of January, when the council consummated the act of seizure. Gen. Runyon, one of the plaintiffs' witnesses, says, " the tes-

tator came, on the 2d of January, 1852, and got me to draw a brief for Alderman Wilcox to speak from that evening." James H. Boylan says, "Mr. Meeker came, and wished my brother to prepare briefs for the members of the council to speak from; he had had one prepared by Gen. Runyon, which he said he did not like, and got my brother to prepare another, with some alterations of Mr. Runyon's, which he left in our office; I copied the brief finally agreed upon." Mr. Harriott says, "In November or December, I saw the testator in Boylan's office, writing; he had a paper relating to the city taking his property, one drawn by Runyon and one drawn by Boylan; he liked the one Mr. Boylan prepared the best; he spoke a great deal of Boylan; he said he was a very worthy young man, and he meant to give him a start in the world, and that he would make provision by his will for Boylan to contest the park in the highest courts of the state." Now the time here spoken of by Mr. Harriott is the same time spoken of by Gen. Runyon and James H. Boylan, and refers to the same brief. Gen. Runyon says it was the 2d of January; Harriott and James H. Boylan place it a few days sooner. But it proves, if the witnesses are to be believed, that at the time the last argument was had before the council, on the 2d of January, or a few days before, that Boylan was acting as the testator's favorite counsel in relation to the park, but that he then said, in emphatic terms, that he would make provision by his will to contest the park in the highest courts of the state. And we are asked to believe that the Hoyt family are all either perjured or mistaken when they swear that, ten days afterwards, as soon as he could conveniently get the will drawn, while his mind was seething under what he considered this unspeakable outrage, he came to their house with a will with this precise provision in it, identical in thought and identical in language. Alderman Hollingsworth says, the day the final vote was taken, or very near it, the testator said he thought a good deal of Boy-

lan, and that he did his business ; so that, if these witnesses are to be believed, on the very night when the last struggle took place before the city authorities, the arguments were had upon the very brief Mr. Boylan had prepared for the testator, and at his request, he preferring Mr. Boylan's brief to Mr. Runyon's ; so that both, when the wrong was consummated on the 2d of January, and when the will was executed, Mr. Boylan was his favorite legal counsellor in this very park controversy.

The regard of the testator for Boylan would appear to have been of considerable standing. Thus John H. Meeker says, during "the year 1849, the testator spoke well of Boylan and his family ; he was with him a good deal, and was very attentive to him ; he visited Boylan's family a great deal, and took his meals there and frequently slept there ; I have heard him speak frequently of leaving Boylan property by his will ; he spoke of his being well treated at Boylan's house ; he always spoke well and highly of him."

James H. Boylan says, " my brother was in the habit of doing business for the testator for ten years before his death ; I saw him at the office frequently ; he used to call pretty nearly every time he came to town ; he spent a considerable portion of his time at my brother's office, and monopolized his time, and would have his business attended to ; he would go with my brother to dinner, or take him to a hotel or restaurant ; I frequently heard Meeker say he thought a good deal of my brother and his family, and that he had done his business more to his liking than any one he had employed ; I saw the testator as often as every two or three weeks ; I heard the testator say, on several occasions and to within six weeks of his death, that if my brother continued to do his business as well as he had done, he would do something nice for him ; he said it in the office, and at my father's house, and in walking with him from time to time."

Mr. Doremus says, " that during the last two years of

the testator's life he saw him in Boylan's office on business as often as twenty times, and that he had heard him speak several times that he was much pleased with the manner Boylan managed his business, and that he intended to leave him something very nice ; that he intended to leave him well off ; that he would make a man of him if he would continue to do as he had done."

It is undisputed that, in 1850, the testator executed in Boylan's office a codicil, among other things making Boylan an executor, substituting, as the testator said, Mr. Boylan for Mr. Whitehead, and which remained in force, so far as we know, until the 25th of September, 1851, the date of the will of 1851.

Dr. Lord, one of the witnesses to the codicil, says, " that during the last six months of his life I saw the testator and Boylan together, and thought they were on the most intimate terms ; he spoke of him as his friend Boylan." It will be remembered that the will of 1852 calls Boylan his worthy friend.

Mr. Harriott says, " that he knew the testator from the spring of 1818 ; I became acquainted with him at Boylan's office and house ; I saw him frequently at the house, and taking his meals there ; he was very familiar, talking with Mrs. Boylan and the children ; he said, in the spring of 1848, that Boylan should henceforth do his business, and that he was going to do something for him in his will to pay him for all his trouble."

Mr. Law says, " that prior to the 6th of September, 1851, he met the testator going to Boylan's office to give instructions, as he said, to his lawyer about the park property ; he said Boylan was his lawyer ; that he thought well of him as a lawyer ; that he had done his business very well, and charged him moderately, and he should remember him for it hereafter ; that he would never let the city have the park property while he lived, and would authorize his executors to stand a suit with them, and leave money in their hands for that purpose."

Mr. Camp says, I know Mr. Boylan enjoyed the testator's confidence in 1851; we were both opposed to the park, and frequently talked about it; I was interested in the land; then Meeker saw Boylan himself, and we were the only persons to fight the city; Boylan took a very active part in the matter.

It would appear, from this evidence, that from the year 1848, until the 12th of January, 1852, the most friendly and intimate relations existed between Boylan and the testator. The testator, when he came to town, staid all night at his house, ate at his table, was on familiar terms with his wife and children. He monopolized his time in his office in relation to his law business, and particularly about the park controversy. Boylan contested it for him on all occasions, both before the public and the council. He spoke of Boylan in the highest terms. From the beginning of their intimacy he held out hopes to Boylan that he would compensate him for all his trouble by his will. As the controversy about the park became more intense, and so late as the last hearing before the city authorities, about the 2d of January, 1852, he averred, in the most solemn manner, that if the city did take his property, he would make a will, and give property to Boylan to litigate it in the highest courts of New Jersey. Ten days afterwards he did make such a will, and we are pressed to believe that four intelligent unimpeached witnesses are perjured when they swear they saw him do it.

But this good understanding between the testator and Boylan, from 1848 to the 12th of January, 1852, was broken by a short interval. It certainly continued unbroken until about the 25th of September, 1851, when the will of 1851 was made; because until that will was executed, Boylan was certainly the heir of Mr. Meeker, and the executor of the testator under the codicil of 1850. About that time the testator became enraged at Boylan, and he continued unfriendly to him until about the middle of December following.

The will of 1851 appears to have been the offspring of two impulses : first, a sudden flaw of passion against his wife ; second, an unjust suspicion against Boylan, which resulted in cutting down, by the will of 1851, to a very serious degree the provisions he had made in former wills in favor of his wife, and his cutting off Boylan from the executorship and devises in the codicil of 1850. We will speak of his wife hereafter. We are now dealing with Boylan. What caused this breach between the testator and Boylan about the 25th of September, 1851 ? On the 6th of September, the city appointed commissioners to assess the damages to the owners of the lands they were about to seize for the park, and then it was resolving itself into a question of money. Boylan might see fit, instead of fighting the city, to take the damages, and thus deprive the old gentleman of the advantage he proposed to himself from this disinterested gift of the lot. If such an idea occurred to him, either accidentally or by suggestion of another, its natural effect was like applying fire to tow. As he had denounced and cut off Mr. Whitehead from his will upon the mere suspicion that he had been instrumental in getting a mere abstract law passed which might take the park, much more would he be indignant at the ungrateful wretch, Boylan, who should be so base as to compromise with the city, when he had given him this valuable present of the lot for the very express purpose that Boylan should do his legal fighting with the city for him. This suspicion was a very natural one for the old gentleman to get, and very likely to occur to him without any suggestion. But as it probably had got whispered around that Boylan had been made executor by the codicil of 1850, and therefore a little jealousy excited among the heirs, it is very easy to believe that some one could be found to make that suggestion to the testator. This, it would appear, actually happened.

John A. Johnson says, the testator told him that Amos Wilcox told him that Boylan was working against him,

but he learned afterwards that it was not so. James H. Boylan says, when the city was about taking the park property, the testator came into Boylan's office, and said that he had heard from several that he had sold his lot, and had dropped his opposition to the city. His brother told him he had not, and explained matters to him, and he seemed to be satisfied. Now what would we expect would be the effect upon the testator when this information was first communicated to him? Would we not ex pect a tempest? Would he be more forbearing to Mr. Boy lan than he had been to Mr. Whitehead? And we accord-ingly find such was the case. He forthwith makes a new will, the one of 1851, cutting off Boylan, and then de-nounces him to everybody on all occasions, in all the moods and tenses, until he reaches his climax in saying that he would not trust Boylan for a dog's dinner, for he was as damned a rascal as Mr. Whitehead. But the virulence with which he denounces Mr. Boylan, as well as Mr. Whitehead, upon such bare suspicions, is a lively proof of his utter hatred of this act of the city, and of his likelihood of fighting it, living or dead. That the testator and Boylan were on good terms, and Boylan at-tending to this controversy with the city as late as the 1st of August, 1851, is certain; for we have the remon-strance here signed by the testator, and drawn up in Mr. Boylan's office, in which he protests against it as unjust, unreasonable, unrighteous, and despotic. That they were friendly, and Boylan acting for him after the 6th of September, when the commissioners were appointed, is obvious from the evidence of Samuel C. Colyer, one of the plaintiffs' witnesses, who says, I was one of the commissioners; Meeker appeared before us and objected, said he had sold one lot to Mr. Boylan; that the first lot was not large enough to build on, and he sold him more at a very small price; he was asked what he got, he said that was his own business; he was excited, and finally said that there was an arrangement between him and Mr. Boylan, and Mr. Boylan was to do the business;

I think Mr. Boylan was present. So that after the 6th of September Boylan was his counsel, and acting for him before the commissioners of assessment, and the testator urging that the city should allow him $100 per foot for the whole of it, because he had sold two feet to Boylan at that rate. He made the will of 1851, revoking the codicil of 1850 and cutting off Boylan, on the 25th of September; so that this suspicion must have got into the head of the testator between the first meeting of the com missioners after the 6th, and before the 25th of September.

The first verbal testimony, as to when this misunder standing arose, is that of Gen. Runyon, who says, " that about the middle of October, 1851, the testator employed me to do some business about the park, and also a general arrangement to do his business; he said he had given Mr. Boylan a lot in the park to do his small business and writing during his lifetime." So that by the middle of October, 1851, as to the park and large business, he had repu diated Mr. Boylan and employed Gen. Runyon. Immedi ately after this employment of Gen. Runyon, he told Mr. Lewis that he had meant to make a man of Boylan, but that he and the corporation and the lawyers meant to get all his property; that he had employed lawyers, and that they had turned against him ; that he once thought Asa Whitehead an honest man, but now he thought him a damned rascal; that Boylan had turned against him ; that he did not know who to trust; that he had employed a lawyer called Run- yon to get a settlement with Boylan.

He told Mr. and Mrs. Swain, in October, 1851, that Boylan was a rogue and a rascal; that he had cheated him in a pair of horses ; that he had been doing his busi ness, but should do no more ; that there were other law yers in Newark. Now, as the testator had got the horses of Boylan in 1848, and had been using them and him ever since, and Boylan had ever since from 1848 to Oc- tober, 1851, been doing all his business, as he had actually,

in the fall of 1850, made a codicil appointing Boylan his executor, and always spoken in the highest terms of him until October, 1851, it is not likely that this sudden outbreak was owing to the horses, but to something more recent, and being in a passion at Boylan, said anything against him that happened to come up first.

So, again, Mr. Cory says, that in the winter before his death, the testator said he had let Boylan have a lot; if he had built on it, they could not take it for a park; but he had not, but had drawn away the stone, and was trying to get the land away (from him) for a park; that he was a damned scoundrel, and he would not trust him with a dog's dinner.

So Jon. C. Noe says, that the testator, in the winter before his death, said that Boylan had promised to intercede for him against the common council about the park, but the damned scoundrel was working against him, and he would not trust him with a dog's dinner.

So Mr. Hull says, that some time before the final action of the city, the testator came to see him at Morristown with his papers, to get them printed into a pamphlet, about the park; he said the corporation was going to rob him; that he had formerly employed Mr. Whitehead, but had discharged him, as he thought he was acting toward him wrong, after which he had employed Boylan, but Boylan was as deep in the mud, and was going to play the same game with him Mr. Whitehead had; that he should thereafter attend to his own business.

So Mr. Munn says, the testator frequently spoke of Boylan and of the lawyers; he said he believed Boylan was a bad man; that he had placed confidence in him, and he had deceived him as the other lawyers did. There is no doubt, from what the evidence declares of the testator's character, he did, while the suspicion lasted, denounce Boylan to everybody he met, and every time he met them.

So he said to Mr. Low, that Boylan had conspired with the city against him; that he made believe he was work-

ing for him, but he was working against him; that he was a damned scoundrel.

So Mr. Bruen says, that on the 20th of December, 1851, the testator said Boylan was a very unfair man.

Now the suspicion upon which all this indignation against Boylan was founded was entirely unjust. There is not a particle of evidence showing that Boylan had sold out to the city, had given up his opposition to it, was trying to get the city to take the land, or had betrayed the interest of the testator in any way, had even ever said or thought of such a thing. On the contrary, the evidence is the reverse. This the testator was certain sooner or later to find out. What would be the effect of this upon the testator's mind when he found out that all this denunciation was entirely unjust? Would not the pendulum swing back all the further for having been drawn so far out of the line, and his confidence in Boylan probably go even further than before? Would we not expect this to be the case by the 2d of January, 1852? The squall struck on the 25th of September, by a new will. Its first blast, as usual, was the most violent, and by the 2d of January we find, in fact, that it had blowed itself to rest, and Boylan more established in his confidence than ever, the testator sleeping at his house, eating at his table, writing in his office, employing him to draw briefs for the contest before the council, repudiating Gen. Runyon's briefs in favor of Boylan's, and denouncing Gen. Runyon on account of his intimacy with Mr. Whitehead. This result, which we would naturally expect, is supported by the evidence. Thus the testator told John A. Johnson that he had heard Boylan was working against him, but learned afterwards that it was not so. James H. Boylan says, that when the city was about taking the park property (which must have been a short time before the 2d of January) the testator came into Boylan's office, and said to him he had understood from several that he had sold his lot, and dropped his opposition to the city; my

2 L*

brother told him he had not, and explained matters to him, and he seemed to be satisfied. Now upon this explanation, which, as the evidence shows, was entirely true, would not his reconciliation with Boylan be perfect? Would he not be very likely to repent him of destroying the codicil of 1850, cutting off Boylan, and to make a new will restoring Boylan to where he was before, even without the additional outrage he received just after by the city's final action upon the park? It is apparent that this reconciliation took place some time before the evening of the 2d of January, when the final action of the city took place.

Gen. Runyon, one of the plaintiffs' witnesses, says, the testator came to me on the afternoon of the second of January, 1852, to draw a brief for Alderman Wilcox to speak from that evening; I was occupied, and advised him to go to Mr. Boylan; he said, I won't; Boylan is a damned rascal—nothing would suit him better than for the city to take the property, so that he could get the money for the lot I gave him, and put it in his pocket. The general is undoubtedly correct about the purport of the conversation; but he must be a little wrong about his time, or what the testator said was so little an index of what he meant to do or had done, we can judge so little of his acts by what he says that the whole case of the plaintiffs is swept from under them, for their case is, that he never made the will of 1852, because he said repeatedly he never had changed the will of 1851, and never meant to. Because we find the testator going from Gen. Runyon's office with this brief in his hand to Boylan's office, and saying there he had no confidence in Gen. Runyon because he was so intimate with Mr. Whitehead, then getting Boylan to write a new brief for him, which was the one actually used before the council. That the general is a little wrong in his time, that the brief must have been drawn some days before the 2d of January is. I think, apparent from many considerations. In the first

place, amidst the multiplicity of the general's business, although he would remember the general import of the conversation, it is not at all likely that six months after he would have any rememberance of its precise date, and he would seek to recall it by reference to some cotemporary fact, and finding, by the records, that the city took final action on the 2d of January, and remembering that his brief was to be used to argue against the confirmation of the report of the commissioners, or perhaps at the last meeting of the council to discuss the question, naturally came to the conclusion that it must have been on the evening when they took final action upon the subject. How very apt this would be to lead him into error, as regards the time, is apparent. This brief was prepared for the final argument, not the final action. There were divers meetings, and no doubt divers arguments before council, between the report of the commissioners, on the 7th of November, and the final action, on the 2d of January. The arguments and discussions were all probably finished before the meeting on the 2d of January for final action. What is so common, then, for such a body even to meet for the express purpose of final action, and for parties to get ready their briefs, &c., and yet after the argument to adjourn for final action at a future day? That such was the case in the present instance, and that the general's brief was prepared before the 2d of January, is apparent from the evidence.

It is apparent, in the first place, from the general's own testimony. Gen. Runyon says, three or four weeks after he drew his brief, he spoke to the testator again about his going to Boylan; he said he would not; he was a damned rascal, and was playing into the hands of the city to swindle me out of my property. This must have been two or three weeks after the final action of the city, and of course Boylan could not then have been playing into the hands of the city. That thing had been played out three weeks before. But, more conclusively, the

general further says, that between October and January, the testator requested him to meet him at Boylan's office, with Mr. Boylan and Gen. Pennington, to consult about this matter of the park; that he did go and meet there in consultation with Boylan, Meeker, and Gen. Pennington; Meeker proposed to file a bill in Chancery against the city and Mr. Whitehead, and a very lively discussion took place upon .that subject. Now this was between October and January. Must it not have been after the brief was drawn by Gen. Runyon? When the brief was drawn, the testator was at swords' points with Boylan. He said he was a damned rascal; he had no confidence in him; he would not go to Boylan's at all; he would not trust him even to draw a brief for Alderman Wilcox to speak from; he would not trust him with a dog's dinner. And yet before the first of January, according to the general's own evidence, the testator requested him to meet with himself, Gen. Pennington, and Mr. Boylan in consultation about the most important business the testator had. This meeting in consultation at Boylan's office must have been after the reconciliation took place between Boylan and the testator, and according to the general's own testimony, must have been before the first of January, and consequently his brief must have been drawn before that time. This view is very strongly supported by other evidence, both on the part of the plaintiffs and of the defendant.

Thus James H. Boylan says, " I remember my brother prepared a brief to be used before the common council; the testator came, and wished my brother to prepare briefs for the members of council to speak from; he had one prepared by Gen. Runyon, which he said he did not like, and he got my brother to prepare another, and left Gen. Runyon's in our office; Gen. Pennington aided in the matter before the council; I copied the brief finally agreed upon." The testator said that Gen. Runyon was so intimately connected with Mr. Whitehead that he had no

confidence in him. Now if, as Gen. Runyon says, he prepared his brief on the afternoon of the 2d of January, to be used that evening before the council—if he is right in his time, the testator must on that afternoon come to his office, and when the general requested him to go to Boylan, said he would not, that he had no confidence in him, that he was a damned rascal, and was betraying him to the city, have gone immediately from Gen. Runyon's office, with his brief still wet, to Boylan's office, and denounced in turn Gen. Runyon to Boylan, repudiated the general's brief, and taken that of Boylan in its place. We are not called upon to convict the testator of such hypocrisy and falsehood.

This statement of James H. Boylan is supported by that of Mr. Harriott. He says, that in November or December, 1851, he and the testator were in Boylan's office writing; the testator spoke a great deal of Mr. Boylan; said he was a very worthy young man, and he meant to give him a start in the world; that he would make provision by his will for Boylan to contest the park in the highest courts of the state; he had a paper in relation to the city taking his property; one Mr. Runyon drew and one Mr. Boylan drew; he liked that Mr. Boylan prepared the best; he signed his name to the one Boylan drew; he spoke so much of writing well that I looked at it; he said he could write better than most of the young men. Mr. Harriott names two facts which show that Gen. Runyon must be wrong in his time; first, that when this took place in Boylan's office the testator had Runyon's brief there, which could not have been if the general had drawn the brief on the 2d of January, and the testator then had the bad opinion of Boylan the general testifies to; second, he testifies that the testator had the general's brief in Boylan's office as early as November or December. This corresponds with James H. Boylan's testimony, and is consistent with the nature of the transaction. Some time after the testator got the general to draw this brief he had been in Boylan's office,

and the explanation spoken of by James H. Boylan and John A. Johnson took place—the natural consequence of his suspicion of Gen. Runyon, on account of his intimacy with Mr. Whitehead, would return, and his confidence in Boylan become greater than ever by the very reason of his unjust suspicion ; and accordingly we find him immediately after getting Boylan to draw a new brief for him, in the place of the one prepared by Gen. Runyon, employing Boylan and Gen. Pennington to contest the matter, and stating that he would make provision by will for Boylan to contest the park in the highest courts of the state ; that he was going to contest it in the highest courts of New Jersey, and that Boylan should do the business, and he meant to leave him something handsome to pay him for his services, paying Gen. Runyon, indeed, the empty compliment of requesting him to meet Boylan at his office in consultation, but employing him no more about the park business, or putting any new business of any kind in his hands, the last receipt of the general's of new business being dated the 5th of December, 1851, but employing Boylan ever after until he died in all his law business, great and small, speaking of him in the highest terms, and ten days after the final action of the city, actually doing what he said just before he would do, make provision by his will for Boylan to contest the park in the highest courts of the state, and leaving him something handsome to pay him for his services.

That Gen. Runyon is a little out of the way in his time is further manifest from the testimony of Dr. Lord. He says, " I went into Boylan's office in December, 1851, and found testator and Boylan there ; I went with them, at the request of the testator, from the office to the council chamber, where the subject of the park was under consideration." So that some time in December the testator was in Boylan's office in consultation about this park business, and they went together to the council chamber to contest it. Gen. Runyon's brief must certainly have

been drawn before this, and this was in December, at some meeting of the council before final action.

That Gen. Runyon's brief was drawn before the 2d of January, is further apparent from the evidence of Mr. Heaton, who says he met the testator in the council chamber (late in the fall it must have been), who said he had got Mr. Boylan for his counsel in the place of Mr. Whitehead.

That the general's brief was drawn before the 2d of January, is further manifest from the evidence of Alderman Hollingsworth, who says, he was an alderman when the park was taken ; that on the day the final vote was taken, or very near it, Boylan and Meeker were together ; after Boylan left, the testator said he thought a good deal of Boylan, and that he did his business. The general's brief must have been drawn before this.

That the general is a little wrong in his time is also manifest from the evidence of Henry Low, one of the plaintiffs' witnesses, who says that the testator told him, in January, 1852, that some time through the winter or fall he went from the council chamber one evening to Boylan's, and staid there all night. This must have been after the reconciliation spoken of by James H. Boylan, and consequently the brief. There were no meetings in relation to the park after the 2d of January. The testator must have staid at Boylan's all night before or at the 2d of January, and it of course must have been after the general drew the brief.

That this reconciliation spoken of by James H. Boylan in itself was natural and to be expected, is proved not only by the testimony of all these witnesses, but by the undisputed facts, that it was Boylan's brief, and not the general's, that was in fact agreed upon and used ; that after this brief, or after the consultation in Boylan's office with Boylan and Gen. Pennington, Gen. Runyon was no longer employed in relation to the park, or, so far as appears, in any new business after the 5th of December ; that al-

ways after this reconciliation Boylan and the testator were constantly together ; that Boylan, after the 2d of January, attended to all the testator's business, in fact that he acted for him at Newark and in Trenton prosecuting the appeal from the city before the courts and the repeal of the act before the legislature. The testator, before the 2d of January, had evidently discovered that the suspicion that Boylan was betraying him to the city was unjust, and his feelings had returned to their accustomed channel. What then was so likely to occur, more so than before the misunderstanding, as that a few days after the city had consummated this great wrong, that he should restore the codicil of 1850, with the addition of additional provisions, as Mr. Harriott expresses it, in his will for Boylan to contest the park in the highest courts of New Jersey? Thus we find Boylan, on the 30th of January, taking out an appeal in the matter of the park as attorney for the testator. On the 24th of February, the testator employs him in the matter of his attachment against J. W. Crane for $1000. On the 8th of March, Boylan is prosecuting, in behalf of the testator, the repeal of the law before the legislature, as appears by the testator's letter of that date to Mr. Clark, a member. At another time we find Boylan and the testator together in Governor Vroom's office in consultation about the repeal. We find the testator, on the 5th of May, writing a letter to Boylan, urging him to take a rule in the above attachment to sell perishable property, and Boylan, as his attorney, taking the rule accordingly, and requesting Boylan to get the city to remit their taxes on the park lot, urging that, as they had seized the land, they ought not to make him pay taxes for it. We find him, on the 10th of March, loaning Boylan two hundred dollars on Mr. Doremus' endorsement ; also, on the 30th of April, putting a bond and mortgage against Mrs. Neil in his hands for collection, as appears by the receipt given for the same. The testator employs Boylan not only to do his business, but he brings him clients. Thus, on the 26th of January, he gets Mr.

Bryson to employ Mr. Boylan as his attorney, and gives him a written power of attorney, for that purpose, to bring an appeal in his case against the city in relation to the park. So that after the explanation spoken of by James H. Boylan a short time before the 2d of January until his death, the fact cannot be disputed · that Boylan, so far as appears, was his personal friend and confidential counsellor, and did all his law business until he died.

Mr. Dalrymple says, that in January or February he saw the testator and Boylan together at Trenton and in the cars, Boylan assisting the old gentleman in and out of the cars.

He not only employed Mr. Boylan up to his death, after this explanation, to do his own and other people's law business, but got him to do other business for him. Thus Searles, one of the plaintiffs' witnesses, says, that in the latter part of March, the testator had sold a pair of oxen to Mr. Johnson in Newark; he drove the testator down to Newark, first to Boylan's office, and the testator requested Boylan to come to Johnson's next day, when he would kill and get the weight and pay for the oxen, and which Boylan the next day accordingly did, and paid it over to the testator. So again, in the spring of 1852, as Mr. Bathgate testifies, the testator and Boylan dined together at Jones' eating house in Newark; putting his hand on Boylan, he said he had sent his boy to get the oxen weighed, and he guessed it must be all right; after dinner the testator, having no money, said to Boylan, my boy, you pay for the dinner, and Boylan did.

In opposition to all this, some evidence is given that after the 12th of January the testator spoke unfriendly of Boylan. Suppose it to be so, it is of no consequence, because we are only interested in the state of his feelings before and at the 12th of January. Besides, his remarks then might, like those before the 12th, be the offspring of some new suspicion equally unjust. Thus the last witness, Searles, says that in March, after the testator had

employed Boylan to get the weight and receive the pay for the oxen, as they were driving home together, the test.tor said, I have done wrong to ask Boylan to get the weight of the oxen; he is a dirty, nasty little puppy, and has cheated me out of a lot in Newark. So E. B. Townley says, that in March, 1852, he was standing with the testator in Newark, who wanted him to buy his calves, and Boylan passed, when the testator remarked, there goes the cursedest rascal that walks the streets. But this evidence is explained by that of Mr. Bathgate, who says, that, in the spring of 1852, he was talking with testator about buying his calves; the testator then said, that on his way home after selling the oxen, a butcher by the name of Cook told him he would not get them weighed right, nor get his money; being so told, he flew into a passion, and made the remark spoken of by Searles and Townley. But Boylan did get them weighed right, and did pay him the money, and consequently the hasty ebullition was as evanescent as its cause. The only other witnesses that speak of the testator's bad opinion of Boylan, after the 12th of January, are Mr. Stager and Mr. Plume. The former says, that in the latter part of February or 1st of March, when the testator was going round getting signatures to go to the legislature about the park, he came into my store and asked me to sign it; he said, while I was writing my name, that Boylan was working against him, that he was a damned rascal; that he had made his will last fall, and given his property to his relatives. The witness was a clerk in the store of Mr. Low, who had married a connection of Meeker, interested in the will of 1851. The great probability is that the witness is mistaken in his time. There were petitions and remonstrances got up to be used before the council as well as before the legislature, and it was a thing very likely to happen that the one time might be mistaken for the other. Besides, how could the witness be right in his time? Boylan, in February and March, was contesting in

every form his own as well as the testator's appeal before the courts, as well as the repeal before the legislature, and the testator was using him in divers other ways ; or if not mistaken in time, the testator must have said this to do away in the mind of Mr. Low and family with the jealousy against Boylan, occasioned by rumors of the codicil of 1850, or else why would he speak in that connection of the will of 1851 at all ?

Mr. Plume says, that the testator, in the winter of 1851— 2, in the month of January—about the middle I think— during the session of court however, came into his office, and in speaking about the park, mentioned about giving Boylan a lot, part of that property, to attend to his business ; that he had proved to be a great rascal, and had sold, or was about to sell, the lot to the city ; that he had got a big price for it, and now neglected his business ; that he was a great rascal, linked in with the city. Mr. Plume speaks indefinitely about his time. The remarks of the testator look very much like his remarks before the explanation spoken of by James H. Boylan. Mrs. Trimble fixes her time by reference to documents, and is supported in it by Mr. Wilcox. She speaks of the 13th of January, and then the testator was on the most friendly terms with Boylan, and told her, in substance, that he had just been making this very will, and the testator was all day in Boylan's office consulting him about prosecuting this vey park controversy. But if Mr. Plume and Stager, who are the only witnesses who speak about these denunciations of Boylan by the testator after the 2d of January, are correct in their time, it was evidently a merely temporary ebullition of passion, caused by some unjust suspicion, as the former one, and explainable, like the testimony of Searles and Townley, by the untruth told him, that Boylan was betraying him to the city, and consequently removed upon his first interview with Boylan. This is the only way we can reconcile the words of the testator with his acts. The plaintiffs, upon this subject, are reduced to

to this dilemma. The strength of their case is, that the testator never intended to make such a will as that of 1852. Their proof is, that the testator repeatedly, after the 12th of January, declared that he had not made any will since that of 1851, and never intended to make another. Now if they insist that the testator while he was thus, after the 2d of January, 1852, until his death, using Mr. Boylan for all purposes, and professing the greatest friendship for him, could thus speak of him as these witnesses say, then it follows that the testator was a man of so much hypocrisy that his words were not the slightest index to his actions, and thus strike their own support from under themselves.

We have thus gone over the evidence of the feelings of the testator towards Mr. Boylan. We think that it shows that, on the evening of the 12th of January, 1852, they were of the most friendly and confidential kind—that the evidences of a contrary feeling were merely hasty ebullitions of passion upon a temporary unjust suspicion. But if they were otherwise, if he really felt what the language of some of these witnesses detail would seem to imply, then he was the most consummate of hypocrites. The codicil of 1850 was drawn in Mr. Boylan's office. He never told him he had revoked it, unless he told him of the will of 1852. He told the friends of Boylan, over and over again, that he meant to make, and had made a will in his favor. He used him for years by feeding him with such hopes. If he felt, as the plaintiffs argue from this evidence, he was a man capable of making the will of 1852, for the very purpose of deluding Mr. Boylan, and of giving it an air of sincerity by pretending to keep it a secret from him, yet taking care to tell it to those whom he knew would give him the intelligence. That he made the will of 1852 with the intention—after using his devisee, vexing his time and patience for days and months and years with his interminable gabble for which (I have it somewhere in the evidence) Gen. Runyon, with the

previous distinct agreement that he was neither to listen or reply, charged and received from him, by special contract, ten dollars for a single hour, but could not stand a second at any price—of changing his will again, and throwing him as a useless thing away. If this were so, all we can say is, that such intent does not revoke the will of 1852—that remains notwithstanding; that the intended time of revocation, as to him, never came; that, as with most men, death struck him also after all by surprise, and he died himself the last victim of his own finesse. But we see no reason to color the memory of the testator with any such conclusions. We think the evidence shows that the testator's feelings towards Boylan were such as his acts indicate, and that he was liable, upon unjust suggestions of others, to give way to sudden outbreaks of passion, which passed away with the occasion.

If the feelings of the testator on the 12th of January were such is the devise itself unreasonable or surprising? Remembering the extreme hatred the plaintiff's own documentary evidence shows the testator entertained for this law increasing with every additional step taken by the city, is it not precisely just such a devise as we should expect? First, as to the devisee. Who so likely as his confidential friend and adviser? So early as 1834, the testator had devised to his counsel as much as $2000 when he was agitated by no such sense of wrong. It was no new idea this devise to counsel to secure present or future services; and when his hatred prompted him to make provision for fighting the city after his death, who would first suggest himself for his proper instrument for that purpose but his legal counsellor and personal friend? Was the amount extravagant? It was about $15,000 or $20,000, about the amount he declared he intended to leave, and had in former wills left out the family on account of his dissatisfaction with his brother Isaac. He intended the park should be litigated in the highest courts, and he had also long declared he had intended to make, as he said, a

2 m*

man of Boylan, by leaving him a handsome donation in his will on his own account, as he had to his favorite counsel to former wills. Could he have gratified these two desires very well with less? What would such a litigation have cost? He had employed as counsel Mr. Boylan, Gen. Runyon, Gen. Pennington, Governor Vroom, and was trying to retain Mr. Webster, then secretary of state of the United States. With such counsel, and in the highest courts, with the expenses of agents, witnesses &c., how much would have been left to Mr. Boylan after he came out of the contest defeated, or even victorious, in a litigation with the great city of Newark? It is somewhat problematical what surplus even now remains to him after this comparatively little short suit with the heirs. Was not the nature of the devise singularly fitted to carry out the object of the testator, the litigation of this matter after his death? Does not the very nature of the devise show the impress of the testator's mind? He gives his counsel the very property in litigation and the house and lot. To give Boylan only the property in dispute would not answer the testator's purpose. The city, on the 2d of January, had actually seized the property, and given $5000 by way of damages. If the proceedings stood, the title at the making of the will was actually vested in the city, and Boylan would only be entitled to the assessment. If he accepted the assessment, the litigation *ipso facto* ceased. If he did not, without an additional devise the testator knew that Boylan could not find the funds wherewith to litigate. He therefore gave him the additional devise. The testator valued the park property at $20,000, the city had only allowed $5000. The whole devise thus as the testator thought secured the litigation by making it Boylan's interest to litigate, for if he settled, he only at most got $5000, but by fighting he would get $20,000. But there was also this additional necessity on Boylan to get what the testator was most anxious for, *viz*. the act declared by the courts unconstitutional. The will of 1852 gave Boylan the park.

But if the proceedings of the city stood, they took the land and paid the assessment. The assessment would not pass under the devise to Boylan, but would pass into the residue, and has probably been actually expended by the executors in litigating the will. Unless Boylan, therefore, litigated the law successfully by getting the act declared unconstitutional, so that the title still remained in the testator's estate, he got nothing at all by the devise of the park to him.

By the very nature and form of the devise Boylan was forced, if he wished to get any part of the $20,000, to litigate the park question in the highest courts of the state in order to get the act of 1850 declared unconstitutional, and consequently the proceedings of the city an absolute nullity. This devise, therefore, to Boylan, whether we consider to whom it was given, its amount, or the character of the devise, was precisely such as the plaintiffs' own documentary evidence of the then condition of the testator's mind and feelings, as well as all the other evidence in the cause, would lead us to expect.

*If he made this devise to Boylan to gratify his indignation, for, as he termed it, the city robbing him of his property, would not the abandonment of the project of the Meeker Seminary be its necessary consequence ?.* The testator, as the evidence and all the former wills show, only proposed to leave about the amount of his brother Isaac's share out of the family. He gave, in the previous wills, about as much to the seminary as by the will of 1852 he gave to Boylan and to law. It was a mere transfer from one foreign devisee to another. The complaint of the heirs now is, that he did not give half of the estate out of the family instead of a quarter.

The plaintiffs insist that, on the evening of the 12th of January, 1852, the testator's love for the poor male children of other people was so much stronger than his hatred of this, as ne calls it, in their own documentary evidence, unconstitutional, unjust, unequal, unrighteous, and des-

potic law, and for which they ought to drive the aristocracy into the North river, instead of the Potomac, as the British threatened our forefathers, as that scarcely any amount of testimony should ever make us believe he could change the one for the other. It is true he had long talked about this Meeker Seminary, to be built at New Providence on the lands he bought of the heirs of the Rev. James Caldwell, and which he went from the morning he was shot. He had mapped the whole farm off twenty years before, reserving a park, and laying off lots handsomely around it. Those lots lay very handsomely around the park, on lands the Rev. James Caldwell went from the morning he was shot, and, as the testator thought, would afford great advantages to mechanics and others to buy and build upon. But the lots not going off very brisk, he, by way of increasing the temptations to purchase lots on such desirable property, provided by his will of 1846 for the erection, on the north side of the park, of the great Meeker Seminary to immortalize his name, and as an additional inducement, provided by his will that the $5000 which was to go to support the teachers was to be loaned and secured by mortgage to the mechanics who should settle on the lots. As he says, in his letter to Bishop Janes, New Providence is a healthy, and if improved, a very delightful place, and very profitable to the dweller there, as there is two hundred water power could be put in operation within four miles of it. Now no doubt, as long as the prospect of the great Meeker Seminary induced mechanics to purchase lots at fair prices around the park, the testator's love for poor male children of other people was a very lively affection. But as the demand for lots decreased, and his indignation at the city for seizing his property increased, would not this love for poor male children be naturally supplanted by the more new and violent passion? Thus, so early as 1848, Mr Osborn says, that before the testator moved to New Providence, the testator said he had thought of giving a handsome sum

to an academy at New Providence, but that the people had not used him well, and that he had altered his will once or twice, and it did not suit him yet, and he did not know but he would have to alter it again.

This substitution of the new passion for the old, is it not also very strongly shown by the plaintiffs' own documentary evidence? It shows that the testator, after the park controversy arose, always declared that if the city seized the park they destroyed the seminary. Thus in his remonstrance to the common council, dated August, 1851, the very first reason he assigns against their taking the park was that he had given it for a seminary for the education of poor children. His argument of course must be, if you take the park, I can't provide by my will to build the seminary. You are taking the property I value at $20,000, I had devoted to that purpose. So in his address to the people of Newark, " I did order this property sold by my will to erect a seminary to teach children. Is it not selfish for the city to take lands of children not able to protect their rights for a park for the idle and vicious to roam in ?" So in his letter to Rev. Mr. Crane, dated 18th February, 1852, urging him to get the law repealed, he says, " you will see by my petition to the council that I had ordered the property sold and the money devoted to the erection and support of a school." Thus, in his letter to Governor Vroom, under date of February 19th, 1852, he says, when employing him to get the park law repealed, " I made known to Mr. Whitehead I had ordered in my will to have the park property sold and the proceeds thereof laid out in building a building and keeping a teacher for ever."

So to Mr. Clark, a member of the legislature, under date of March 8th, 1852, he writes, urging the repeal of the law, " this law authorizes the city to take my lands, and makes me pay myself for so doing, two-thirds in the first place, and my quantum of the remainder. You will see by a remonstrance of mine, that I made known to the

council that I had ordered the property sold, and the money to be used for the building and support of a free school. The law will deprive me of so doing, as I have made my will, and given away my other property and do not wish to alter my will." So in his letter to Mr. Muir, dated September 4th, 1851, he says, " Campbell and Price know that you know by my will that the park is ordered to be sold by my executors and the money to be applied to build a seminary, and funds to pay a teacher for poor children for ever." So in his letter to Rev. Mr. Crane, urging him to help get the law repealed, he says, " should the law not be repealed it will prevent me of building a seminary, and should they repeal I think I should sell off in lots or all and build immediately." The argument of all this is, do not take the park, for I have devoted it to the seminary. If you take the park, the seminary cannot be built.

He told Mr. Valentine, one of the plaintiffs' witnesses, in the winter or spring of 1852, that the city should not take the park ; that it disarranged his plan, evidently referring to the seminary. So he told John A. Johnson, a few months before his death, that he had three suits against him in one day in New Providence, and he believed the people had combined against him. He told Mr. Camp that the city taking the park was taking bread out of the mouths of poor children.

We have thus reviewed the evidence of the testator's mind and feelings on the evening of the 12th of January, 1852, as regards this devise to Boylan. Were they not on that evening in the very condition of all others the most favorable to produce a will with the precise provision in it in these regards as the will of 1852 ? The storm in the testator's mind had been rising since the passage of the law of 1850. His excitement increased with every step in advance by the city. During all the time his feelings had been gathering and becoming charged and surcharged with elements of change. When the wrong was consum-

mated, on the evening of the 2d of January, would we not, as soon as he could conveniently do it, expect a will with these provisions in it, as naturally as we would expect lightning from the cloud? Ten days after he came, as the Hoyt's say, to their house, and executed such a will. Did he execute it? They swear he did. From the mere fact of the transfer of Isaac's share from the seminary to Boylan, are we to say they are all perjured?

What does the testator himself say *after* the 12th of January?

The great feature in the will of 1852, and which has caused all this litigation, is giving the park property and the lot in Broad street, Newark, to Boylan, with a provision for contesting its being taken in the highest courts in New Jersey, in place of giving about the same amount to the Meeker Seminary.

Capt. Samuel Nichols, residing in Newark and owning property near the land seized by the city for the park, was opposed to it the same as the testator. On the 15th of January, only three days after this will is dated, and thirteen days after the final action of the city condemning the land for a park, Capt. Nichols wrote to the testator to come and see him, in order to concert measures for further litigation. In February, the testator came and apologized for not answering the letter, saying he was expecting to come in a few days and omitted to reply; that he had come to spend the evening and talk it over. Capt. Nichols says they did talk it over. They discussed the question of repeal by the legislature, of *certioraris*, of suits in the state and United States courts. Among other things, the testator said that he felt much aggrieved by the proceeding; that his income was large, and he would set apart some to contest it. Capt. Nichols told him he would do the same. The testator replied that that was unnecessary, for he had made a will, and provided for its being carried to the highest courts of the state. Upon cross-examination, the captain says, " I am as positive as

I stand here that the testator said that he had made provisions by his will to carry it to the highest courts of the state; I am impressed with this, because I wanted some provision to be made in regard to the matter."

If this evidence of Capt. Nichols be true, that of Mrs. Hoyt and her daughters cannot be either error or falsehood. There is no suggestion, that if the testator made any will with such a provision in it as that he named to Capt. Nichols, but that it must have been the will of the evening of the 12th of January, 1852. What possible ground can we have to suspect that Capt. Nichols is either perjured or mistaken? No one suspects him of perjury. How could he be mistaken? It was a most emphatic remark of the testator, one in which Capt. Nichols tells us he was himself as much excited as the testator, and of the purport of which he is absolutely certain. If the will of 1852 is not gen uine, Capt. Nichols must be added to this already long list of witnesses perjured or mistaken.

Mrs. Mary J. Trimble says, that she was a client of Mr. Boylan, and was in his office on the 13th of January, 1852; that the testator drove up to Mr. Boylan's office that morning in Newark, between ten and twelve, with a pair of black ponies, in and old fashioned sleigh, painted in old fashioned style, one color of which was yellow. She fixes the time by the date of her assignment of a mortgage made that day in Boylan's office, and she is corroborated, as to the time, also by Mr. Wilcox; as she resided in town, she gave way to let the testator have his business attended to first; after a while the testator went with Boylan to dinner; she and they returned to the office in the afternoon; while Boylan was gone out on some errand, the testator asked the witness if she was a sister of Mrs. Boylan—she said she was not; he said he was an old man, and had been making a will, and given Mr. Boylan the property the city wished to rob him of; he said he wished Boylan to know all about his business, as he had made him an executor, and he would have to

settle it up. If Mrs. Trimble tells the truth, this could only refer to the will of the 12th of January, 1852, for it is not suggested that if the testator made a will with any such provisions in it as are detailed by Mrs Trimble, it must have been the will now before the court. It is not suggested that Mrs. Trimble is perjured. She is certainly not mistaken in the day she was in Boylan's office, or that the testator was in Newark, and dined with Boylan that day. Could she be mistaken in the purport of the testator's remark? In Boylan's office, alone with the eccentric rich old testator, would she not be very likely to remember any remark made by the testator in relation to his will in favor of Boylan? Unless she is either perjured or mistaken, we have the testator, the very next day after the date of this will, before he gets home, declaring that he had made this will. The Hoyts all swear that the evening before they saw him execute it. Mrs. Trimble swears that the next day he told her he had executed it. If this will be not genuine, Mrs. Trimble must be added to the list of witnesses perjured or mistaken. She makes seven. John A. Johnson, the testator's agent, says, that in February, 1852, the testator told him that he had made provision in his will to resist the city taking the park in all the courts of New Jersey and in the United States courts. It is not suggested, that if the testator did make a will with such a provision in it, that it could be any other will than the one of 1852. Unless thus Johnson is also perjured or mistaken, the testator must have declared to him, in February, 1852, that this evening scene of the 12th of January was a reality, and not a fiction. If this will is not genuine, Mr. Johnson must be added to the list of witnesses perjured or mistaken. He makes No. 8. Dr. Lord testifies, that in February, 1852, the testator told him he meant to contest the right to take his property, and that he had made provision to carry it to the highest court. Now is not this evidently reflecting

the language of the will of 1852? It says, my wish is that the said Boylan should defend this property against the city of Newark taking it to be used as a public park in the highest court of New Jersey. Is he not evidently, by the term provision, referring to a will; and if so, what will could he have referred to except the will of the evening of the 12th of January? Dr. Lord further testifies, that in the summer or fall before his death, he said he had abandoned the project of the seminary—that the thing would soon be forgotten by the people of New Providence, and he was about to be robbed by the city, and he had abandoned it. As this project of the seminary was in the will of 1851, which was uncancelled, he could only abondon it by a new will, and the will of 1852 does avowedly abandon it. Dr. Lord further testifies, that on the 7th of April, 1852, the testator called on him at his house in Newark, and asked where Bishop Janes put up in Trenton; that he wanted to write to him to have Mr. Morrell to be the preacher at New Providence, and Curtis Tally the presiding elder; that Morrell was an old friend, and Tally had married a niece of his, that he could live at his house; he said he ought to be accommodated, as he had been making a will, and in it had given $1000 to that church. This evidence of Dr. Lord is emphatically corroborated by the letter given in evidence by the plaintiffs to the bishop, dated April 12th, 1852, in which the testator makes specially these very requests of the bishop, urging, as an additional motive upon the bishop, that if he would do so he would go immediately at building the church, and not wait for his executors to fulfil his plans. If the testator did use this language to Dr. Lord, he could only have referred to the will of 1852, for the will of 1851 contains no such provision. It is not suggested that Dr. Lord intentionally misrepresents. Could he be mistaken in the whole scope of this conversation with the testator? He came to Dr. Lord's early in the morning, apparently for no other object but to get the address of the bishop

The only reason he gave for this request to the bishop was, that he ought to be accommodated, as he had been making a will, and had given $1000 to that church. Dr. Lord here gives three different conversations with the testator, one in the fall of 1851, when he said he had abandoned the seminary, one in February, 1852, when he said he had made provision for litigating the park in the highest courts, and one in April, 1852, when he wanted to write to Bishop James to send him Morrell and Tally, because he had made provision in his will to give one $1000 to the church, and ought to be accommodated. If Dr. Lord is not mistaken or perjured in the whole scope of all and each of these conversations, it amounts to a declaration at each time by the testator, that the evening scene of the 12th of January was a reality, and no fiction, because each conversation can refer only to the will of 1852; so that if this will be not genuine, Dr. Lord is triply perjured or mistaken, and must be added to the other witnesses in that category. He makes No. 9.

The Rev. Mr. Fort says, that one time, after the middle of April, 1852, he was riding with the testator, and having understood that he intended leaving $1000 to the church, he asked the testator the nature of the legacy to the church; the testator replied, it would be a specific legacy, to be drawn from the residuary property, and that if the executors were careful in settling up the estate there would be no difficulty in having enough for the legacy, and that some conversation was had about the site. Mr. Fort thanked him for the contemplated legacy, and said we would erect a monument to his memory. The testator replied, that he had arranged that his executors should erect a monument. Mr. Fort further says, that he had other conversations with the testator afterwards at his own stoop and at his sick bed, and up to as late as the 10th or 12th of May. On these occasions the witness urged on the testator to be his own executor, and to pay the $1000 in his lifetime, and then urged to give a con-

ditional note, stating that there might be difficulty about his will, that it might be broken by his relatives. The testator replied, they can't do it; I defy them. Mr. Fort adds, that owing to the difficulty about the will, he afterwards made a general remark, that we would get nothing. Now, there is no legacy in the will of 1851 to the church. If the testator said this to Mr. Fort, he must then of course have referred to the will of 1852, which gives it a legacy of $1000 out of what the testator would in all probability understand as residuary property. The plaintiffs have sworn several witnesses to prove that Mr. Fort must be either perjured or mistaken. Mr. Cory says, that on the morning of the 17th of May, 1852, as Mr. Fort was going to his gate, he said, I have seen Esq. Meeker last night or this morning; he is going to die before I get back, and he has not left us a dollar in his will for our church. Mr. Cory's wife says, as Fort was going by our gate, he said, Meeker is going to die, and is not going to leave us a dollar in his will for our church. Mrs. Elrick, a a daughter of Mr. Cory, says, that as Mr. Fort was going past our gate, he said he had conversed with Mr. Meeker on that morning or the evening previous, and that he had told him that he had not left a dollar in his will to our new church; that he had talked with him several times to endeavor to induce him to give $1000 and the site to our church. Mr. Sampson's version of the same conversation is, Fort said he had seen Mr. Meeker that morning, or the night previous, and that he said he had left nothing by his will, and nothing to the church; that he had a conversation with Meeker, and we were not going to get anything from him towards building our new church. It will be observed that all these witnesses speak of the same time, the morning of the 17th of May. Mr. Fort says, the last interview he had on temporal matters with the testator was on the 12th of May. But suppose the evidence of these witnesses to be strictly true, and they rightly apprehend what Mr. Fort said, what does it prove?

They don't testify that the testator, on that occasion, said that he had left nothing to the church in his will, and Mr. Fort expressly swears now he never did say so to him. It only follows, then, that if Mr. Fort did say to them what they say he did, he must have told them an untruth. He must have told them the testator said what he expressly now swears he did not say. But there is no necessity of any such harsh construction. The truth of this evidence lies upon its surface. Mr. Fort says, that he urged the testator to give the one thousand dollars in his lifetime, and that something was said about the site, but the testator expressly refused to give the one thousand dollars in his lifetime, saying he had made his will, and did not wish to alter his arrangements, and refused either to give or sell the site in his lifetime, and that he did owing to the apprehended difficulties about any will the testator might make, remark generally that they would get nothing for their church; that he had conversed with Mr. Meeker, and that he would get nothing, and that he would die before he would get back. A hasty general remark, as he was passing Mr. Cory's gate, was quite as likely as not to be misunderstood and construed as they now detail it.

That Mr. Fort was talking about his getting something in his lifetime is manifest from the remark of Mrs. Elrick, for she says Mr. Fort said he had talked with the testator several times to endeavor to induce him to give $1000 and the site to the church, and she understood this as relating to a gift by will, whereas Mr. Fort says that he never did ask him to give anything by will, but urged him to be his own executor, and to cash the legacy in his lifetime. Now, although is was perfectly easy and to be expected that these witnesses, under the circumstances, would misapprehend this passing general remark, how is it possible for Mr. Fort to be mistaken about it? He testifies he never did say so to them as they understood it, because the testator never said so to him, and he could

not tell them so without telling them what he knew to be untrue. But again, supposing this evidence to be true, and that not only Mr. Fort told the witnesses so, and the testator, on the 17th of May, at the time spoken of, told Fort so, that does not prove the testator did not tell Fort, in April, that he had left one thousand dollars to the church in his will. That fact remains unaffected. If the testator said, on the 17th of May, that he had left nothing in his will to the church, he might have said so for various causes, without impugning the truth of what he had said before in April. It might have been from forgetting the will of 1852, owing to the gradual failure of memory and the natural disposition of old people to forget recent events, or it may have been from a desire to conceal from those around him the fact that he had changed the will of 1851.

But how is it possible to conceive that Mr. Fort could be mistaken when he says that the testator did say he had left the church one thousand dollars in his will? The testator not only told him so, he says, but also told him out of what fund it was to be raised, dilated upon the necessity of care by the executors, said it would be a specific legacy. Mr. Fort was the pastor of the church, his interest was direct in the question of building a new church, to which this legacy was devoted. His inquiry of the testator was direct and specific. They discussed the question of the site, and in gratitude for the legacy, Mr. Fort offered the old gentleman to erect a monument to his memory, urged him to be his own executor and to give a conditional note, and all this occurring on repeated occasions. How is it possible to conceive that he could be so far mistaken; that while the testator was all the time telling he had given the church nothing in his will, he should be urging the testator to cash the legacy in his lifetime? What then? If not mistaken, will the plaintiffs infer that the witness is perjured?

But Mr. Fort states another fact. He says, when the

testator, in April, told him he had left the church a legacy of one thousand dollars, he thanked him for it, and said to him, we will erect a monument to your memory. The testator replied, that he had arranged that his executors should erect a monument. The only will which speaks of a monument is the one of 1852. There is nothing of that kind either in the will of 1834, 1846, 1848, or 1851. The first clause in the will of 1852, is, "I do order and direct my executors, herein after named, to settle my just debts and a suitable monument to be erected to my memory." By the will of 1851, he gives to a board of trustees, to be known as trustees of the Meeker Seminary, eighteen lots of land and five thousand dollars, after the death of his wife, for the building of a seminary for the schooling of poor male children. It is not suggested, in this last fact stated by Mr. Fort relating to the monument, that the witness is either perjured or mistaken, but an explanation is given. It is insisted by the plaintiffs, that when the testator replied to the witness that he had arranged with his executors to erect a monument to his memory, he referred to the seminary, and so was speaking of the will of 1851. This is pressing our credulity very hard. It is indeed a beautiful thought, that this disinterested charity should be his only mausoleum, but it is much more in the vein of Milton than of Meeker. From his hard and material organization, as developed by the evidence, I am much inclined to think that at his age, when the priest spoke to him of death, and erecting a monument to his memory, there passed before his mental vision a tombstone, and not a schoolhouse. But this poetic explanation does not exactly suit the conditions of the question. The suggestion was of a stone monument erected over his remains to mark the spot where he lay, and the remark of the testator was a literal reply having no relation whatever to so fine a fancy. The reply of the testator answered literally and precisely to the provision of the will of 1852, identical in thought and language.

But there is still another difficulty about the plaintiffs' explanation. The testator said he had arranged that his executors should erect a monument to his memory. He could not have referred to the seminary, for he had not arranged with his executors to erect the seminary. That was to be done by a board of trustees, and not by his executors at all. The will of 1851 thus answers none of the conditions of the testator's remark; but the will of 1852 does literally and precisely. I think the explanation of this remark of the testator given by the plaintiffs is unsatisfactory, and that, if the witness is to be believed, the testator must have referred to the will of 1852. If he did, the evening scene of the 12th of January could be no fiction. If this will be not genuine, the Rev. Mr. Fort must be added to the list of witnesses perjured or mistaken, and makes No. 10.

Mr. Skinkle says, that in the spring of 1852, the testator came to his store and inquired for Mr. Boylan; he said he had been at Boylan's to stay all night, but found both him and his wife out; he spoke very hard about the park; he said he wanted Boylan to move in his house in Washington street; that he should never lose anything by what he had done for him; that he had made provision for him in his will. As there is no provision for Boylan in the will of 1851, the testator could only have referred to the will of 1852. This witness must also be either perjured or mistaken if the will of 1852 be not genuine. This is No. 11. The testator, the witness says, wished Boylan to move into his house in Washington street. This is the property in dispute, and it was not unnatural if the will of 1852 is genuine. Mr. Harriott also states this same fact.

Alderman Francis says, that in the spring of 1852, three or four weeks before his death, the testator called on him, and complained that he had deceived him by not voting against the park; he said the city would never get possession of it; that he would law them out of it ·

that the land was worth one hundred dollars per foot; that he intended to law it during his lifetime, and had or would make provision to law it after his death. As the will of 1852, and that only, provides for litigating it after his death, the testator must necessarily have referred to it.

Mr. Doremus says, that in the fall and winter of 1852, and he thinks as late as March, he heard the testator say, on several occasions, that the city had defeated his plan for the education of poor children; that they had robbed poor children, as he had, in a previous will, appropriated the park, or the amount of it, to the establishment of a seminary for the education of poor children, and since the city had taken the property he should abandon the plan, and not carry it out. He seemed to throw it all on the city's taking the property. As he left the will of 1851 uncancelled, he could only have prevented the plan being carried out by his will of 1852, and must consequently, in this conversation with Doremus, have referred to that instrument. Mr. Doremus further says, that the testator told him that he wanted Boylan to take care of himself while he lived, and that after his death he would have something very handsome. This must have referred to a will, and could be no other than that of 1852. Mr. Doremus further testifies, that the testator told him that he was going to fight the city as long as he lived, and after that should leave it for others or for his executors to fight. This he could only do by will, and he must consequently again have referred to the will of 1852.

There are no less than eight witnesses besides the Hoyt family who all give the details of conversations with the testator after 12th of January, 1852, in which he in effect declared that he had made the will of 1852, and that the evidence of the Hoyt family in that regard was true.

Now the testator either did make these declarations to these eight witnesses, or he did not. If he did not, they must all be either perjured or mistaken. But I do not see

how they can be allowed the charity of the supposition of mistake. It will be observed that they put into the mouth of the testator thoughts and even language identical with those detailed by the Hoyt family as having been used by him on ·the evening of the 12th of January, and also identical in thought and language with the will in controversy. This would be so if it were all true; it might be so if it were all perjury; but how could it be accidental? If not true, it could only happen by the witnesses all, after having heard this will read and the evidence of the Hoyt family, putting similar thoughts and language into the mouth of the testator. If the testator did in fact say what these witnesses say he said, how could that happen unless the will of 1852 be genuine? If not genuine, the testator never saw or heard of it. How, then, is it possible he could have detailed to the witnesses its prominent provisions and the very language in which it is clothed?

But the plaintiffs themselves have furnished very strong written evidence of the truth of these witnesses, and that the testator recognised the existence of the will of 1852. On the 7th of April, 1852, he went to Newark, and called on Dr. Lord for the purpose of finding out the address of Bishop Janes, of the Methodist church. He told Dr. Lord that he wished *to write* to the bishop to have Francis Morrell · to be preacher at New Providence and Curtis Tally the presiding elder; that Morrell was an old friend, and Tally had married a niece of his; that he could live at his house; that he ought to be accommodated, as he had recently been making a will, and given one thousand dollars to that church—not that he meant to do it, but that he had done it. The will of 1852 does give one thousand dollars to that church, and also one thousand dollars to the wife of Tally. The plaintiffs have given in evidence a letter from the testator, dated only five days afterwards, *viz.* the 12th of April, in which he makes these very requests of the bishop, in which, among other things, he says, "If you could see your way of sending Morrill with

us it would be the means of building a neat brick church. I will say if you will make the two appointments I will g ve fifteen hundred dollars towards the erection of a church, and I will take Tally into my family, and find him a first rate horse to make his tours in, he being a first rate man for planning and getting along with a church. Could you do anything better to forward and increase the cause? I expect you would so arrange it as to put Lippincott into Newark or Paterson district and give perfect satisfaction. My health is very poor, except to help plan and means, and I will not wait for my executors to fulfil my plans, but should my life be spared go immediately about the work, if you will send these two gentlemen to aid me in the work, and do believe that it can and will be done, and very much to the benefit of the church to which you have the honor to preside." What induced the testator to write this letter? Was it not the consciousness that he had made these two legacies of one thousand dollars each, one to the church and one to Mrs. Tally, and he felt, as he said to Dr. Lord, that he ought to be accommodated?

It was a characteristic of the testator to use his wills for present purposes, without any regard whether they had been revoked by subsequent wills or not, and he did not feel like throwing away, as it were, these two large legacies. But in writing to Bishop Janes he took care not to say he had made a new will, because he did not wish that fact known to the people of New Providence. But still he says enough to show that the will of 1852 is present to his memory. How else can we understand the expression, if you will send these two gentlemen (Morrell and Tally) I will not wait for my executors to fulfil my plans but go immediately about the work (of building the church)? The will of 1851 had no plan to be fulfilled by his executors in regard to the church at all. But that of 1852 gave to the church one thousand dollars when they build a church that shall cost three thousand dollars, pro-

vided it was built within three years after his decease.
The letter to Bishop Janes recognizes a will in which his
executors were to fulfil his plans in respect to building
this new church in New Providence. *There is no such will
except that now in controversy.* This letter is a proof, pro-
duced by the plaintiffs themselves under the testator's
own hand, that the will of 1852 is genuine, and that the
evening scene of the 12th of January is a reality, and not
a fiction.

But the plaintiffs have produced still further written
evidence under the testator's hand that the will of 1852 is
genuine. In his letter to the Rev. J. S. Crane, dated
March 15th, 1852, he says, " you spoke of going down to
Trenton on Tuesday next, the petition of repeal will be
laid before the house. Alexander has taken it to present.
If you could go down after your school hour and stay
until the next morning, you (could) do a great deal
through the evening. Should it not be repealed it will
prevent me of building a seminary, and should they re-
peal the act, I think I would sell off in lots and build im-
mediately." That is if they repeal, he would not wait for
his executors to fulfil his plans, but would go right at
work; but if they did not repeal, it would prevent him
of building the seminary. Now that could not be pre-
vented if, as he did do, he left the will of 1851 uncan-
celled except by the will of 1852, and his strong expres-
sion, that the leaving that act unrepealed would absolutely
prevent his building the seminary, shows that he was writ-
ing under the consciousness of the existence of the will of
1852, which alone could make that assertion true. The
expression, that in case of repeal he would himself build
the seminary immediately, shows a consciousness that if he
died in the then situation of his wills that the seminary
would not be built.

*Do the other provisions of the will of 1852 indicate a for-
gery? Are its other provisions such as we should not expect?*
In the first place, Hoyt and Boylan, by an uncertain con-

tract between them, got only at most one quarter of the estate. It was as easy for them to take more. Robbers generally do not leave three-fourths of the property. They were certainly moderate in their desires. As regards the devise to the widow in the will of 1852, is that not what we would expect? The will of 1851 bears every mark of having been written when the testator was in a pet with his wife. The evidence shows that she expressed herself dissatisfied with it immediately after his death, and said it was written in such a mood. She undoubtedly knew, and we have no reason to disbelieve her. But the will of 1851 bears internal evidence of such a state. It is ·in this respect in singular contrast with all his preceding wills. Thus in the will of 1848, the one next preceding, he gives her the homestead farm and all the furniture and utensils *in fee*. In the will of 1851 he gives her the same only *for life*. In the will of 1848, he gives her fifteen acres additional, which are not in the will of 1851 at all. In the will of 1848, he gives her $5000 in cash. In the will of 1851, he gives her only $1000 in cash, and $400 per year during her natural life. But again, in the will of 1846, he gives a devise to Mrs. Tally, his wife's favorite niece, which is dropped in the will of 1851. Again, in the will of 1848, he gives Richard Townley, a nephew of his wife, $500, which is dropped in the will of 1851. In the will of 1846, he gives special devises to Richard Crane, David A. Crane, and Clark Townley, other relatives of his wife, which are not in the will of 1851. Now would we not expect when he got over his pet he would change his will of 1851, and come back again in this regard to something like the provisions in her favor contained in former wills? And when, in the will of 1852, we find him giving her the same homestead and personal property in fee, and $4000 in cash, and the specific devises to her relations, is it not precisely the thing we would expect? So the devise, in the will of 1852, to Jonathan M. Muir is a return to the will of 1848, giving him the same property

with the addition of $1000 in cash, and a release from all obligations. Is it any wonder, after having had his attention called to it repeatedly by Mr. Hoyt, that he should somewhat, in the will of 1852, have increased his devise to Jonathan M. Meeker, jun., his lame nephew, and namesake, whom he personally liked, and from whose father in early life he had received kindnesses? Was his spite against his nephew's wife so relentless because she, as he says in the will of 1846, when he advised her to keep apprentices, ordered him out of her house, that neither the remembrance of his father's kindnesses nor the tears he made him shed by reading to him the false will spoken of by Mr. Johnson could bring him back to any natural emotion?

In the 5th clause in the will of 1852, giving $1000 to Mrs. Tally, which is not in the will of 1851, he comes back again to the will of 1846. The 6th devise in the will of 1852 to Richard Townley of $300 is not in the will of 1851, but is $500 in the will of 1848. The 7th clause in the will of 1852 of $500 to his worthy agent, Mr. Johnson, is not in the will of 1851, but in the will of 1848 is to his son. He offered Mr. Johnson to give him a legacy of $2000 when he was writing his will of 1848, but Mr. Johnson, having been three days writing on the will, and not having yet come to his promised legacy, told him he must get some one else to finish it, when the testator changed his mind, and gave $500 to his son, instead of the $2000 to himself. The 8th clause in the will of 1852 is of $500 to his friend, James F. Meeker; that precise sum is given him in the will of 1846. Moreover, is it to be wondered at, when we consider the friendship with which the evidence shows he always spoke of him, and that he was one of his executors in the wills of 1848 and 1851, and a trustee for divers purposes in the will of 1852? The devise to Abigail Pierson, Phœbe Roberts, and Violet, in the will of 1852, are pretty much the same as they were in the preceding wills. The making of Boylan an executor in the will of

1852 is but a return to the codicil of 1850. The leaving out of the will of 1852, the name of his brother Isaac is precisely what is done in the will of 1851. The devise in the will of 1852, to Halsey Meeker, is the same as in the wills of 1851, 1848, and 1846. The leaving out of the will of 1852, the specific legacies to his nephews and nieces contained in his other wills is compensated by giving them the residue. The devise of $1000 to the church in the will 1852, is not in the will of 1851, but is in both the wills of 1834 and 1848. As regards the 15th devise in the will of 1852, of $500 to the Market street church, that is in none of the other wills. Upon this devise Mr. Heaton testifies, that in the summer of 1851, the testator said he was going to do something for this church; that late in the fall of 1851, they spoke to the testator to help this church; the testator replied, he should make arrangements for the assistance he was going to render it; that I would find he had not forgotten it; that he should do something nice for us. Dr. Lord says, that the testator told him he would do something for that church, and he supposed he would from what he said. Now, if the will of 1852 is a forgery, how or why did this devise get in the will? It is in none of the other wills. Hoyt or Boylan could not therefore have copied it. Why should Hoyt or Boylan have put in a forged will a devise of $500 to the Market street church? It is true that Boylan was a member of that church, but is not the presumption much more natural that the testator did in fact make the devise at the request of his friends to the church, than that Boylan should commit forgery to benefit a church of which he was a member? How did Boylan or Hoyt know of these conversations with Heaton and Dr. Lord? Are they and the church implicated with the Hoyts in this conspiracy? If we believe Mr. Heaton, here is a distinc declaration by the testator, in the fall of 1851, that he meant to make a will giving something nice to this church. The will of 1852, and that only,

does give $500 to that church.    The 9th clause in the will of 1852 is, I give to my friend A. C. M. Pennington $500, provided he brings no account against my estate for services.    Does not this devise bear upon its face the impress of the testator's mind?    As Mrs. Hoyt says, he was always afraid of lawyers' charges.    He was nervous upon that subject.    He gave, as we have seen, a lot, in the spring of 1851, to Boylan, to do his small business during his life, and congratulated himself that he could, as long as he lived, have the luxury of as many little lawsuits as he pleased without the spectre of a lawyer's charge coming in at the end of it.    This devise to Gen. Pennington had a tendency to produce a similar satisfaction.    Gen. Pennington was already engaged in this great lawsuit about the park.    He meant to litigate it in all the courts as long as he lived.    Gen. Pennington he knew would soon have a bill indefinitely large in the highest courts of New Jersey.    Gen. Pennington would not be so particular in demanding cash, if he was given to understand he was to have a large legacy.    And when he was dead, if the general brought in any account he was to have no legacy. This is a devise of the same type as are contained in the former wills.    Thus, so early as the will of 1834, he gives the family of his executor, Mr. Whitehead, $1500, and $500 to young Mr. Pennington.    In the will of 1846, he gives $1500 to Asa Whitehead for paying him for his services in taking charge of his estate, and is to take no more of his estate for the charge and settlement of the same.    Is it not true, as Mrs. Hoyt says, that he was always afraid of lawyers' charges?    By the 11th item in the will of 1852, the testator gives to his friend, Oliver S. Halsted, jun., $500.    By the will of 1834, he gives to William S. Pennington, son of William Pennington, $500. Is not the devise to Mr. Halsted a younger brother of the one to Mr. Pennington, its form cast in the same matrix, its lineaments impressed with the same paternity? No reason can be given for the one more than for the

other. There was, perhaps, something about each that struck the fancy of the old gentleman, and we can merely say it was his peculiarity. It is suggested that, at the time of the devise, Mr. Halsted's father was surrogate general, and that the devise was with the absurd intent to in some way favor the probate of this forgery. But if this was a forgery Boylan must have been implicated, and its master spirit. We must assume that Boylan then knew that in a few days the term of office of the surrogate general would expire, and before the testator died, in all human probability, a new Chancellor set upon the woolsack. Such an absurd intent and such ignorance of the term of the chancellorship might very easily be supposed of the testator, but not of Boylan. This devise, in all its aspects, looks like part and parcel of the testator.

The 16th item of the will of 1852 is, "I give to my friend, Isaac Miller, five hundred dollars." This item is in none of the other wills. How did it happen to get into the will of 1852? He was no relative of the testator, only his friend. Who is Isaac Miller? Is he a coconspirator with Hoyt and Boylan? How else did his name get in the will of 1852? It does not appear that Hoyt or Boylan knew or had ever heard of Mr. Miller, or that he was acquainted with the testator. Unless he was a coconspirator with them, why should they put his name in the will, and commit forgery and perjury for his sake? It does not appear that putting his name would in any way facilitate the forgery. He is in no former will. He was no relative of the testator. But for the evidence of Mr. Bonnell, one of the plaintiffs' witnesses, it would not appear that Mr. Miller knew any of these parties, or that they had ever heard of him. Mr. Bonnell says, that as the testator started from New Providence, on the evening of the 12th of January, he asked him to go along with him to Mr. Miller's, near Newark, to stay all night, and as the testator left he said he was going to Miller's to stay all night. Of all these parties, the testator alone is brought by the

2 o*

evidence in relation with Mr. Miller. On the very even-
ing he went to Hoyt's he said he was going to stay all
night at Miller's. This, in the first place, shows great in-
timacy between the testator and Mr. Miller. Very few
persons cared to have him stay all night, unless those to
whom he held out hopes of legacies. Where he proposed
to stay all night looked very much like a legacy pro-
mised and expected, and where he gave a legacy it
looked very much like his staying all night. For a legacy
payable after his death, he expected a *quid pro quo* in his
lifetime. His legacies were drafts drawn upon his estate
payable after his death, for which he received present
consideration. When he started to stay all night at Mil-
ler's, does it not look as if he had the will of 1852 in his
pocket, with this five hundred dollar legacy in it? At any
rate, how, under the evidence, is the legacy to Mr. Miller
to be explained, if it were not the testator's own sug-
gestion? And if so, then this will of 1852 must be genu-
ine.

The will, then, of 1852 is, in all its parts just what the
circumstances would lead us to expect, and is proved to be
genuine by five eye witnesses, by the repeated declarations
of the testator before it was made that he would make
such a will, by repeated emphatic declarations of the testa-
tor, after its date, that he *had* made such a will, and by the
nature and character of all its provisions.

Let us now place in the opposite scale the evidence of
the plaintiffs against the will of 1852, and mark its weight
upon it. The great point of the plaintiffs' case is, that the
testator never intended to change the will of 1851 or to
make such a will as that of 1852 ; that he was so wedded
to the provision in the will of 1851, providing for the
Meeker Seminary, that he could not have changed it. The
evidence to prove this consists of the declarations of the
testator, made after the 12th of January, 1852. These dec-
larations are the following :

Thus, Henry Low says, that he married a daughter of

Deborah Hand, and that he thinks that about the 21st of January, 1852, the testator staid at his house all night, and while there said that he had made his will last September, and it was the last he should ever make; that he had given the witness' mother-in-law a house and lot in Fair street, and her brother John a house and lot adjoining, and that he had left $10,000 to build the Meeker Seminary. So Mr. Stager says, that in February or March, when the testator was in the store of the preceding witness, he said he had made his will last September, and given his property in Newark to his relations. So Mr. Brokaw says, that he was hired by the testator, on the 14th of January, to work for him; that on the evening of the 15th, the testator invited him to come into the room and sit with him, and kept him there talking until eleven or twelve o'clock, and said he had made a will in September, and left Muir the homestead and $2000. So he told Mr. Cory and many others, after the 12th of January, 1852, that he had left $10,000 to the Meeker Seminary. So Mr. Bonnell says, that one day in the latter part of the winter before his death, the testator took him on the ground, and showed him where the seminary was to be and the park in front, and said he had left $10,000 for the school. He said the same thing, after the 12th of January, to many other witnesses. I have no doubt that after the 12th of January the testator did make use of these expressions. But I have no doubt, also, that the testator did, as we have seen, declare to many of the defendants' witnesses, before the 12th of January, that he intended to make such a will, and after that date that he had made such a will as that of 1852. The witnesses on both sides undoubtedly tell the truth. The untruth, or perhaps more properly the finesse, was on the part of the testator. In the first place, it is not necessary to suppose falsehood or deception in any. The testator may, when he made these declarations, from the lapse of memory with respect to recent transactions in old men, not have recollected the

will of 1852; but I am satisfied that these contradictory statements of the testator were intentional, and not from loss of memory; that he intentionally concealed from the inhabitants of New Providence that he had altered his intentions about the Meeker Seminary, and the devisees under the will of 1851 that he had made a new will.

Mr. Hoyt says, that on the evening of the 12th of January, 1852, at the time of the execution of that will, the testator said he wanted to make a private will; he said he had made a good many wills, and he had talked too much about what he had done in them, and he was now determined to have one will that the world should not know anything about; Hoyt remarked that he had come to a poor place to have a secret kept where there were so many young ladies; he replied, that he would take the risk of that. Now, when we recollect the freedom with which he talked to everybody about his wills, and the liberties people took with him in consequence thereof, as developed by the testimony on the part of the plaintiffs as well as of the defendants, it looks very natural that the old gentleman should come to such a determination, and if he did, this kind of duplicity and double talking was its natural consequence. Elizabeth Hoyt says, that when the testator executed the will of 1852, he remarked that if the people of New Providence knew that he had not provided for a school that they would treat him in a very contemptuous manner; that he had often spoke of such a provision, and they expected it. Mary Hoyt says, that when her father started to go for another witness, the testator said he preferred not to have anybody out of the family, as he wished it to be entirely private; that he had intended giving something for the seminary, but had given up the idea; that the people of New Providence would be very much disappointed about it—that they expected it. Mrs. Hoyt says, that the testator said he had thought of giving money to the seminary, but had relinquished the idea; that the people of New Providence

were not worthy of it; that he did not wish them to know anything about it, or they would be angry and treat him ill; that they would ride him on a rail. Is not this evidence of the Hoyts very likely to be true? If the testator did make the will of 1852 without leaving anything to the seminary, would he wish the people of New Providence to know it? Would he not naturally conceal the fact from them? For over twenty years he had been holding up before the eyes of the people of New Providence this great Meeker Seminary, which was to immortalize his own name, and make, as it were, New Providence a rival to Newark. He had over twenty years before mapped off the land into lots, laid out on it a public square, shown to everybody the precise spot where this great institution of learning was to be erected. He had probably held out these things as inducements to mechanics and others to buy some of his lots at high prices. Is it wonderful, then, that if, after having kept up such a caterwauling about this seminary for so many years, he should change his mind that he would want to conceal it from the people of that place, that he should think they might not, after becoming aware of the change, treat him with that respect and deference that great contemplated charity had won from them towards him? Now what does the evidence show the fact to be? It is precisely what we should expect if this evidence were true. After the 12th of January, 1852, whenever the testator is talking to the people of New Providence, he always tells them that his true will is the will of 1851, and that he has left $10,000 for the seminary, and so also when he is talking to the beneficiaries under the will of 1851. But when he is talking to other people he always speaks of the will of 1852 as his true will. So universally is this the case that you can always tell, if you know who he is talking to, which will he is talking about; and, *vice versa*, if you know which will he is talking about, who he is talking to. Thus hav-

ing, on the evening of the 12th of January, executed the will of 1852, he goes next morning to Newark, and tells the first stranger he meets, then at Boylan's office, Mrs. Trimble, who was no devisee under the will of 1851, and a stranger in New Providence, that he was an old man, and had just been making the will of 1852, giving Boylan the park property. He goes from there to New Providence, and the next evening calls his servant man, Brokaw, in his room, and kept him talking till eleven or twelve o'clock, and telling him that he had made a will in September, giving Mr. Muir the homestead. So, on the 7th of April, 1852, he goes to Dr. Lord, who resides in Newark, and asked where Bishop Janes put up in Trenton; that he wanted to write to him to have Morrell to be preacher at New Providence, and Tally presiding elder, and said he ought to be accommodated, as he had been making a will, and had given $1000 to that church. He goes straight from Newark to New Providence, and showing the letter to Bishop Janes, dated April 12th, to Mr. Cory, Stephen Day, and Samuel Day, who all reside in New Providence, tells them that he had left nothing to the church in his will, but that if he could get Morrell and Tally he would give $1000 to the church, and have it built right away; that he had, by his will, given $10,000 to the seminary. So Nathaniel Bonnell, John Noe, Amos Potter, Mr. Munn, Jonathan Potter, Henry Brown, Mr. Valentine and Levi Clark all reside in New Providence. About the 21st of January, 1852, he explains quite minutely to Henry Low, whose mother-in-law was a beneficiary under the will of 1851, the provisions of that will, and says he will never make another, while a few days afterwards he explains with still greater emphasis and certainty to Capt. Nichols, who resided in Newark and interested in opposing the park, the will of 1852. The only other witnesses who speak of the declarations of the testator with respect to the will of 1851, after the 12th of January, 1852, are Mr. Jerolaman and Mr. Lewis.

They do not reside in New Providence, but their conversations with the testator were while they were visiting there. So that all the declarations of the testator, after the 12th of January, 1852, in relation to the will of 1851, were made either to the people in New Providence or to the devisees under the will of 1851. But the moment he gets out of New Providence, and has no object to serve by talking about the will of 1851, then he speaks of the will of 1852, and its provisions. As such were his remarks to Mrs. Trimble, Dr. Lord, Captain Nichols, Mr. Skinkle, John A. Johnson, Mr. Doremus, and James H. Boylan. John A. Johnson gives a singular confirmation of the truth of the Hoyts upon this part of the case. Mr. Johnson resided in Newark, and was his agent and his executor in the will of 1848. In February, 1852, he still thought he was executor in the will of 1848, and in a conversation with the testator, the testator remarked that he had made provision in his will for contesting the park matter in the highest courts of New Jersey. Mr. Johnson replied, how could you do that unless you have made a new will—and to that the testator gave no answer. It was evident that the testator saw he had gone too far with Mr. Johnson. He could make no answer without either retracting what he had said or acknowledging to Mr. Johnson that he had made a new will cutting him off as executor.

It is utterly inconceivable that all these coincidences should be accidental. They demonstrate, as far as moral matters are capable of demonstration, that when the Hoyts testify that the testator said he was anxious that the people of New Providence should not learn that he had left nothing for the great Meeker Seminary, they tell the truth.

This using of the old will after he had made a new one, was characteristic of and habitual with the testator. He had practised it more or less for thirty years. He considered all his wills as equally good until he died ; and so they were for his purposes, whatever they might be for

the devisees. He commanded thereby the services of the devisees until they found out that a new will had been made, and this he took care they should not do. The case is full of evidence of this kind of deception on the part of the testator. Thus, in February, 1852, Mr. Johnson and the testator went to Mr. Whitehead's office, and by way of inducing Mr. Whitehead to bring the Condit suit to a close, said he wanted to settle his business as much as he could; for, speaking to Mr. Whitehead, he said, you are to have the settlement of my business, thereby saying to Mr. Whitehead, in effect, that his will of 1846 was yet in force, although he had certainly made two wills and a codicil since. But what is still more amusing is, when Mr. Johnson, knowing of the will of 1848, in which he was himself executor, remonstrated with the testator upon this fraud upon Mr. Whitehead, and told him it was wrong to so deceive Mr. Whitehead, as he, Johnson, had been made executor in this place by the will of 1848, the testator replied, "Alderman, we have to figure so sometimes." Now, Mr. Johnson had himself been removed as executor, by the codicil of 1850 and the will of 1851, as well as Mr. Whitehead, so that he intended to dupe Mr. Johnson as well as Mr. Whitehead. It was a double deception. This kind of deception was his mode of figuring. He sought to get services out of Mr. Whitehead by virtue of the will of 1846, and out of Mr. Johnson by the will of 1848, both of which he knew he had revoked by subsequent wills. So in the case of the will of 1851, he did not wish to lose the use of the bequest in it, by letting those interested know he had revoked it by the will of 1852. The plaintiffs' own documentary evidence shows the strongest proof of this kind of deception on the part of the testator. Thus in his remonstrance to the common council, under date of August 1st, 1851, he assigns, as the first reason why the city should not take the park, that he had purchased it of Mr. Whitehead, who afterwards requested him to lay it out as a park; but he re-

fused, stating to him that he had given it for a seminary for poor children, which he knew by his will, of which he was the executor. The testator here practised no less than three deceptions about his will. First, in telling Mr. Whitehead that he was executor of his will, when he had made no less than three since. It was another, in stating the same untruth to the council. It was a third deception, in stating to the council that he had by his will given this land for the education of poor children, for he had done no such thing by any of his wills.

So he practised the same deception in his address to the people of Newark, wherein he says, I by my will did order this property at my decease to be sold, and to erect a seminary to teach children, &c. Now no will orders this land to be sold, and its proceeds appropriated for any such purpose.

So in his letter to Mr. Muir, dated September 4th, 1851, he writes to him, "let Campbell and Price (aldermen) know that you know by my will that the park is ordered to be sold by executors, and the money appropriated and applied by executors to build a seminary." There was no such special appropriation in any of his wills, and his saying so was a deception to make his will effect his purpose of inducing the city authorities to abandon the park. We find the same kind of deception in the letter to Mr. Clark, dated March 8th, 1852. So in his letter to Governor Vroom, dated February 19th, 1852, he says, Mrs. Whitehead did call on me to give the plot of land for the park. I refused and made known to her that I had ordered in my will to have it sold and the proceeds thereof laid out in building and keeping a teacher forever, for which doing I had made her husband one of my executors and authorized to carry out my designs. Here we find him first deceiving Mrs. Whitehead, and then Governor Vroom, saying to him in effect that he had given this park for a seminary by a will of which Mr. Whitehead was executor, when, since the will of 1846, of which Mr. Whitehead

was executor, he had made the will of 1848, the codicil of 1850, and the will of 1851, in none of which was Mr. Whitehead executor, and in none of which was this land specially devoted to the seminary.

That he understood the difference between leaving ten thousand dollars to build the seminary, and devoting this park land specially to that purpose, is evident from the fact, that when he is talking with the plaintiffs' witnesses, with no view to affect the action of the public authorities respecting the park, he always speaks of the bequest of ten thousand dollars as a pecuniary one, but when he speaks to an alderman, or to anybody with the view of preventing the city taking the park, he always says he has devoted the land specially for the seminary. When he wishes to persuade the city from taking it, he always pretends that he had given this park property specially for the purpose of a seminary. How quick the testator could change from the one thing to the other is shown by the evidence of Mr. Stager, one of the plaintiffs' witnesses. Mr. Stager was a clerk in the store of Mr. Low, whose mother-in-law was one of the devisees under the will of 1851. In February, the testator came to the store to get signatures to a petition to the legislature to repeal the park law, and upon his asking Stager to sign it, Stager said it would be of no use, as he had no property in the city. The testator replied that he had made his will last September, and given it to his relatives, whereas he was all the time pretending to the council and to the legislature that the city should not take the park, as he had devoted it to the Meeker Seminary. But it suited him best, in Low's store, to say he had given it to his relatives.

The testator practised the same kind of deception in 1848, when his nephew, Jona. M. Meeker, came to see him, as detailed by Mr. Johnson. The testator was then so sick that his physician had given him up. He was angry at his nephew's wife, so he orders Mr. Johnson to get a will, that he had revoked by a subsequent will, in which

he had cut off his nephew, and actually read it to him as his true will, and drove him weeping from his presence under t at belief. When, therefore, in January, 1852, he told his nephew, Mr. Low, that he had made his will in September, and never meant to make another, was it anything more than the old habit? The same deception he had been attempting upon Mr. Whitehead from 1846, upon Mr. Johnson since 1848, upon his nephew when he read an old will to him, and which he had practised systematically upon his poor relatives for the last thirty years, and upon the common council, the legislature, and others since the project of the park had been started.

We come now to the Bishop Janes letter, dated the 15th of April, 1852, but which was never sent. This was considered a strong point in the plaintiffs' case, and at first blush certainly appeared so, but dissolves at once when we advert to the peculiarities of the testator. In this letter he says, among other things, "if you will send Morrel to preach and Tally as presiding elder at New Providence, I will give $1500 towards the erection of a new church, and it is also my intention to establish and build a seminary for learning on property I own in New Providence, where the Rev. James Caldwell went from the morning he was shot. I have ordered by my will a plot of land I own in Newark, to be sold at my decease, and to build with the money, which I think is worth $20,-000, together with some ten or twelve acres of land, in order that children may be taught. Could you do anything better to forward and increase the cause? I expect you could so arrange it as to put Lippincott in the Newark district, which would give perfect satisfaction. My health is poor, and unable to do anything much myself, except to help plan and means, and will not wait for my executors to fulfil my plans, but should my life be spared go immediately about the work, if you will send me those two gentlemen to aid me in the work, and I do believe that it can and will be done, and very much to the benefit of

the church to which you have the honor to preside." The wonder is how the testator could write this way if he had made the will of 1852. In the first place, his total want of candor and the unscrupulous manner in which he used his wills to effect his present purposes are apparent upon the face of this letter. For some object or other, he wished the bishop to station Morrel and Tally at New Providence, and to induce him to do so, proposes to employ Mr. Tally to oversee the building of the seminary, to which he had given, by his will, the park property in Newark, valued at $20,000, and ten or twelve acres at New Providence. Now it is utterly untrue that he had given the park property, or any other property valued at $20,000, to the seminary. On the contrary, he had, by the will of 1851, only given the half of that sum in money, payable out of his estate generally. Again, by way of inducement, he says he will give $1500 towards the building of a new church, and yet, with this letter in his hand, he goes to Mr. Cory, Stephen and Samuel Day, and says, I will give $1000 to build the church, if I can get Morrel as preacher and Tally as presiding elder. The other $500 was evidently the same $500 he wanted his wife to give, and not what he intended to give himself. The insincerity of this pretence to Bishop Janes, that he would go immediately at work at the church, is manifest from the evidence of Mr. Cory. He wrote the bishop he would give $1500; he told Mr. Cory, with the letter in his hand, $1000. In his letter, he offers the $1500 absolutely; when speaking to Mr. Cory, it was accompanied with impracticable conditions. In his letter, he says he had appropriated ten or twelve acres for the seminary, and he told Mr. Cory from two to five acres. This insincerity is further illustrated by the evidence of Levi Clark, another of the plaintiffs' witnesses. He told Mr. Clark, after writing this letter, that he would give $1500 to the church, if they would build such a one as he wished, and that it ought to cost $5000 at least. Now this was an entirely different thing from his letter to

the bishop.   It was accompanied  with what he himself admits was an impracticable condition, and of this $1500 $500 were to come from his wife, who he knew would not give it, and about which, as appears by the evidence of Mr. Clark, he did not venture to speak to her about. The key to this Bishop Janes letter will be found in the expression he made use of to Dr. Lord on the morning of the 7th of April.   He then went to Dr. Lord's house, in Newark, as early as eight or nine o'clock, and asked where Bishop Janes put up in Trenton, and said that he wanted to write to him to have Morrel to be the preacher at New Providence, and Tally the presiding elder; that Morrel was an old friend, and Tally had married his niece, and *that he ought to be accommodated,* as he had been making a will, and given $1000 to that church.   By the will, he had also given $1000 to Mrs. Tally.   As he had given these legacies, he thought he ought to be accommodated. He ought in some way, he thought, to have the value of the $2000 in his lifetime.   It was habitual with the testator, when he gave a legacy, to think he ought to be accommodated.   The old gentleman did not see any use of a will unless it answered some present purpose.   We have a circumstance of this habit in the case of his lame nephew, Jonathan  M.  Meeker.    By his will of 1834, he had given him the homestead farm in fee, and consequently thought he ought to be accommodated there also, and went to his house, and began to dictate to his nephew's wife about her domestic arrangements, as he did in the domestic arrangements of the diocese by this letter to Bishop  Janes,  whereas the nephew's wife, woman-like, became indignant, and ordered him out of the house, whereupon he sat down, and wrote with his own hand the will of 1846, having the following as its tenth clause : " I give Jonathan M. Meeker, jun., my house corner of Mulberry street, after the death of his present wife.   It is understood the said Johnathan is not to hold, enjoy, or possess the said property until after the death of his present

2 P*

wife, as she without provocation, while living in my house, ordered me out of the same, only because I advised the taking of apprentices, wherefore during his living with that woman he cannot enjoy the same ; but I order my executors to put the money at interest from year to year on good bond and mortgage as long as the lifetime of the said Jonathan's present wife, and should he outlive her, pay over the said rents and deliver the said house to said Jonathan during his natural life." The letter to Bishop Janes was the natural offspring of the same habit of thought as the advising his nephew's wife to keep apprentices. He had given legacies in both cases, and thought he ought in both cases to be accommodated ; in the one case, by dictating to his nephew's wife her domestic arrangements, and in the other, who should be preacher and presiding elder at New Providence. In this letter he not only seeks to dictate these appointments, but even says he expects that the bishop can so arrange as to put Lippincott in the Newark district, as if, by virtue of these legacies, he thought he was entitled to take a general charge of the domestic concerns of the diocese. As he did not send the letter, we are left in doubt whether the bishop would or would not have been as indignant as the wife. This attempt to receive a *quid pro quo* for the legacies to the church and to Mrs. Tally was only a single instance of the testator's habit of turning his wills to present purposes, and that without any regard whether they had or had not been revoked by subsequent wills.

The old gentleman was very economical, so much so that when he thought he had sold his horses to the plankroad company, he refused, on a cold winter night, after a drive, to put his new blankets on them, assigning as a reason that the horses were as good as sold, and so hardly worth while to muss the blankets. He was entirely too economical to lose these large legacies of $1000 each, to the church and to Tally. He had turned his other legacies to good account. He had probably sold off lots and

procured for himself great consideration and obsequiousness for a generation from the people of New Providence by virtue of the devise to the Meeker Seminary. His poor relations, for two generations, had been helping him accumulate this estate by the assurances and rumors of his devises to them, and under the expectation it was to be all theirs at last. His devises to Mr. Whitehead, in the wills of 1834 and 1846, were no doubt with an expectation that Mr. Whitehead would do his law business without charge, and probably, not succeeding to his satisfaction in that, changed his will in 1848, and yet holding out to the day of his death to Mr. Whitehead, to the common council, and the legislature, that the will of 1846 was yet unrevoked, and when remonstrated with on the deception, replied, " Alderman, we must figure so sometimes." This letter to Bishop Janes is only another instance of the same kind of figuring. He offered John A. Johnson, in 1848, if he would again become his agent, he would leave him a legacy of two thousand dollars, and asked him to write his will. Mr. Johnson, after writing three days, and not having yet come to his legacy, threw it up in despair, and consequently had so little confidence in the testator's candor, that when first told that a legacy had been left him of five hundred dollars in the will of 1852, said it was put in to stop his mouth.

He used his pretended devise of the park to the Meeker Seminary for the purpose uniformly, before the council, and the people and the legislature, to effect his object of defeating the seizure of the park by the city. He turned the devise to Mr. Boylan to many useful accounts; he monopolizes his time, and got a respectful auditor; he dined and lodged at his house; he got his law business, not only during his life but for an indefinite period after his death, as a *quid pro quo*, and commanded the services of Mr. Boylan for almost all purposes. Gen. Pennington was to pay for his legacy by legal services in his lifetime. He gave, in the will of 1852, five hundred dollars to Isaac

Miller, and evidently thought he ought to be accommodated also in that regard, for we find he left home on the evening of the 12th of January, saying he was going to stay there all night. He staid so often at Hoyt's that for some time he had been violently threatening some of them with a legacy. The only part of his wills, past and present, for which he did not see that he was likely to have any satisfactory return were these two legacies, of one thousand dollars each, to Tally and the church. He had endured it from the 12th of January till the 7th of April, when he could stand it no longer, and he posts off early to Newark to Dr. Lord to get the address of Bishop Janes, so that he could get some return for these legacies. The only way that opened to him was to take the control of the spiritual administration of the church, and as he told Dr. Lord, inasmuch as he had given these two thousand dollars, he thought he ought to be accommodated. It is not quite certain but that he proposed another advantage to himself by this letter. He was at that time in difficulty with J. W. Crane. He was very indignant at him, as appears by his letters to J. T. Crane. He was pursuing him with lawsuits, attachments, and orders for sale of his property. Mrs. Tally was a connection of J. W. Crane, and he thought if he could get Mr. Tally at New Providence he would induce J. W. Crane to come to terms. Thus in his letter to J. T. Crane, under date of March 15th, 1852, he says, speaking of J. W. Crane, " he is very obstinate and will not give up one of your aunt's papers, although some of them do not concern him at all. He never as much as inquired about the health of your aunt but held himself at a distance. He must be of a different temper from an honest man—but so he is. I think he will hold on until all the property is spent in law. She has worked long and hard to save that little, and to have it wrenched out of her hand by one in whom she reposed so much confidence is truly hard and unnatural. I think should Mr. Tally come on here and go and see him he might

effect a settlement." He evidently wanted Mr. Tally to come to New Providence, so as to effect this settlement, and as he had given his wife a legacy of one thousand dollars, he thought he ought to be accommodated. But it may be asked why would he thus deceive the bishop. We do not know certainly that he meant to do so, for he never sent the letter. But suppose he had, that he intended to induce the action of the bishop by an untrue statement is patent upon the face of the letter, for he tells him he had given by his will this park property, worth twenty thousand dollars, to the seminary, which was every word of it untrue. But suppose this to have been true, what else could he do, if he wrote to the bishop at all making such a request? He could not say, as he said to Dr. Lord, he had been making a will, and given one thousand dollars to the church; that he had abandoned the Meeker Seminary; for these were the last things he wished to come to the ears of the people of New Providence and the devisees under the will of 1851: and besides, he had sagacity enough to see that the uncertain hope of a legacy would not be temptation enough to induce action on the part of the bishop. So, without saying he had made a new will, and left the church one thousand dollars, he holds out a greater temptation by promising immediate action, and not waiting for his executors to carry out his plans. The letter to Bishop Janes is precisely such a one as, knowing the testator's peculiarities and the existence of the will of 1852, we should expect him to write. He feared that, unless he should do something of the kind, he might die, and suffer the extreme injustice of getting no benefit from his own legacies. A point is made by the plaintiffs upon the evidence of Levi Clark, one of the plaintiffs' witnesses. Mr. Clark says, that after the 12th of January, the testator said to him he had left nothing to the church, and wished him to write a codicil for him to that effect; and hence it is argued that the testator never could have made the will of 1852. But the

slightest examination of Mr. Clark's evidence will show that this is only another instance of the testator's habitual dissimulation in regard to his wills. Mr. Clark says, that after the 12th of January, and it must also have been after the 12th of April, for it was after he wrote for Morrel to come up, he wanted to borrow one thousand dollars of the testator. But he declined to loan the money unless Mr. Clark would let the Methodist church have one hundred dollars out of it. If he had succeeded in this offer, he would have got back on the spot ten per cent. of the legacy to the church, and could again have altered his will at leisure, or he would have cleared the same amount by usury under pretence of devoting it to the church. Mr. Clark being an inhabitant of New Providence, it was of course necessary for the testator to conceal from him the will of 1852, abandoning the Meeker Seminary; so he keeps up with him the delusion in that respect and about not leaving anything to the church, but said he had written to Morrel to come up, and he would give fifteen hundred dollars if they would build such a one as he wished, and that Morrell would be a good man to go around and get the balance of the money. Mr. Clark suggested his building the church himself. He ther pleaded poverty, spoke of his poor relations and the Meeker blood, and his having devised ten thousand dollars to the seminary. Mr. Clark then suggested he might make a codicil giving the fifteen hundred dollars to the church. This immediately relieved the old gentleman from the dilemma into which his duplicity had betrayed him, and he forthwith fell into the suggestion of Mr. Clark. Yes, he would make a codicil leaving this fifteen hundred dollars to the church, and Mr. Clark ever after most faithfully until the old gentleman's death, followed up this suggestion of getting this codicil. But for some reason or other, the codicil, like a will o' the wisp, always eluded his grasp. Mr. Clark says, after I suggested the codicil, the testator wanted me to write it. He told him he would, and

agreed to go to the testator's house to do it. Now the testator knew that Mr. Clark was on bad terms with Mrs. Meeker, and that his house was the last place Mr. Clark cared about coming to. But still Mr. Clark, in his zeal for the church, agreed to come there to write the codicil. Some time afterwards the testator met him, and asked him why he had not been to write the codicil. Mr. Clark replied, that he had been past the testator's house two or three times, and had not seen him around; at one time he inquired, and they said he was sick; that he was not on good terms with his wife, and he did not like to go there. This was in April, and the testator spoke of it several times. At last, on the first of May, Mr. Clark ventures into the testator's house to draw the codicil, and the way he got in, as detailed by Mr. Clark, is not a little amusing. He says, I called there afterwards, about the 1st of May; at first I passed by because I did not see him; afterwards I saw him, when his buggy was being got up, and I saw him coming out of the gate; I told him I had called to write that codicil, if he wished it; he said he was glad I had come, for he wanted it attended to; but he said he was going to Esq. Little's, and he would attend to it when he got back. So Mr. Clark got in the buggy, and went with him to Mr. Little's. As they were riding along, the testator suggested the pleasant subject of Mr. Clark's misunderstanding with Mrs. Meeker, and said, if his wife and Mr. Clark had been on good terms he would like to make him an executor. Mr. Clark, however, did not see fit to take the hint, and after getting back from Little's, at last ventured into the house. After they got in, the first thing the testator did, by way of helping on the codicil, was to irritate his wife, and stir up the old feud between her and Mr. Clark. It is thus naively detailed by Mr. Clark: he spoke of the attachment against Joseph Crane (his wife's nephew, a sore subject with her), in her hearing, and wanted her to take my (Clark's) advice; she said nothing, and he got a little irri-

tated; nothing was said in that room about the codicil; we then went into the parlor and took a little brandy, and then we talked about the codicil; he said if Mrs. Meeker and I had been on good terms he would make me an executor. He wanted Mr. Clark so to draw the codicil, that of the fifteen hundred dollars he proposed to give the church, one thousand dollars of it should be his own money, and five hundred dollars of it Mrs. Meeker's. This rather puzzled Mr. Clark how to draw a will so as to enable the testator to dispose of another person's property. Mr. Clark says he wanted, in his codicil, to leave her a gift of five hundred dollars. Mr. Clark remarked to him he did not see how he could provide for that in his codicil. The testator replied he should make it so. Mr. Clark told him if he wanted her to give five hundred dollars he had better bring her in the room. He declined, and said he would postpone the subject and have a talk with her, and politely requested Mr. Clark to bother him no more about the codicil, by remarking, when they parted, that it was unpleasant to Mr. Clark to come to his house, and he would come to Mr. Clark's, which he took care never to do. Mr. Clark's zeal for the church still, however, prompted him to harrass the old gentleman about this codicil when he met him from home. He says he saw him again after that in the road, and he spoke about his not coming to his house about the codicil. They rode past the tavern. Mr. Clark invited him to go in and take a drink, but he declined, and went on. Afterwards again, when Mr. Clark was on a load of hay at Noe's blacksmith shop, he said to the testator, you did not come to see about the codicil. He said no, but he would call in a few days. But he took care never to call. If he had intended to make the codicil, why did he not do it? He was not a man to delay making a new will after he had once resolved on it. The true reading of this evidence is, Mr. Clark living in New Providence, he did not wish him to know he had made a new will leaving out the Meeker

Seminary, but yet, wanting to realize something for these two one thousand dollar legacies to the church and Tally in the will of 1852, he talked to Clark as he did to Cory and Stephen and Samuel Day, and in his letter to the bishop, that if he could get Morrel and Tally there he would give one thousand dollars to the church right away, and go at building it himself; and when Mr. Clark made the natural suggestion, that if he could not get them there, he could effect his beneficent design to the church by a codicil, it answered his purpose precisely. He professed his desire to so arrange it. He then concealed the making of the will of 1852, and professed to be anxious to do what appeared so reasonable to Mr. Clark, but yet with the intention of never making such a codicil, because he knew he had made that very provision for the church in his will of 1852.

But it is next said that the testator's affections were so strong toward his relations that he could never have intended to make this will of 1852. Besides this being very nearly as strong an argument against the will of 1851 as that of 1852, how stands the evidence?

The first witness examined on this point by the plaintiffs is Mr. Cory. Mr. Cory says, that upon one occasion he heard the testator say he meant to lick his wife like the devil, and take his money and go to England. This, it must be confessed, is not a very strong start in that direction. Mr. Cory also says, the testator always went high on the Meeker blood. Persons would say to him, Esq., you are rich, give me some of your property. The testator would reply, you are not of the blood, and I cannot give you anything. He also said his brother's children might not have any of the blood, but there could be no mistake about the sisters. The evidence on this point is somewhat accumulated. Thus when Samuel Wilcox said to him, I suppose you have given me nothing in your will, he said no—you have no Meeker blood in you. But Mr. Wilcox adds, I have heard him speak of his heirs as hardly

. worthy of his estate. Thus the plaintiffs have also proved, by Henry Low, that the testator was once complaining a)out his property. Mr. Low, said, if you have too much, give me some of it; he replied, I would, but unfortunately you have none of the Meeker blood in you. So Levi Clark, another of the plaintiffs' witnesses, says, when I asked him to build the church himself, he spoke of the seminary, and then of his poor relations; he spoke of the Meeker blood, and said he meant to give his property to his blood. When any one would say to him, you had better give me something, he would say, you are not of the Meeker blood. So that if he was solicited to give to a church in his lifetime, he excused himself by relating how much he was going to give to a seminary after he was dead. If alms were asked, his heart immediately yearned towards his poor relations. If impudence asked for a legacy he put himself upon the Meeker blood. Is it not very apparent that this resort to Meeker blood was only the old gentleman's way of getting clear of importunity and impertinence?

We have thus gone over the evidence upon the question, whether the testator intended to make such a will as that of 1852, and conclude that the evidence of the plaintiffs, when placed in its true relations, as well as that of the defendants, is corroborative of the Hoyt statements. Other suggestions are made going to its actual execution; but if the vital act be conceded, that the testator intended to make such a will as that of 1852, it cannot be fairly an open question that the scene of the evening of the 12th of January, as detailed by the Hoyts, was a reality, and not a fiction. But still the suggestions are pressed, and we have given them a careful consideration. Upon this branch of the case it is said, in the first place, that the signatures to the will of 1852 are forgeries.

We have upon this question, in the first place, five witnesses, who swear they saw them signed; and in the second place, several signatures of the testator, admitted

to be genuine, are submitted to our inspection. On comparison, I cannot say that it is impossible that those to the will may not be genuine. They look to me extremely like some that are admitted to be genuine. And in the third place, we have numerous other witnesses, pro and con, who express opinions as various as their feelings. On the part of the plaintiffs, Mr. Cory says, the signatures are smoother than I have seen him write lately; I should not think them his. Mr. Bonnell says, the signatures are in a better handwriting than his towards the latter part of his life; there is a resemblance, but I have some doubts about their being his. Stephen Day says, I doubt the signature; that it is not his. John T. Wilcox says, the signature I should take to be in a much better hand than I have seen him write in the latter part of his life, smoother and better, and that they are not his. Joseph C. Noe says, I should not think the signatures to be his. J. T. Crane says, I don't believe the signatures to be his. David Ball says, I think the will and signatures are in the same handwriting, and not the testator's; I think he did not write as good a hand as that for the last three or four years. Mr. Parsons says, the signature is very expertly done. Amos Potter says, my opinion is that the signatures are not his. Jotham Potter says, it does not appear to me that I should recognise the signature, it resembles it some. R. T. Crane says, I have my doubts about their being genuine. Mr. Linbury says, I should not take them to be his. Mr. Richards says, the signatures do not correspond with those I have seen him write. Gen. Runyon says, I do not think them genuine. James F. Meeker says, the signature does not appear perfectly natural to me; my firm conviction is that, if the testator ever did execute that will, he was under some hallucination of mind or deceived in the contents; the signatures slant a little more than any of late years I have seen; the whole signatures have an unnatural appearance. Mr. Valentine says, these signatures are in a smoother hand than I have

seen him write, or think he could. Mr. Pierson says, I don't think he ever wrote those names. Mr. Little says, I am satisfied in my own mind, so far as I can be from looking at and examining them, that they are not genuine. Levi Clark says, I think they are not his.

On the part of the defendants, Mr. Woodruff says, I believe the signatures to be his. Mr. Drake says, I believe them to be his. Mr. Harriott says the same thing. Mr. John H. Meeker, Mr. Hollingsworth, Mr. Low, Mr. Smith, Mr. Doremus, Mr. Douglass, and Mr. James H. Boylan express the same opinion. If we deduct from the plaintiffs' witnesses those who really express no opinion, we will find that those who thus express opinions pro and con are exactly equal, and so I think is, as nearly as may be, the weight of their respective testimony, and it can make no difference whether we put this evidence of handwriting in the scales or not.

But there is still in this question of signature a striking confirmation of the truth of the Hoyt statement. Several of the most intelligent witnesses of the plaintiffs put their doubts, as to the signatures, upon the ground that they were smoother and better than they had seen him write lately, or within the last three or four years of his life, and such, upon inspection, would appear to be the case. Now, is not this precisely what we would expect to see in the circumstances under which this will was executed? The testator was evidently familiar at Hoyts, and liked to visit there. The evidence of Mr. Valentine, one of the plaintiffs' witnesses, would show that. He probably received from Hoyt and the females, who were, if we are allowed to judge from their evidence, ladies in every sense of the term, a deference and respectful attention it was his fortune rarely to receive. He was universally voted a bore. Valentine and Bonnell refused to keep him company at $5 per day. Gen. Runyon charged him $10 an hour for letting him talk in his office. Even Kay, the landlord, congratulated himself, to use his own words, on

getting clear of that old customer. The old gentleman was not wanting in sagacity. He was quick to see outside things. The misfortune was he never looked into himself. He was conscious of this repugnance to his company, but could not divine the cause. Those ladies were too well bred to exhibit it. They were probably amused at his eccentricities, but as Mrs. O'Shannessy, one of the plaintiffs' witnesses, says, they said to her, we must not mind what an old gentleman should say, and treated him with the respect due to his age. The old gentleman was consequently fond of visiting there, enjoying a luxury there he very much valued, but received no where else, except from a devisee, a respectful audience. On the evening in question, when he came to sign the will, he had been peculiarly happy. He had for the whole evening enjoyed an interested audience. It had flowed in an uninterrupted current of enjoyment in explaining to them the subject he most delighted to converse upon, his property and the mode he meant to dispose of it, unbroken by any rude impatience of his auditors or any intruding spectre of lawyers' charges at the close. So agreeable an impression had their polite and considerate attention made upon him, that after he left, his imagination became so extravagant that he thought he had actually kissed them, and when he got home tried to make his old wife jealous by telling her so.

In this mood, the hero of the evening, he came to the final crowning solemn act of the signature to the will. He would naturally, under such circumstances and in such a presence, want to make no mean signature. Other witnesses besides the Hoyts say he prided himself upon his handwriting. Other writings before us show that he had been in the habit of writing a good deal, and been a good penman. He asked the ladies for pen and ink to write his name. They at first brought him steel pens. He was not going to risk his reputation with steel pens. He pushed them away, saying he had tried them before, and

could not use them, and his signatures of his later years, brought here by the plaintiffs, show upon their face the scraggy steel pen corroding for weeks in the turbid ink. He asked for a quill pen. It was the quill pen he had learned to write with in his youth, and had used generally through life, and with which he thought he could best demonstrate his good penmanship. They found a quill, but such was the change of habits, no penknife was to be found. The ladies thereupon brought their gold pens. The nature of their correspondence admitted of no turbid ink or harsh corroded iron pen. Their ink must be of the most fluid, and their gold pens of the smoothest and softest patents. He selected one, and dipped it in the fluid ink. But he was not yet ready to risk his reputation before the ladies by rashly venturing on the documentary signature. He gets another piece of paper, and tries the gold pen on it several times. It comes up to his expectations, and he then spreads the will out before him on the round table to sign it in a hand in sympathy with the importance of the occasion. After so halcyon an evening, in the happiest mood, with instruments and materials the most perfect of their kind, in the warm furnace-heated parlor, with the will spread out before him, with the lamp casting its bright light upon the white page, and conscious that faces still brighter were peering over his shoulders, he makes the signatures, and triumphantly contemplating his successful exploit, looking up, exclaims, "I can beat any of you." Elizabeth says, after he had tried the gold pen several times, he said he could write better than any of us. Mrs. Hoyt says, when the paper was executed, he said he could write better than any of them. Mary says, he tried several pens before he found one to suit him, and said he was a good writer, and could beat any of us. Would we not expect to see, as the plaintiffs' witnesses say, a signature smoother and better than they had seen him write lately? Who does not know the difference made in a signature even of young people, by

care, materials, and mood ? And such, so far as we can judge by comparison and inspection, is the signature in con- t versy, and accounts for the discrepancy in the opinions of the witnesses. The signatures bear upon their face the evidence of this care. Every letter and every ornamental touch has the full development of his more careful signa- tures. Every marginal signature carefully humors the creases of the papers. A question is made of the dot at the end of the middle marginal signature. But this was an easy thing to happen, as he contemplated for a moment his success in the signature, especially as he had just seen Miss Anna do the same thing.

There is another fact connected with the signatures which appears to me confirmatory of the Hoyt statement. They say that the testator came there that evening with the will prepared, and said that he had got it written in Newark or New York, and that after it was executed he put it in his pocket. They say nothing about its being folded. Yet, if what they say is true, it probably was folded before the signature. Upon inspecting the will, it is apparent that all three of the marginal signatures were carefully made with reference to the folds in the paper, as they now exist. This would not have happened unless they were there when the signatures were made precisely as they are now, so that when these marginal signatures were made, whoever made them, these half sheets compos- ing the will must have been fastened together at the top with the same black tape it is now, and they all folded to- gether mathematically exact, as they are at present. This is precisely what would happen if their statement was true, and extremely unlikely to happen if their statement was a fabrication.

The plaintiffs next suggest that the testator never in- tended to make the will of 1852, because when he left home on the evening of the 12th of January, he started to go to stay all night at Isaac Miller's, and not at Hoyt's. Mr. Bonnell and Mr. Valentine say, when he started, he

said he was going to Miller's to stay all night. When he started, he probably did intend, as he said, to stay at Miller's all night. He had been at Hoyt's a short time before, and found him not at home, and notwithstanding he had left word for him to do so, Hoyt had not come to see him at New Providence. This starting for Miller's looks to me, rather than otherwise, as if, when he started, he had the will in his pocket, and meant to execute it there that night. There is in the will of 1852, a legacy of five hundred dollars to Mr. Miller. Of all the persons connected with this will, the only one shown to have had the slightest intimacy or knowledge of Mr. Miller is the testator. He was not usually encouraged to stay all night where there was no expectation of a legacy, and where he did leave a legacy it was his custom to stay all night. He thought in such cases, as he said to Dr. Lord in regard to the one thousand dollar legacy to the church, he had been making a will giving Mr. Miller a legacy of five hundred dollars, and thought, when he went to Newark to sell his horses or on other business, that he ought to be accommodated. But after he got upon the road, the recollection of the agreeable society at Hoyt's, or a sense of the impropriety of executing a will at the house of the devisee, or a passing whim, undoubtedly induced him to change his mind, and drive to Hoyt's. The plaintiffs' suggestion, that after he started he lost his way, and got there by accident, is totally unwarranted by the evidence. He was perfectly familiar with the roads. They were perfectly plain, and the snow and moonlight must have made it anything but dark. His getting embarrassed in the trees, after he got there, was extremely likely to happen, as it was the first time he had driven there after the snow fell. But that he came there by design, and not by accident, is shown by everything he said and did after he got there. If he drove in there from confusion, the first thing he would have done, when O'Shannessy, the plaintiffs' witness, came to him, would have been to ask where he

was, to say he was lost, and having been put right, to go again on his way. Instead of that, the first thing he said was to ask if Hoyt was at home. He then orders his horses put up, prepares to stay for the night, and says not a single word to anybody about his having missed his way, ever at any time or to anybody. When riding by Hoyt's, some time afterwards, in company with Mr. Valentine, to whom he said on the 12th of January, when he started, that he was going to stay at Newark all night, he told Mr. Valentine that he did not go to Newark that night, but stayed at Hoyt's all night. Now if he had missed his way on the evening of the 12th, would he not have said so? The language he used to Mr. Valentine was that of one who had changed his mind after leaving him, and not of one who had missed his way, and staid at the wrong place by accident. So that taking the whole circumstance together, it shows, rather than otherwise, he came to Hoyt's that evening with the will of 1852 in his pocket. But it is said that Hoyt had the testator's note and a bill of sale for a cow, and he was so suspicious that Hoyt intended to perpetrate some fraud or forgery on him that all this going and staying at Hoyt's was to take up his own note and bill of sale. But this, in the first place, is negatived by the plaintiffs' own evidence, that when he left home on the evening of the 12th of January, he started to stay all night at Isaac Miller's. The principal fact upon which is founded the argument, that the only object of the testator's visit, on the 12th of January, to Hoyt's was to take up his own note and bill of sale, is the expression in his letter to Mr. Muir, dated December 27th, 1851, in which, after a long discourse about his lawsuit with J. W. Crane, he winds up by saying, if you leave your business by two o'clock this afternoon I want you to go with me by Hoyt's, and try to settle my business with him; don't fail and we will reward for your services. In the first place, this letter is before the final action of the city seizing the park. The letter is dated the

27th of December, 1851, and the city took final action on the 2d January. The testator, consequently, did not then yet know whether the contingency upon which he had threatened to make the will of 1852 would ever arise, and I do not see how his writing to Mr. Muir, on the 27th of December, about such small business, his attention to which was so characteristic, is any argument that after his feelings were so outraged, as all the evidence shows it was by the action of the city on the 2d of January, that his visit to Hoyts on the 12th of January must necessarily have been only about the trifling matter of the sale of a cow, and not of the matter which then absorbed all his feelings and all his passions, the making provision for defeating the triumph of the city in seizing what he considered his most valuable property for nothing.

But again, if he went to Hoyt's not to make a will, but to take up his own note for forty dollars and a bill of sale for a cow, why did he not take them up, or even speak about them? He staid all night, yet not a single word did he say about either. Not a single question is even put, upon cross-examination, to any of the Hoyts, if he did speak about them or not. But the facts show that the testator could not have gone to Hoyt's for any such purpose. About a year before, Hoyt had loaned the testator forty dollars, for which he took the testator's note, payable in a year, unintentionally without interest. This appears by the evidence of Hoyt and Johnson, on the part of the defendants, as well as by the evidence of Cory, Bonnell, Lewis, and Valentine, on the part of the plaintiffs. About November 5th, 1851, the testator had sold Hoyt a cow for twenty-seven dollars, and taken Hoyt's note for that sum, and given Hoyt a bill of sale for the cow. So that on the 12th of January, 1852, Hoyt held the testator's note for forty dollars for money lent, and the testator held Hoyt's note for $27 for the cow, and still held possession of the cow, Hoyt never having yet called and taken her away. Now he could not take up the bill

of sale and the note of Hoyt without bringing with him the note of twenty-seven dollars given to him by Hoyt. Yet he started from home to go to Isaac Miller's and in relation to selling his horses; he would consequently not have put the twenty-seven dollar note in his pocket, and the strong probability is that he had not that note with him at Hoyt's on the 12th of January. But again, if on the 12th he had offered to pay Hoyt his forty dollar note, and to deliver up the twenty-seven dollar note and take back the bill of sale, and Hoyt had refused to receive the money, would it not have satisfied the testator that the suspicions which it is sought to persuade us the testator had toward Hoyt were true, and would he not, on the spot and always after, to everybody and upon all occasions, have denounced Hoyt as contemplating a fraud and forgery upon him, and warned his legatees accordingly? Yet there is not a particle of evidence that the testator ever hinted such a thing to any human being; on the contrary, we find him going to Hoyt's a few days afterwards, as proved by Mr. Valentine, one of the plaintiff's witnesses, for the sole friendly purpose of advising him not to sell a couple of fat oxen before Washington's birthday.

That the testator could easily have arranged this business on the 12th of January with Hoyt, if he had wished to and came for that purpose, is further manifested by the fact, that a few days afterwards, *viz* the 28th of January, Hoyt came to his house with his $40 note, when the testator paid him the amount without interest, and gave up to Hoyt his $27 note and a receipt against the bill of sale. The reason the testator, when he sold the cow to Hoyt, took Hoyt's note for $27, instead of endorsing it on the $40 note he had given to Hoyt, was probably either because Hoyt had not the note then with him, or because the $27 note drew interest, while the note he had given to Hoyt for $40 borrowed money did not, and the reason why after the sale of the cow, when Hoyt did

not take her away, he wanted him to give up the bill of sale, was not because he was afraid of Hoyt's pecuniary responsibility, for that could not have been, for Hoyt at the very time held his note for $40 without interest, and all that was necessary for him was to endorse it on the note or take a receipt for it, but because, after the sale, he told other people who wanted to buy the cow that Hoyt had given him not $27, as the receipt shows it was, but $35 ; and he found he could get that sum for her, and that was the probable reason why, on the 27th of December, before the final action of the city about the park, he wanted, to give back to Hoyt his note for $27, and take up the bill of sale he had given him, but with his usual insincerity, when he had hopes of selling the cow for an advanced price, he pretended that he would not let Hoyt take her away without the cash, when Hoyt at the very time held his note for considerably more than the whole price. We are asked to believe that the testator entertained a strong suspicion of Hoyt on account of Hoyt's offering to loan him large sums of money, intending thereby to get his signatures so as to forge this will, and therefore the testator wanted to, and was very anxious to take up this $40 note. Not a particle of actual anxiety to take it up before Hoyt called on him at his own house with the note on the 28th of January is shown. There is no evidence to show that Hoyt did make any such large offers, except the testator's own declarations. Hoyt says, that when the park was under agitation, the testator talked about building it up to throw impediments in the way of the city. This looks natural. He had offered to give a lot to Johnson if he would build. He had seduced Boylan into actual building, and it was natural that he should talk about building himself, however little he really intended it. Hoyt says, he offered to loan him for that purpose $3000, belonging to his mother. Mr Cory, plaintiffs' witness, says, the testator told him Hoyt offered to loan him $80,000 without interest, but actually only loaned

him $40, while Mr. Bonnell says, the testator told him Hoyt offered to loan him a large sum of money, $50,000, $60,000 or may be as high as $80,000. Mr. Valentine says, testator told him Hoyt offered to loan him $80,000, while Mr. Lewis, another of the plaintiffs' witnesses, says, that the testator told him that Hoyt offered to lend him $200 or $300 that belonged to his mother; that he took a little of it, and gave him his note for it. So that Lewis, upon this point, precisely sustains Mr. Hoyt; and if the testator said to the other witnesses what they detail, it is only another instance of how little reliance is to be placed upon what the testator intends to do from what he says, and proves conclusively that any expression of suspicion towards Hoyt on account of any such offer of large loans was sheer pretence, and made to serve some purpose. But still it is suggested that Hoyt got the note of the testator, so as to have his signature to forge the will from. But why would he want it? If Hoyt forged the will, he must have been in conspiracy with Boylan, and Boylan, from the time he had been doing business for the testator, must have had a wheelbarrow load of them. We have a score of them exhibits in this very cause, given by Meeker to Boylan, signed to deeds, agreements, letters, and receipts. What earthly necessity was there for Hoyt, if he and Boylan were in conspiracy to forge this will, to go to all this trouble to get the testator's signature? But again, the only mode suggested by which Hoyt could have made the will of 1852 correspond, as it does, with the other wills and the family affairs of the testator, is by supposing that Hoyt had one of the other wills before him; but if he had, he must also have had the signatures of the testator on the margin of each half sheet.

But it is said, in the next place, that Hoyt must have written this will of 1852—first, because the body of the will and the testatum clause are in the same handwriting; and secondly, because the body of the will is in a strange handwriting, and Hoyt does not tell us who did write it.

As to the first point, by inspection, the handwriting of the body of the will and the testatum clause appear to be in a totally different handwriting. Hoyt denies it, and only one witness in the whole volume ventures on such a suggestion. As to the second point, that Hoyt does not tell who did draw it, if he and his family tell the truth, how could he? If the testator had the will drawn in New York, how could Hoyt tell us who drew it? The plaintiffs were much more likely to know who the testator consulted in New York than Hoyt; why don't they tell us? But it is said, that if anybody but Hoyt drew this will, the plaintiffs could have found who drew it; but if they had, would they tell us? But suppose they have not been able to discover who wrote the will, is that surprising? If Hoyt tells the truth, the testator intended they should not find out. He must have taken what he deemed sufficient means to effect his purpose. Is it wonderful that he should have succeeded? But it is said that the testator would not have gone to New York to get this will drawn. How do we know it? He was very eccentric. He was on the 2d of January wild, as some of the witnesses express it, with indignation at the city taking the park. He was very anxious that the people of New Providence should not know during his lifetime that he had changed his mind about the Meeker Seminary, as is proved by his acts as well as by the Hoyt family. He was in the habit of going to New York about that time. When his object was to make this will, and at the same time to conceal this feature in it from his neighbors, what so natural as to go from home to get it drawn, and to go to Hoyt's, eight miles from New Providence, to have it executed? But it is said, if anybody but Hoyt drew it, he would come forward and avow it. But this might not happen, for a great many reasons. In the first place, he perhaps imposed secrecy. In the next place, the one who drew it would most probably be some friend of the family, and then he would intentionally keep in the back ground, or if he was not,

if he was a stranger to the family, he would most probably never hear of the matter again, or he might have moved away or died, or he might, when he saw that popular opinion was so intense against this will, fixing upon every one connected with it the imputations of forgery and fraud, have intentionally kept silent from regard to the peace and reputation of himself and family.

But suppose, as is alleged by the plaintiffs, Hoyt did in fact draw this will, I do not see how it affects the case. Our whole argument has supposed that Hoyt was not to be believed. If you take the plaintiffs' evidence about Hoyt as true, it only shows that he was a man who would be very likely to tell an untruth when the truth would serve him better. Suppose Hoyt drew the will, does it make it any the more probable that the evening scene described by the ladies was a fiction? Does not still the broad fact remain, that the testator did, on the evening in question, read and comment on this will, whoever drew it, and sign and execute it? Does it render it less probable that he did declare, before the 2d of January, 1852, that if the city did seize his property for a park that he would make such a will; or that the numerous witnesses, who testify that, after the 12th of January, he declared he had made such a will, are all either perjured or mistaken? I do not see how, if we admit that Hoyt drew this will, it diminishes in any appreciable degree the immense mass of other evidence in favor of its being actually read, commented on, adopted, and executed by the testator. But it is said, in the next place, that Hoyt must have written this will, because of the alterations in the words Cottage and A. C. M. in the will. But as we have said before, suppose that he did write it, it does not at all prove that he forged it. But how do these alterations prove that Hoyt wrote the will? First, as to the alteration in the word Cottage street. In the will it was originally written Corten street, and changed to the word Cottage street, which is the true name of the street. If Hoyt had written

the will, is that a kind of mistake that he would have made? Whoever wrote the will of 1852 must either have been dictated to by the testator, or had one of the testator's former wills before him. If Hoyt wrote it from the former wills, he could not have made this mistake, for they all have it Cottage street plain enough. Hoyt had been to Newark and examined the property, upon a proposition to make a trade respecting it. He would likely know the name of the street, or if he did not would consult his coconspirator, Boylan, before he put in the name. But if the testator dictated the will to a stranger in Newark, we can understand how he might mistake the name, and so as regards the name of Gen. Pennington. If the testator was dictating to a stranger, he would be very certain to confound A. C. M. with Asa M. Pennington. But how could the coconspirators, Hoyt and Boylan, make such a mistake, when it appears that Boylan must have been as familiar with Gen. Pennington's name almost as he was with his own, and Hoyt himself informed of it by Chancellor Williamson long before the will was drawn. Gen. Runyon says that the letters A. C. were originally in the will Asa. I have no doubt it was so, at the same time I must confess it is beyond my power of inspection to make it out. So far as I can see, it was originally A. C. M. But suppose these to be alterations, and beyond all doubt made by Hoyt, what does it prove? The conversation of Hoyt with Chancellor Williamson had reference not to a forged, but to a genuine will. It was a genuine will that he wanted to know how to execute correctly. It is evident that no forged will was then running in his head. Now the very fact of the alteration is a presumption of its genuineness. When the body of a paper is genuine there may be an object in forgery by an altera tion because the original cannot be restored, but when the whole instrument is a fabrication and forgery, where is the object of an alteration? There is no necessity of it. A new original is more easily made. Who ever heard of

forgery by alteration upon an instrument that was all a forgery? Would these co-conspirators, Hoyt and Boylan, have gone to all this trouble to get up and carry through this complicated scheme of forgery and perjury, and yet, when they discover this mistake in their names, have not taken the trouble to copy over again this half sheet, which would have avoided this whole difficulty? But this whole inference against Hoyt is drawn from his remark to Chancellor Williamson, which yet bears upon its face evidence that he had reference to a genuine, and not a forged will. But this mistake in the name of Gen. Pennington, if mistake it was, was one very likely to be made by the testator himself in dictating this will. The person of all others, as the evidence shows, that was running in his head was Asa Whitehead, and under such circumstances nothing was more likely to happen than for the testator, by accident, to say Asa M. for A. C. M. Pennington, or at any rate to be so understood by a stranger to whom he was dictating. Again, it is suggested that the will of 1852 is not genuine, because it wants the prolixity of the testator's former wills, and its not being altered or interlined by him. This might be owing to the person who drew the will, and it might also be owing to the excited state of feeling into which the testator was thrown by the action of the city on the 2d of January. His feeling against the city was a very different one from that in favor of the poor male children of other people, or that towards his nephews, for whom the evidence shows he had no real affection. His hatred for this outrage by the city swallowed up every other emotion, and it is the natural tendency of intense passion to shorten and concentrate.

The only other suggestion against the genuineness of this will, that I remember, arises upon its envelope. It is endorsed in Hoyt's handwriting.

"Jona. M. Meeker's will, of New Providence, Essex

2 b*

county, New Jersey. Not to be opened until ten days ʊˮter my decease.

J. Edwards Hoyt."

The will of 1834, drawn by Mr. Whitehead, was put up in a similar envelope, and endorsed by him thus :

" Left in the hands of Asa Whitehead, to be opened after my decease. June 27th, 1834.

Jona. M. Meeker."

The only difference between the two is that the one of 1852 delays the opening for ten days after the decease, and is signed by Mr. Hoyt instead of the testator.

Hoyt's account of this is, that the testator asked him to put it in an envelope, and that he accordingly put it up and sealed it in this exhibit. He then wrote it with a pencil, and asked me to write on it " Jona. M. Meeker's will, of New Providence, New Jersey. Not to be opened until ten days after my decease," and asked him to put his signature under it. He at first refused, but the testator insisting, he finally did it, as the shortest way to get rid of him ; that the reason the testator gave for wishing the will not opened until days after his death was, that the New Providence people would be very much disappointed about the dropping of the Meeker Seminary, and it would be a very uncomfortable home for him if they knew he had changed his mind ; and as he had also given Boylan a considerable sum, the heirs would very likely contest the will if they knew of it, and file a *caveat* before the ten days were out after his decease, and it would probably save a great expense, he said, to have the will proved before a *caveat* was filed, and it was his wish to have that course taken with it.

This is urged as being so unnatural and eccentric that it is strong proof that this whole statement of the Hoyt family is a fabrication. It does not strike me at all in that light. It appears to me to be entirely in unison with the testator's character, and the evidence of the Hoyt family. Two feelings appear to have dictated this provision of ten

days. First, as he did not wish the people of New Providence to know about his change in the Meeker Seminary during his life, so, as was natural, he did not wish them to know it for a few days after his death. He had an instinctive dread that the curses of the people of New Providence, for having trifled with them so long about this great Meeker Seminary, would break out at his funeral, and follow his hearse to the grave. The other was a sentiment of economy, like that which induced him to save his new horse blankets for the night after he thought he had sold his horses. He wished to save the expense of a litigation consequent upon a *caveat.*

We have a very striking instance of this same thing in the will of 1848. This was also enclosed in an envelope. Upon the envelope is endorsed, in the testator's handwriting, the following words : " I would advise some one of my executors to draft a copy of this, my will, before they take the same to the surrogate, for an instruction to be governed by, as a copy will cost several dollars." Now is not this an endorsement of precisely the same character as the one of 1852 ? If he would make such an endorsement to save the expense of a copy, would he not much more do so to save the expense of proving it under a *caveat ?* The thought is characteristic of the testator. Both endorsements are evidently children of the same parent. The result has shown very clearly that his fear of expense upon a *caveat* was not without foundation. It is next urged that Hoyt, and not the testator, signing this endorsement is very suspicious. Hoyt said he did it at the request of the testator, as the shortest way to get rid of him. This appears to me very natural. Why he should do it for any other reason does not appear. He could much more easily forge the testator's name to the envelope than the will. We can conceive why the testator should request it. His signing it himself would not bind Hoyt to keep the injunction. He wanted to bind Hoyt to it by his own signature. And in this he succeeded, for Hoyt faithfully kept his pro-

mise.    The incongruity of Hoyt's signing it did not strike him ; what he wanted was Hoyt's substantial promise, under his signature, to respect the injunction not to open the envelope until ten days after his decease.    The suggestion that Hoyt imposed his company upon the testator is not supported by the evidence.    His interview with the assessor in Newark is explained.    The will disposes of all the property, wherever situated, or its language is such that it is evident the testator thought so.

We have thus gone over the evidence upon the question whether the will of 1852 is the true will of the testator. These questions, as to the endorsement on this envelope, as to the handwriting, as to who drew the will, as to the erasures in the names of Gen. Pennington and Cottage street, would be entitled to very great consideration if the ques tion rested only upon the formal execution of the will. But this case rests upon no such narrow basis.    It rests upon broad masses of evidence of the intention of the testator to execute such a will, evidence which, by its very nature and its volume, excludes all suspicion of mental incapacity, undue influence, hallucination, imposition, substitution, forgery, perjury or fraud.

There is in fact no evidence against this will.    The evidence of the plaintiffs, brought from different places, at different times, given by different persons, when placed in its true relation, fits unexpectedly into that of the defendants like counterparts of the same indenture.    No apology is necessary for the jury for coming to the result they did. In their situation, we might have done the same.    If we have come to a truer result, it is because we have had advantages which the jury had not.    We have had the printed evidence before us, with time and opportunity to collate, reflect, compare.

It is asked, if the court set aside a verdict upon the weight of the evidence, where is the use of a jury.    The question is answered best by asking another, if the jury can find against any amount of evidence, where is the use

of the court. The jury would in such cases be judges of law as well as of fact in civil as well as in criminal cases. The jury, when they find against the clear weight of the evidence, find not fact, but decide law. The presumption is that they so find not because they believe the fact to be so, but because they think the law ought to be otherwise.

We have reviewed this cause at such great length not because of its great difficulty, but only in respect to the high tribunals who have come to a different result, and in the hopes of saving future litigation upon this will.

Let the verdict be set aside, and a new trial granted.

GREEN, C. J. concurred.

NOTE. The following statement relative to this suit was furnished to the reporter by one of the counsel in the cause, but was received too late for insertion in its proper place.—REP.

This action was originally commenced in the Circuit Court for Essex county, by the plaintiffs claiming various undivided interests, as tenants in common, in certain real estate situate in the city of Newark, against the defendant, Boylan, the occupant of the premises. On the return of the summons, in May, 1856, Samuel W. Turner, the other defendant, was admitted to defend as landlord, and having entered his appearance, presented a petition for the removal of the cause into the Circuit Court of the United States for the District of New Jersey, on the ground of his being a citizen of Ohio, and the real party in interest, Boylan being merely tenant under him. It appeared, however, by the petition, that one of the plaintiffs was also a citizen of Ohio, and two other citizens of Connecticut; and although it was contended that they were tenants in common, and not necessarily joined in the action with the other plaintiffs, who were citizens of New Jersey, yet the court refused to allow the removal of the cause as to any of the plaintiffs—first, because the plain-

tiffs were properly, if not necessarily, joined as parties ; secondly, because Boylan, though a mere tenant, was, by our late sttaute, a necessary party ; and therefore inasmuch as some of the plaintiffs were not citizens of the state where the action was brought, and also as one of the defendants was not a citizen of a different state, the case did not come within the act of congress providing for the removal of actions. The matter was carried before Justice Grier, in the Circuit Court of the United States, on a motion for a *mandamus*, and he refused the writ on the latter ground taken by the county court, there being a Pennsylvania case-of similar purport.

The defendants then removed the cause into the Supreme Court by *habeas corpus*, and it went down to the Essex Circuit for trial, before Justice Haines, in October, 1858. A verdict being taken for the plaintiffs, a rule to show cause why the same should not be set aside, and a new trial had, was granted in the following November term of this court, and was argued in June term, 1859.

*See same case*, 2 *McCar*, 310 ; Cited *in Otterson* v. *Hofford*, 7 *Vr*. 131; *Lynch* v. *Clements*, 9 *C. E. Gr.* 438 ; *Cadmus* v. *Vreeland*. 1 *Stew.* 359.